EXHIBIT A

Association of Ship Brokers
& Agents (U.S.A.), Inc.

October 1977

**COPY**

CODE WORD FOR THIS
CHARTER PARTY:

**ASBATANKVOY**

## PETRIAN SHIPBROKERS LIMITED

# TANKER VOYAGE CHARTER PARTY

**PREAMBLE**

LONDON         21st October 1995

Place        Date

IT IS THIS DAY AGREED between   SPRINGSEA MARITIME CORPORATION

~~chartered owner~~/owner (hereinafter called the "Owner") of the   Greek flag

SS/MS   VENTURE             (hereinafter called the "Vessel")

and   INTERNATIONAL OIL OVERSEAS INC.        (hereinafter called the "Charterer")

that the transportation herein provided for will be performed subject to the terms and conditions of this Charter Party, which includes this Preamble and Part I and Part II. In the event of a conflict, the provisions of Part I will prevail over those contained in Part II.

**PART I**

A.   Description and Position of Vessel:

    Deadweight: 82,212 metric tons ~~(2240 lbs.)~~     Classed: Det Norske Veritas

    Loaded draft of Vessel on assigned summer freeboard 14.63 metres ~~ft.~~ ~~in.~~ in salt water.

    Capacity for cargo: 97,035.6 cubic metres at 98 percent ~~tons (of 2240 lbs. each)~~ ~~% more or less, Vessel's option.~~

    Coated:   ☐ Yes    ☒ No

    Coiled:   ☒ Yes    ☐ No     Last ~~two~~ three cargoes:   Crude Oil

    Now:   Spot Fujairah     Expected Ready:   30th October 1995

B.   Laydays:

    Commencing: 0100 30th October 1995   Cancelling:   2400 30th October 1995

C.   Loading Port(s)   On safe berth/port RAS TANURA

                               Charterer's Option

D.   Discharging Port(s):   One safe ship to ship transfer off FUJAIRAH

                               Charterer's Option

E.   Cargo:   About 36,000 metric tons one grade No Heat Crude

                               Charterer's Option

F.   Freight Rate:   Lumpsum US$122,500.00 basis one load/one discharge   per ton (of 2240 lbs. each).

G.   Freight Payable to:   See Special Provision 1.        at

POLEMBROS SHIP

H.   **Total Laytime in Running Hours:**

   96 hours

I.   **Demurrage per day:**   US$13,000.00 per day or pro rata

J.   **Commission of**      **% is payable by Owner to**   See Special Provision 5.

   **on the actual amount freight, when and as freight is paid.**

K.   The place of General Average and arbitration proceedings to be London/New York (strike out one). — English Law.

L.   **Tovalop:** Owner warrants vessel to be a member of TOVALOP scheme and will be so maintained throughout duration of this charter.

                                   (as attached)

M.   **Special Provisions:**

   Special Provisions Nos 1 to 6 as attached are deemed incorporated in this Charter Party.

   IN WITNESS WHEREOF, the parties have caused this Charter, consisting of a Preamble, Parts I and II, to be executed in duplicate as of the day and year first above written.

Witness the signature of:                      _____

                              By: _____

Witness the Signature of:                      _____

                              By: _____

POLEMBROS SHIP

# PART II

1. **WARRANTY—VOYAGE—CARGO.** The Vessel, classed as specified in Part I hereof, and to be so maintained during the currency of this Charter, shall, with all convenient dispatch, proceed as ordered to Loading Port(s) named in accordance with Clause 4 hereof, or as near thereunto as she may safely get (always afloat), and being seaworthy, and having all pipes, pumps and heater coils in good working order, and being in every respect fitted for the voyage, so far as the foregoing conditions can be attained by the exercise of due diligence, perils of the sea and any other cause of whatsoever kind beyond the Owner's and/or Master's control excepted, shall load (always afloat) from the factors of the Charterer a full and complete cargo of petroleum and/or its products in bulk, not exceeding what she can reasonably stow and carry over and above her bunker fuel, consumable stores, boiler feed, culinary and drinking water, and complement and their effects (sufficient space to be left in the tanks to provide for the expansion of the cargo), and being so loaded shall forthwith proceed, as ordered on signing Bills of Lading, direct to the Discharging Port(s), or so near thereunto as she may safely get (always afloat), and deliver said cargo. If, heating of the cargo is requested by the Charterer, the Owner shall exercise due diligence to maintain the temperatures requested.

2. **FREIGHT.** Freight shall be at the rate stipulated in Part I and shall be computed on intake quantity (except deadfreight as per Clause 3) as shown on the Inspector's Certificate of Inspection. Payment of freight shall be made by Charterer without discount upon delivery of cargo at destination. Any disbursements or advances made to the Master or Owner's agents at ports of loading and/or discharge and cost of insurance thereon. No deduction of freight shall be made by water and/or sediment contained in the cargo. The determination of the Petroleum Inspector shall be arranged and paid for by the Charterer who shall furnish the Owner with a copy of the Inspector's Certificate.

3. **DEADFREIGHT.** Should the Charterer fail to supply a full cargo, the Vessel may, at the Master's option, and shall, upon request of the Charterer, proceed on her voyage, provided that the tanks in which cargo is loaded are sufficiently filled to put her in seaworthy condition In that event, however, deadfreight shall be paid at the rate specified in Part I hereof on the difference between the intake quantity and the quantity the Vessel would have carried if loaded to her minimum permissible freeboard for the voyage.

4. **NAMING LOADING AND DISCHARGE PORTS**

(a) The Charterer shall name the loading port or ports at least twenty-four (24) hours prior to the Vessel's readiness to sail from the last previous port of discharge, or from bunkering port for the voyage, or upon signing this Charter if the Vessel has already sailed. However, Charterer shall have the option of ordering the Vessel to the following destinations for wireless orders:

On a voyage to a port or ports in:

| | |
|---|---|
| ST. KITTS | Caribbean or U.S. Gulf loading port(s) |
| PORT SAID | Eastern Mediterranean or Persian Gulf loading port(s) |
| | (from ports west of Port Said.) |

(b) If lawful and consistent with Part I and with the Bills of Lading, the Charterer shall have the option of nominating a discharging port or ports by radio to the Master on or before the Vessel's arrival at or off the following places:

| Place | On a voyage to a port or ports in: |
|---|---|
| LAND'S END | United Kingdom/Continent (Bordeaux/Hamburg range) |
| | or Scandinavia (including Denmark) |
| SUEZ | Mediterranean (from Persian Gulf) |
| GIBRALTAR | Mediterranean (from Western Hemisphere) |

(c) Any extra expense incurred in connection with any change in loading or discharging ports (as named) shall be paid for by the Charterer and any time thereby lost to the Vessel shall count as used laytime.

5. **LAYDAYS.** Laytime shall not commence before the date stipulated in Part I, except with the Charterer's sanction. Should the Vessel not be ready to load by 4:00 o'clock P.M. (local time) on the cancelling date stipulated in Part I, the Charterer shall have the option of cancelling this Charter by giving Owner notice of such cancellation within twenty-four (24) hours after such cancellation date; otherwise this Charter to remain in full force and effect

6. **NOTICE OF READINESS.** Upon arrival at customary anchorage at each port of loading or discharge, the Master or his agent shall give the Charterer or his agent notice by letter, telegraph, wireless or telephone that the Vessel is ready to load or discharge cargo, berth or no berth, and laytime, as hereinafter provided, shall commence upon the expiration of six (6) hours after receipt of such notice, or upon the Vessel's arrival in berth (i.e., finished mooring when at a sealoading or discharging terminal and all fast when loading or discharging alongside a wharf), whichever first occurs. However, where delay is caused to Vessel getting into berth after giving notice of readiness for any reason over which Charterer has no control, such delay shall not count as used laytime.

7. **HOURS FOR LOADING AND DISCHARGING.** The number of running hours specified as laytime in Part I shall be permitted the Charterer as laytime for loading and discharging cargo; but any delay due to the Vessel's condition or breakdown or inability of the Vessel's facilities to load or discharge cargo within the time allowed shall not count as used laytime. If regulations of the Owner or port authorities prohibit loading or discharging of the cargo at night, time so lost shall not count as used laytime; if the Charterer, shipper or consignee prohibits loading or discharging at night, time so lost shall count as used laytime. Time consumed by the vessel in moving from loading or discharge port anchorage to her loading or discharge berth, discharging ballast water or slops, will not count as used laytime.

8. **DEMURRAGE.** Charterer shall pay demurrage per running hour and pro rata for a part thereof at the rate specified in Part I for all time that loading and discharging and used laytime as elsewhere herein provided exceeds the allowed laytime elsewhere herein specified. If, however, demurrage shall be incurred at ports of loading and/or discharge by reason of fire, explosion, storm or by a strike, lockout, stoppage or restraint of labor or by breakdown of machinery or equipment in or about the plant of the Charterer, supplier, shipper or consignee of the cargo, the rate of demurrage shall be reduced one-half of the amount stated in Part I per running hour or pro rata for part of an hour for demurrage so incurred. The Charterer shall not be liable for any demurrage for delay caused by strike, lockout, stoppage or restraint of labor for Master, officers and crew of the Vessel or tugboats or pilots.

9. **SAFE BERTHING—SHIFTING.** The vessel shall load and discharge at any safe place or wharf, or alongside Vessels or lighters reachable on her arrival, which shall be designated and procured by the Charterer, provided the Vessel can proceed thereto, lie at, and depart therefrom always safely afloat, any lighterage being at the expense, risk and peril of the Charterer The Charterer shall have the right of shifting the Vessel at ports of loading and/or discharge from one safe berth to another on payment of all towage and pilotage shifting to next berth, charges for running lines on arrival at and leaving that berth, additional agency charges and expense, customs overtime and fines, and any other extra port charges or port expenses incurred by reason of using more than one berth, Time consumed on account of shifting shall count as used laytime except as otherwise provided in Clause 15

10. **PUMPING IN AND OUT.** The cargo shall be pumped into the Vessel at the expense, risk and peril of the Charterer, and shall be pumped out of the Vessel at the expense of the Vessel, but at the risk and peril of the Vessel only so far as the Vessel's permanent hose connections, where delivery of the cargo shall be taken by the Charterer or its consignee. If required by Charterer, Vessel after discharging is at clear shore pipe lines of cargo by pumping water through them and time consumed for this purpose shall apply against allowed laytime. The Vessel shall supply her pumps and the necessary power for discharging in all ports, as well as necessary hands. However, should the Vessel be prevented from supplying such power by reason of regulations prohibiting time on board, the Charterer or consignee shall supply, at its expense, all power necessary for discharging as well as loading, but the Owner shall pay for such power to the Vessel for other purposes. If cargo is loaded from lighters, the Vessel shall furnish steam at Charterer's expense for pumping cargo into its Vessel, if requested by the Charterer, providing the Vessel has facilities for generating steam and is permitted to have fires on board. All overtime of officers and crew incurred in loading and discharging shall be for account of the Vessel.

11. **HOSES; MOORING AT SEA TERMINALS.** Hoses for loading and discharging shall be furnished by the Charterer and shall be connected and disconnected by the Charterer, or, at the option of the Owner, by the Vessel at the Charterer's risk and expense. Laytime shall continue until the hoses have been disconnected. When Vessel loads or discharges at a sea terminal, the Vessel shall be properly equipped at Owner's expense for loading or discharging at such place, including suitable ground tackle, mooring lines and equipment for handling submarine hoses.

12. **DUES—TAXES—WHARFAGE.** The Charterer shall pay all taxes, dues and other charges on the cargo, including but not limited to Customs overtime on the cargo, Venezuelan Habilitation Tax, C I M Taxes at Le Havre and Portuguese Imposto de Comercio Maritimo The Charterer shall also pay all taxes on freight at loading or discharging ports and any unusual taxes, assessments and governmental charges which are not presently in effect but which may be imposed in the future on the Vessel or freight. The Owner shall pay all dues and other charges on the Vessel (whether or not such dues or charges are assessed on the basis of quantity of cargo) including but not limited to French duties de quai and Spanish derramas taxes The Vessel shall be free of charges for the use of any wharf, dock, place or mooring facility arranged by the Charterer for the purpose of loading or discharging cargo; however, the Owner shall be re-

or barratry of the Master, pilots, mariners or other servants of the Owner in the navigation or management of the Vessel; fire, unless caused by the personal design or neglect of the Owner; collision, stranding or peril, danger or accident of the sea or other navigable waters, saving or attempting to save life or property; wastage in weight or bulk, or any other loss or damage arising from inherent defect, quality or vice of the cargo; any act or omission of the Charterer or Owner, shipper or consignee of the cargo, their agents or representatives; insufficiency of packing, insufficiency or inadequacy of marks; explosion, bursting of boilers, breakage of shafts, or any latent defect in hull, equipment or machinery, unseaworthiness of the Vessel unless caused by want of due diligence on the part of the Owner to make the Vessel seaworthy or to have her properly manned, equipped and supplied; or from any other cause of whatsoever kind arising without the actual fault of privity of the Owner And neither the Vessel nor Master or Owner, nor the Charterer, shall, unless otherwise in this Charter expressly provided, be responsible for any loss of damage or delay or failure in performing hereunder, arising or resulting from:—Act or God, act of war, perils of the seas, act of public enemies, pirates or assailing thieves, arrest or restraint of princes, rulers or people; or seizure under legal process provided bond is promptly furnished to release the Vessel or cargo; strike or lockout or stoppage or restraint of labor from whatever cause, either partial or general; or riot or civil commotion.

20. **ISSUANCE AND TERMS OF BILLS OF LADING**

(a) The Master shall, upon request, sign Bills of Lading in the form appearing below for all cargo shipped but without prejudice to the rights of the Owner and Charterer under the terms of this Charter The Master shall not be required to sign Bills of Lading for any port which, the Vessel cannot enter, remain at and leave in safety and always afloat nor for any blockaded port

(b) The carriage of cargo under this Charter Party and under all Bills of Lading issued for the cargo shall be subject to the statutory provisions and other terms set forth or specified in sub-paragraphs (i) through (vii) of this clause and such terms shall be incorporated verbatim or be deemed incorporated by the reference in any such Bill of Lading. In such sub-paragraphs and in any Act referred to therein, the word "carrier" shall include the Owner and the Chartered Owner of the Vessel

(i) **CLAUSE PARAMOUNT.** This Bill of Lading shall have effect subject to the provisions of the Carriage of Goods by Sea Acts of the United States, approved April 16, 1936, except that if this Bill of Lading is issued at a place where any other Act, ordinance or legislation gives statutory effect to the International Convention for the Unification of Certain Rules relating to Bills of Lading at Brussels, August 1924, then this Bill of Lading shall have effect, subject to the provisions of such Act, ordinance or legislation. The applicable Act, ordinance or legislation (hereinafter called the "Act") shall be deemed to be incorporated herein and nothing herein contained shall be deemed a surrender by the Owner of any of its rights or immunities or an increase of any of its responsibilities or liabilities under the Act. If any term of this Bill of Lading be repugnant to the Act to any extent, such term shall be void to the extent but no further

(ii) **JASON CLAUSE.** In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Owner is not responsible, by statute, contract or otherwise, the cargo shippers, consignees or owners of the cargo shall contribute with the Owner in General Average to the payment of any sacrifices, losses or expenses of a General Average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo If a salving ship is owned or operated by the Owner, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the Owner or his agents may deem sufficient to cover the estimated contribution of the cargo and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the cargo to the carrier before delivery.

(iii) **GENERAL AVERAGE.** General Average shall be adjusted, stated and settled according to York/Antwerp Rules 1950 and, as to matters not provided for by these rules, according to the laws and usages at the port of New York or at the port of London, whichever place is specified in Part I of this Charter. If a General Average statement is required, it shall be prepared at such port or place in the United States or United Kingdom, whichever country is specified in Part I of this Charter, as may be selected by the Owner, unless otherwise mutually agreed, by an Adjuster appointed by the Owner and approved by the Charterer. Such Adjuster shall attend to the settlement and the collection of the General Average, subject to customary charges. General Average Agreements and/or security shall be furnished by Owner and/or Charterer, and/or Owner and/or Consignee of cargo, if requested. Any cash deposit being made as security to pay General Average and/or salvage shall be remitted to the Average Adjuster and shall be held by him at his risk in a special account in a duly authorized and licensed bank at the place where the General Average statement is prepared.

(iv) **BOTH TO BLAME.** If the Vessel comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servant of the Owner in the navigation or in the management of the Vessel, the owners of the cargo carried hereunder shall indemnify the Owner against all loss or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owner of said cargo, paid or payable by the other or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or Owner. The foregoing provisions shall also apply where the owners, operators or those in charge of any ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect of a collision or contact.

(v) **LIMITATION OF LIABILITY.** Any provision of this Charter to the contrary notwithstanding, the Owner shall have the benefit of all limitations of, and exemptions from, liability accorded to the owner or chartered owner of vessels by any statute or rule of law for the time being in force.

21. **WAR RISKS.** (a) If any port of loading or of discharge named in this Charter Party or to which the Vessel may properly be ordered pursuant to the terms of the Bills of Lading be blockaded, or

(b) If owing to any war, hostilities, warlike operations, civil war, civil commotions, revolutions or the operation of international law (a) entry to any such port of loading or of discharge or the loading or discharging of cargo at any such port be considered by the Master or Owners in his or their discretion dangerous or prohibited or (b) it be considered by the Master or Owners in his or their discretion dangerous or impossible for the Vessel to reach any such port of loading or discharge—the Charterers shall have the right to order the cargo or such part of it as may be affected to be loaded or discharged at any other safe port of loading or of discharge (whether covered by this Charter or not) as may be ordered by the Charterers within the range of loading or discharging ports respectively established under the provisions of the Charter Party (provided such other port is not blockaded or that entry thereto or loading or discharge of cargo thereat is not in the Master's or Owner's discretion dangerous or prohibited). If in respect of a port of discharge no orders be received from the Charterers within 48 hours after they or their agents have received from the Owners a request for the nomination of a substitute port, the Owners shall then be at liberty to discharge the cargo at any safe port which they or the Master may in their or his discretion decide on (whether within the range of discharging ports established under the provisions of the Charter Party or not) and such discharge shall be deemed to be due fulfillment of the contract or contracts of affreightment so far as cargo so discharged is concerned. In the event of the cargo being loaded or discharged at any such other port within the respective range of loading or discharging ports established under the provisions of the Charter Party, the Charter Party shall be read in respect of freight and all other conditions whatsoever as if the voyage performed were that originally designated. In the event, however, that the Vessel discharges the cargo at a port outside the range of discharging ports established under the provisions of the Charter Party, freight shall be paid as for the voyage originally designated and all extra expenses involved in reaching the actual port of discharge and or discharging the cargo thereat shall be paid by the Charterers or Cargo Owners In the latter event the Owners shall have a lien on the cargo for all such extra expenses.

(c) The Vessel shall have liberty to comply with any directions or recommendations as to departure, arrival, routes, ports of call, stoppages, destinations, zones, waters, delivery or in any otherwise whatsoever given by the government of the nations under whose flag the Vessel sails or any other government or local authority including any de facto government or local authority or by any person or body acting or purporting to act as or with the authority of any such government or authority or by any committee or person having under the terms of the war risks insurance on the vessel the right to give any such directions or recommendations. If by reason of or in compliance with any such directions or recommendations, anything is done or is not done such shall not be deemed a deviation.

If by reason of or in compliance with any such direction or recommendation the Vessel does not proceed to the port or ports of discharge originally designated or to which she may have been ordered pursuant to the terms of the Bills of Lading, the Vessel may proceed to any safe port of discharge which the Master or Owners in his or their discretion may decide on and there discharge the cargo. Such discharge shall be deemed to be due fulfillment of the contract or contracts of affreightment and the Owners shall be entitled to freight as if discharge has been effected at the port or ports originally designated or to which the vessel may have been ordered pursuant to the terms of the Bills of Lading. All extra expenses involved in reaching and discharging the cargo at any such other port of discharge shall be paid by the Charterers and/or Cargo Owners and the Owners shall have a lien on the cargo for freight and all such expenses

(vii) **DEVIATION CLAUSE.** The Vessel shall have liberty to call at any port or ports in any order, to sail with or without pilots, to tow or to be towed, to go to the assistance of vessels in distress, to deviate for the purpose of saving life or property or of landing any ill or injured person

**VENTURE - Charter Party dated 21st October 1995**
**Special Provisions - Page 1.**

1.  With reference to Clause G - Freight payable in US Dollars by telegraphic transfer, before breaking bulk at final discharge port, to:
    Chase Manhattan Bank N.A.,
    PO Box 127.,
    Chase House,
    Grenville Street,
    St Helier,
    Jersey JE4 8QH
    Channel Islands.
    Credit:      Wintersea Maritime Corporation
    Account No:  6710018513
    Reference:   m/t Venture - CP 21/10/95

2.  Conoco Weather Clause:
    Delays in berthing for loading or discharging and any delays after berthing which are due to weather conditions shall count as one half laytime, or if on demurrage, at one half demurrage rate, except during ship to ship transfer where all time to count in full, weather permitting or not.

3.  Despite named ports, Charterers always to have responsibility of nominating and clearing vessel prior to fixing.

4.  All expenses for ship to ship transfer at Fujairah, including agency, to be for Charterers' account and settled directly by them.

5.  Address commission of 2.5 percent payable to Charterers on freight and demurrage and deductible from payments made.

    Commission of 1.25 percent payable by Owners to Petrian Shipbrokers Limited London on freight and demurrage as and when paid.

6.  International Oil Overseas Additional Clauses Nos to to 51 as amended and attached are deemed incorporated in this Charter Party.

POLEMBROS SHIP

on the vessel whether or not such dues or charges are assessed on the basis of quantity of cargo, including but not limited to French droits de quai and Spanish derramas taxes. The Vessel shall be free of charges for the use of any wharf, dock, place or mooring facility arranged by the Charterer for the purpose of loading or discharging cargo; however, the Owner shall be responsible for charges for such berth when used solely for Vessel's purposes, such as awaiting Owner's orders, tank cleaning, repairs, etc. before, during or after loading or discharging.

13. (a). CARGOES EXCLUDED VAPOR PRESSURE. Cargo shall not be shipped which has a vapor pressure at one hundred degrees Fahrenheit (100°F.) in excess of thirteen and one-half pounds (13.5 lbs.) as determined by the current A.S.T.M. Method (Reid) D-323.

(b) FLASH POINT. Cargo having a flash point under one hundred and fifteen degrees Fahrenheit (115°F.) (closed cup) A.S.T.M. Method D-56 shall not be loaded from lighters but this clause shall not restrict the Charterer from loading or topping off Crude Oil from vessels or barges inside or outside the bar at any port or place where bar conditions exist.

14. (a). ICE. In case port of loading or discharge should be inaccessible owing to ice, the Vessel shall direct her course according to Master's judgment, notifying by telegraph or radio, if available, the Charterers, shipper or consignee, who is bound to telegraph or radio orders for another port, which is free from ice and where there are facilities for the loading or reception of the cargo in bulk. The whole of the time occupied from the time the Vessel is diverted by reason of the ice until her arrival at an ice-free port of loading or discharge, as the case may be, shall be paid for by the Charterer at the demurrage rate stipulated in Part I.

(b) If on account of ice the Master considers it dangerous to enter or remain at any loading or discharging place for fear of the Vessel being frozen in or damaged, the Master shall communicate by telegraph or radio, if available, with the Charterers, shipper or consignee of the cargo, who shall telegraph or radio him in reply, giving orders to proceed to another port as per Clause 14 (a) where there is no danger of ice and where there are the necessary facilities for the loading or reception of the cargo in bulk, or to remain at the original port at their risk, and in either case Charterer to pay for the time that the Vessel may be delayed, at the demurrage rate stipulated in Part I.

15. TWO OR MORE PORTS COUNTING AS ONE. To the extent that the freight rate standard of reference specified in Part I F hereof provides for special groupings or combinations of ports or terminals, any two or more ports or terminals within each such grouping or combination shall count as one port for purposes of calculating freight and demurrage only, subject to the following conditions:

(a) Charterer shall pay freight at the highest rate payable under Part I F hereof for a voyage between the loading and discharge ports used by Charterer.

(b) All charges normally incurred by reason of using more than one berth shall be for Charterer's account as provided in Clause 9 hereof.

(c) Time consumed shifting between the ports or terminals within the particular grouping or combination shall not count as used laytime.

(d) Time consumed shifting between berths within one of the ports or terminals of the particular grouping or combination shall count as used laytime.

16. GENERAL CARGO. The Charterer shall not be permitted to ship any packaged crude or non-liquid bulk cargo of any description; the cargo the Vessel is to load under this charter is to consist only of liquid bulk cargo as specified in Clause I.

17. (a). QUARANTINE. Should the Charterer send the Vessel to any port or place where a quarantine exists, any delay thereby caused to the Vessel shall count as used laytime; but should the quarantine not be declared until the Vessel is on passage to such port, the Charterer shall not be liable for any resulting delay.

(b) FUMIGATION. If the Vessel, prior to or after entering upon this Charter, has docked or docks at any wharf which is not rat-free or stegomyia-free, she shall, before proceeding to a rat-free or stegomyia-free wharf, be fumigated by the Owner at his expense, except that if the Charterer ordered the Vessel to an infected wharf the Charterer shall bear the expense of fumigation.

18. CLEANING. The Owner shall clean the tanks, pipes and pumps of the Vessel to the satisfaction of the Charterer's Inspector. The Vessel shall not be responsible for any admixture if more than one quality of oil is shipped, nor for leakage, contamination or deterioration in quality of the cargo unless due admixture, leakage, contamination or deterioration results from (a) unseaworthiness existing at the time of loading or at the inception of the voyage which was discoverable by the exercise of due diligence, or (b) error or fault of the servants of the Owner in the loading, care or discharge of the cargo.

19. GENERAL EXCEPTIONS CLAUSE. The Vessel, her Master and Owner shall not, unless otherwise in this Charter expressly provided, be responsible for any loss or damage, or delay or failure in performing hereunder, arising or resulting from:— any act, neglect, default

(vii) DEVIATION CLAUSE. The Vessel shall have liberty to call at any ports in any order, to sail with or without pilots, to tow or to be towed, to go to the assistance of vessels in distress, to deviate for the purpose of saving life or property or of landing any ill or injured person on board, and to call for fuel at any port or ports in or out of the regular course of the voyage. Any salvage shall be for the sole benefit of the Owner

21. LIEN. The Owner shall have an absolute lien on the cargo for all freight, deadfreight, demurrage and costs, including attorney fees, of recovering the same, which lien shall continue after delivery of the cargo into the possession of the Charterer, or of the holders of any Bills of Lading covering the same or of any storageman.

22. AGENTS. The Owner shall appoint Vessel's agents at all ports.

23. BREACH. Damages for breach of this Charter shall include all provable damages, and all costs of suit and attorney fees incurred in any action hereunder.

24. ARBITRATION. Any and all differences and disputes of whatsoever nature arising out of this Charter shall be put to arbitration in the City of New York or in the City of London whichever place is specified in Part I of this charter pursuant to the laws relating to arbitration there in force, before a board of three persons, consisting of one arbitrator to be appointed by the Owner, one by the Charterer, and one by the two so chosen. The decision of any two of the three on any point or points shall be final. Either party hereto may call for such arbitration by service upon any officer of the other, wherever he may be found, of a written notice specifying the name and address of the arbitrator chosen by the first moving party and a brief description of the disputes or differences which such party desires to put to arbitration. If the other party shall not, by notice served upon an officer of the first moving party within twenty days of the service of such first notice, appoint its arbitrator to arbitrate the dispute or differences specified, then the first moving party shall have the right without further notice to appoint a second arbitrator, who shall be a disinterested person with precisely the same force and effect as if said second arbitrator has been appointed by the other party. In the event that the two arbitrators fail to appoint a third arbitrator within twenty days of the appointment of the second arbitrator, either arbitrator may apply to a Judge of any court of maritime jurisdiction in the city above-mentioned for the appointment of a third arbitrator, and the appointment of such arbitrator by such Judge on such application shall have precisely the same force and effect as if such arbitrator had been appointed by the two arbitrators. Until such time as the arbitrators finally close the hearings either party shall have the right by written notice served on the arbitrators and on an officer of the other party to specify further disputes or differences under this Charter for hearing and determination. Awards made in pursuance to this clause may include costs, including a reasonable allowance for attorney's fees, and judgement may be entered upon any award made hereunder in any Court having jurisdiction in the premises.

25. SUBLET. Charterer shall have the right to sublet this Vessel. However, Charterer shall always remain responsible for the fulfillment of this Charter in all its terms and conditions.

26. OIL POLLUTION CLAUSE. Owner agrees to participate in Charterer's program covering oil pollution avoidance. Such program prohibits discharge overboard of all oily water, oily ballast or oil in any form of a persistent nature, except under extreme circumstances whereby the safety of the vessel, cargo or life at sea would be imperiled.

Upon notice being given us the Owner that Oil Pollution Avoidance controls are required, the Owner will instruct the Master to retain on board the vessel all oily residues from consolidated tank washings, dirty ballast, etc., in one compartment, after separation of all possible water has taken place. All water separated to be discharged overboard.

If the Charterer requires that demulsifiers shall be used for the separation of oil/water, such demulsifiers shall be obtained by the Owner and paid for by Charterer.

The oil residues will be pumped ashore at the loading or discharging terminal, either as segregated oil, dirty ballast or co-mingled with cargo as it is possible for Charterers to arrange. If it is necessary to retain the residue on board co-mingled with or segregated from the cargo to be loaded, Charterers shall pay for any deadfreight so incurred.

Should it be determined that the residue is to be co-mingled or segregated on board, the Master shall arrange that the quantity of tank washings be measured in conjunction with cargo suppliers and a note of the quantity measured made in the vessel's ullage record.

The Charterer agrees to pay freight as per the terms of the Charter Party on any consolidated tank washings, dirty ballast, etc., retained on board under Charterer's instructions during the loaded portion of the voyage up to a maximum of 1% of the total deadweight of the vessel that could be legally carried for such voyage. Any extra expenses incurred by the vessel at loading or discharging port in pumping ashore oil residues shall be for Charterer's account, and extra time, if any, consumed for this operation shall count as used laytime.

## BILL OF LADING

Shipped in apparent good order and condition by _____

on board the _____

Steamship
Motorship

whereof _____ is Master, at the port of _____

_____

_____

_____

to be delivered at the port of _____

or so near thereto as the Vessel can safely get, always afloat, unto _____

or order on payment of freight at the rate of _____

This shipment is carried under and pursuant to the terms of the charter dated New York/London _____

                                          contract
between _____ and _____ , as

Charterer, and all the terms whatsoever of the said charter except the rate and payment of freight specified therein apply to and govern the rights of the parties concerned in this shipment.

In witness whereof the Master has signed _____ Bills of Lading

of this tenor and date, one of which being accomplished, the others will be void.

Dated at _____ this _____ day of _____

                                                                    Master

Form 30-165 Printed and Sold by UNXCO 190 Baldwin Ave., Jersey City, NJ 07306 - (800) 631-3098

**VENTURE - Charter Party dated 21st October 1995**
**INTERNATIONAL OIL OVERSEAS ADDITIONAL CLAUSES (ASBATANKVOY)**
**(Dated 11.07.1995)**                                    **Page 1.**


1)    **PRIVACY:**
      All  negotiations  and every detail of this fixture are to be
      kept strictly private and confidential.


2)    **WORLDSCALE:**
      Unless   otherwise   provided  herein  Worldscale  terms  and
      conditions are to apply to this Charter Party.


3)    **ELIGIBILITY:**                                        AMENDED.
      Owners warrant that the vessel is in all  respects  eligible
      for trading within and from ranges and areas specified in the
      Charter Party and, is not prevented from discharging in  such
      ranges  and  areas  and  that  at all times she shall have on
      board all  certificates,  records  and  other  documents  and
      equipment required for such service.

      Owners  further  warrant that they have full knowledge of all
      restrictions and requirements by port authorities and warrant
      that ship is fully acceptable and can perform voyage in  both
      loading and discharging ports.

      If  Charterers  have not declared the exact ports at the time
      of fixture, this Clause shall be applicable to  the  intended
      ports  mentioned in the Charter Party negotiations, such will
      not limit Owners' warranty under this Clause  to  such  ports
      only.


4)    **DRUG AND ALCOHOL CLAUSE:**                           AMENDED.
      Owners warrant that they have a policy on  Drug  and  Alcohol
      Abuse  ("Policy")  applicable  to  the  vessel which meets or
      exceeds the standards in  the  Oil  Companies'  International
      Marine  Forum Guidelines for the Control of Drugs and Alcohol
      on Board Ship ("OCIMF Guidelines").  Owners  further  warrant
      that  this  Policy  will  remain in effect during the term of
      this Charter, and that Owners shall exercise due diligence to
      ensure that the Policy is complied with.  For the purposes of
      the Clause and the OCIMF Guidelines, alcohol impairment shall
      be defined as a blood alcohol content of  40  mg/100  ml  or
      greater;  the appropriate seafarers to be tested shall be all
      vessel officers and the drug/alcohol  testing  and  screening
      shall include random testing of the officers with a frequency
      to ensure that each officer is tested at least once a year.


5)    **ETA CLAUSE:**
      Master  to  give  Charterers  ETA loading port immediately on
      fixing and 7 days, 72/48/24/12 hours prior arrival at loading
      and discharge ports where time  permits  also  ETA  discharge
      port  on  sailing from load port as well as any change in ETA
      exceeding six (6) hours in all cases.  All  ETA  notices  are
      essential for demurrage purposes.

**VENTURE - Charter Party dated 21st October 1995**
**INTERNATIONAL OIL OVERSEAS ADDITIONAL CLAUSES (ASBATANKVOY)**
**(Dated 11.07.1995)**                                    **Page 2.**

6)  **BALLAST, INERT GAS SYSTEM AND CRUDE OIL WASHING:**
    A.  Vessel shall arrive at load port with clean ballast,
        fully inerted (if instructed).

    B.                                                    DELETED.

    C.  Owner warrants vessel has operable Crude Oil Washing and
        Inert Gas System, and both Systems shall be operational
        during duration of this Charter Party up to standard
        required by Loading Terminals by fully capable and
        qualified personnel.


7)  **CERTIFICATES:**
    Vessel to comply with latest effective MARPOL and IMO
    Regulations and to be kept in compliance throughout Charter
    period.

    All other National and International Certificates to be kept
    clean and valid including but not limited to Compliance on
    Civil Liabilities, FMC Certificates as per current Rules and
    Regulations and any changes in such Rules and Regulations.
    Owners warrant that the vessel will conform in all respects
    with the applicable parts of the requirements as defined by
    the "International Convention for the Prevention of Pollution
    from Ships 1973/1978". Such compliance to include but not to
    be limited to requirements as regards efficient stripping.
    The vessel is provided with a dual IOPP Certificate,
    necessitating inspection and certification by Class Surveyor.

    Any delay caused to vessel due to any Certificate being
    unavailable or expired shall be totally for Owners' account.

    Further any detention by any port authority and/or competent
    authority for any reason due to class/flag or port
    requirements shall be totally for Owners' account.


8)  **CARGO:**                                            **AMENDED.**
    Owners warrant vessel is able to segregate minimum two (2)
    grades with double valve, line and pump segregation. Owner
    warrants vessel able to load/discharge two (2) grades
    simultaneously without contamination.

    The vessel is to present at loading port(s) fit for the
    carriage of cargo.


9)  **PUMPING:**                                          **AMENDED.**
    Owners warrant that the vessel can maintain at vessel's
    manifolds a pressure of **average 100** PSI or that cargo can be
    discharged within twenty four (24) hours, provided shore
    facilities permit, **and discharge is not interrupted for shore
    reasons.** Owner warrants vessel can discharge two (2) grades
    simultaneously.

**VENTURE - Charter Party dated 21st October 1995**
**INTERNATIONAL OIL OVERSEAS ADDITIONAL CLAUSES (ASBATANKVOY)**
**(Dated 11.07.1995)**                                    **Page 3.**

10)   **SHIP TO SHIP TRANSFER OPERATIONS:**                  AMENDED.
       Charterers are to provide suitable fenders/lines and hoses to
       safely effect **ship to ship transfer** operations. Handling of
       such equipment on board the vessel shall be by Owners' crew
       at Owners' cost. All such equipment shall be removed from
       the vessel by Charterers upon completion of **loading** without
       delay.

       Vessel's crew shall connect/disconnect cargo hoses, heave
       down/heave up fenders, take/throw connection lines, transfer
       to/transfer back cargo hoses and any other activities
       required for the completion and safe conduct of the ship to
       ship transfer operation for their account without any
       exclusion.

       Owners warrant that the vessel is equipped with minimum ten
       (10) ton derricks port and starboard amidships to handle
       bunker lines/cargo hoses.

       All extra insurance for above ship to ship lighterage
       operations shall be for Owners' account and Charterers have
       no liability for hull or other damage, if any, that may occur
       during such operations, **provided that anchorage is safe and
       that ship to ship transfer operation carried out in
       accordance with ICS/OCIMF Ship to Ship Transfer Guide.**
       Owners warrant that the vessel is equipped and capable of
       safely carrying out all procedures as set out in the latest
       revised edition of the ICS/OCIMF SHIP TO SHIP TRANSFER GUIDE.

11)   **SUPERCARGO:**                                         AMENDED.
       Charterers have the option to place on board one supercargo
       at any time **at load/discharge port.** Owner is to provide such
       supercargo with good accommodation with private bath and food
       at Captain's table at a cost of US$7.00 per day at
       Charterers' expense. Supercargo will be allowed access, to
       investigate, ullage and sample all cargo, slop, bunker, and
       ballast tanks, also any void spaces, and access to any other
       parts of vessel that may relate to carriage of cargo as he
       may require. He shall also have the right to require
       selected valves on bunker and cargo systems to be sealed to
       preclude the possibility of cargo/product/bunker migration.

12)   **VESSEL DESCRIPTION:**

       | | | |
       |---|---|---|
       | Name | : | **Venture** |
       | Flag | : | **Greek** |
       | Built | : | **1976** |
       | Class | : | **Det Norske Veritas** |
       | SDWT | : | **82,212 metric tons** |
       | Draft | : | **14.63 metres** |
       | Cubic capacity | : | **97,035.6 cubic metres at 98%** |

**VENTURE - Charter Party dated 21st October 1995**
**INTERNATIONAL OIL OVERSEAS ADDITIONAL CLAUSES (ASBATANKVOY)**
**(Dated 11.07.1995)**                                          **Page 4.**

| | | |
|---|---|---|
| LOA | : | **232.0 metres** |
| Beam | : | **36.0 metres** |
| Coated | : | **No** |
| Coiled | : | **Yes** |
| IGS/COW | : | **Yes / Yes** |
| Size and description of | | |
| Reducers on board | : | **4X16'/12' - 4X16'/10' 4X16/8'** |
| Pumping capacity | : | **3 X 2750 cubic metres/hour** |
| Tank cleaning equipment | : | **COW** |

Vessel complies with OCIMF Ship to Ship Transfer Guidelines.

13) **PROTECTION & INDEMNITY INSURANCE:**
Owner warrants the vessel is a member of the **Liverpool &
London** P&I Club and is complying with the revised P&I TOVALOP
Clause 1987 as attached all in good standing. Owner warrants
that vessel holds a pollution cover of US$500 million, and
additional US$200 million during full time of Charter Party.

INTERNATIONAL OIL OVERSEAS
ADDITIONAL CLAUSES - (Dated 11.07.1995)                        Page 5.

Owners agree to allow Charterers to have the benefit of
Owners' P&I insurance to the extent the Rules of that
Association permits. Owners to be responsible for all third
party claims which fall under Owners' responsibility.

14) **SAFETY:**
The vessel is to comply with the latest Safety at Sea and
other Safety Regulations.

15) **INSURED VALUE:**
The vessel's insured value is **US$ 7.5 million.**

16) **COMMUNICATIONS:**                                        AMENDED.
The Master is to allow Charterers' supercargo the use of
vessel's communication equipment for reasonable operational
purposes without charge, **excessive use will be charged.**

Master shall transmit to Charterers, on Owners' account,
daily noon positions giving required information regarding
vessel's position, distance to go, average speed, ETA next
port, cargo temperature maintained and any other information
requested.

**VENTURE - Charter Party dated 21st October 1995**
**INTERNATIONAL OIL OVERSEAS ADDITIONAL CLAUSES (ASBATANKVOY)**
**(Dated 11.07.1995)** Page 5.

Vessel shall maintain twenty four (24) hour watch on VHF
Channel 16/14.

17) **TRADING HISTORY:**
Owners guarantee that the vessel is not boycotted by the Arab
League and has never traded to Israel.

18) **AGENCY:** AMENDED.
**Owners to appoint agents nominated by Charterers' at both
ends, provided competitive.**

19) **ACCESS:**
The Master shall not allow any vessel or craft, other than
those of port authorities or pilots, to secure alongside
without the express authority of Charterers.

20) **MOORING:**
Owners shall provide vessel with appropriate wires/lines for
safe mooring at all terminals within the ranges/areas
specified herein.

21) **OVER AGE INSURANCE:** DELETED.

22) **QUANTITATIVE RESPONSIBILITY:**
Although Charterers' surveyor may be monitoring any transfer
operation, this does not relieve Master or Owners of
responsibility for verifying the quantity involved in each
oil movement nor for liability under the terms of this
Charter Party for any oil losses.

23) **BERTH OCCUPANCY:** AMENDED.
Owners warrant vessel shall vacate the berth after completion
of ballasting or within one and a half hours following
completion of loading/discharging **maximum six (6) hours for
ballasting.** If ship is not able to vacate berth after such
time due to reasons attributed to ship, any extra berth
occupancy charges by terminal and port shall be for Owners'
account, all time lost for such occupancy shall not count as
used laytime.

24) **CHARTER SIGNATURE:** DELETED.

25) **INTRANSIT LOSS:** DELETED.

**VENTURE - Charter Party dated 21st October 1995**
**INTERNATIONAL OIL OVERSEAS ADDITIONAL CLAUSES (ASBATANKVOY)**
**(Dated 11.07.1995)**                                   **Page 6.**


26)  **BLENDING:**                                          DELETED.


27)  **JUBAIL/FUJAIRAH CLAUSE:**                            DELETED.


28)  **CRUDE OIL WASHING:**                                 AMENDED.
     If requested by Charterers, Owners/Master shall conduct Crude
     Oil Washing of cargo tanks at discharge port(s) **during** cargo
     discharge operation. Time used for Crude Oil Washing in
     excess of **twelve (12) hours** shall not count as used laytime
     or as demurrage even if laytime has expired.


29)  **DEMURRAGE TIME BAR:**                                AMENDED.
     Owners agree that Charterers shall be released from all
     liability for payment of demurrage, unless the claim has been
     submitted to Charterers in writing with fully certified
     original supporting documents, **where available,** such shall
     include but not be limited to original signed Notice of
     Readiness submitted and accepted and duly signed Time Sheets
     and Statement of Facts duly countersigned by shippers and
     receivers respectively and original Pumping Logs duly
     countersigned by terminal representatives within **ninety (90)**
     days of completion of discharge.

     **Charterers to pay demurrage within ninety (90) days of**
     **receipt of claim. If claim is disputed counter proposal to**
     **be made by Charterers within twenty one (21) days of receipt**
     **of original or subsequent claims.**

     **If Charterers do not reply in time, full amount of original**
     **claim to be paid in full within ninety (90) days of receipt**
     **of original claim. Late payment will be liable to interest**
     **at LIBOR Rate.**


30)  **ADHERENCE TO VOYAGE INSTRUCTIONS:**                  AMENDED.
     In the event of Owners/Master failing to comply fully with
     the voyage instructions of Charterers or any other subsequent
     instructions relayed by Charterers, Owners shall be
     responsible for such failure and shall indemnify Charterers
     for any loss of time, costs and expenses directly suffered by
     Charterers arising therefrom and in particular due to
     underlift or overlift of cargo, whether or not Owners are
     entitled to claim deadfreight, **provided such instructions**
     **given in good time.**


31)  **YORK/ANTWERP RULES:**
     York/Antwerp Rules 1974, as amended 1990, apply to this
     Charter Party.

**VENTURE – Charter Party dated 21st October 1995**
**INTERNATIONAL OIL OVERSEAS ADDITIONAL CLAUSES (ASBATANKVOY)**
**(Dated 11.07.1995)**                                              **Page 7.**

32)  **AVERAGE/ARBITRATION:**
     General Average and Arbitration shall take place in London
     and English Law applies to this Charter Party.

33)  **BILLS OF LADING:**
     In the event of a change in discharge port named in Bills of
     Lading or if the Bills of Lading are not available at
     discharge port(s), the cargo is to be released by Owners
     against a Letter of Indemnity signed by an authorised
     signatory of Charterers in Owners' P&I Club wording without
     bank guarantee or countersignature.

34)  **ROB'S:**                                                    AMENDED.
     In the event that any cargo remains on board upon completion
     of discharge, Charterers shall have the right to deduct from
     freight an amount equal to the FOB port of loading value of
     such cargo plus freight due with respect thereto, provided
     that the volume of cargo remaining on board is **liquid and**
     **pumpable and reachable by vessel's pumps** as determined by an
     independent surveyor. Any action or lack of action in
     accordance with this provision shall be without prejudice to
     any rights or obligations of the parties.

35)  **WAR RISKS:**                                                AMENDED.
     **Any increase of hull and machinery war risk premiums over and**
     **above those in effect on the date of this Charter Party, will**
     **be for Charterers' account.    Any premiums, or increases**
     **thereto, attributable to closure (i.e., blocking and**
     **trapping) insurance shall be for Owners' account.**

     **Surcharges which are in effect on the date of this Charter**
     **Party are for Owners' account for the first seven (7) days.**

36)  **CHARTERERS' UNDERWRITERS' CLAUSES:**                        AMENDED.
     **Owners to telex within one (1) day of fixing the following**
     **information:**

     1.  Statement confirming that vessel is Classed and name of
         Class and that vessel shall remain Classed with existing
         Class maintained during the entire Charter Party period/
         voyage.

     2.  Vessel Class Notation.

     3.  All outstanding Class Recommendation, on the vessel.

     4.  Year and month of when vessel was built.

     Above information/warranties are required by the Underwriters
     of Charterers. Charterers will be unable to accept Notice of
     Readiness/load vessel in the absence of above.

**VENTURE - Charter Party dated 21st October 1995**
**INTERNATIONAL OIL OVERSEAS ADDITIONAL CLAUSES (ASBATANKVOY)**
**(Dated 11.07.1995)**                                    **Page 8.**

37) **TOVALOP:**                                          AMENDED.
    **Owners to fax if requested** valid TOVALOP Certificate and
    **C.L.C. Certificate** covering the entire Charter Party period.
    This is required before payment is made by Charterers.

38) **NOTICE OF READINESS:**                              AMENDED.
    Laytime and/or demurrage at each loading and discharging port
    or place shall commence at the expiry of six (6) hours after
    Notice of Readiness to load or discharge has been **tendered by**
    the Master, whether ship is on demurrage or not, **except if**
    **vessel berths earlier.** Such notice shall be given at the
    customary anchorage **or** the nominated loading place.

39) **ARBITRATION:**
    Notwithstanding the contents elsewhere herein, both parties
    to this Charter Party agree that any claim for a disputed
    amount equal to or below US$25,000.00 (twenty five thousand
    United States Dollars), arising out of this Charter Party
    whether due to demurrage or any other reason, both parties
    herein irrevocably agree to refer such dispute for
    arbitration in accordance with the London Martine Arbitrators
    Association Small Claims Procedure 1989, and the award of
    such procedure shall be final and binding on both the
    parties. Any disputes for amounts above US$25,000.00 (twenty
    five thousand United States Dollars) arising out of this
    Charter Party shall be dealt with according with Clause 24.

40) **DISCHARGE PORTS:**                                  DELETED.

41) **PRO RATION:**                                       DELETED.

42) **DEVIATION**                                         DELETED.

43) **STORAGE:**                                          DELETED.

44) **POSITION AND BALLAST SPEED:**
    Owners warrant that the vessel's position at the time of
    fixture is **spot Fujairah** and vessel's ballast speed will be
    **about 12.0** knots with an expected ETA basis **Ras Tanura** of
    **30th October 1995.**

45) **SPEED:**                                            AMENDED.
    Vessel will perform the laden voyage at **about 12.0** knots,
    weather and safe navigation permitting.

**VENTURE - Charter Party dated 21st October 1995**
**INTERNATIONAL OIL OVERSEAS ADDITIONAL CLAUSES (ASBATANKVOY)**
**(Dated 11.07.1995)**                                    **Page 9.**

46)  **BALLASTING/SHIFTING:**                              AMENDED.
     Deballasting and time proceeding to **first** berth shall not
     count as used laytime or time on demurrage, even if vessel on
     demurrage.

47)  **SOUNDING:**
     Charterers to have the right to sound vessel's bunker tanks
     upon arrival and departure at loading and discharging
     port(s).

48)  **DOCUMENTATION:**
     Owners warrant and undertake that all loading documents shall
     be strictly private and confidential and shall not be handed
     over to any party other than Charterers or Charterers' agent/
     representative, only if instructed by Charterers. Such
     confidentiality shall include copies and/or quotes of such
     documents to any party other than Charterers.

     Owners undertake to instruct Master to strictly adhere to
     above and not to release any information under whatsoever
     circumstances neither in writing or in verbal unless agreed/
     instructed in writing by the Charterers.

49)  **TOP MANAGEMENT:**                                    DELETED.

50)  **FIXTURE TIME:**                                      DELETED.

51)  **ENTIRE AGREEMENT:**
     This Charter Party and the attached Clauses 1 to 51 with
     amendments constitutes the entire agreement between the
     parties. No amendment shall be considered as a part of this
     Charter Party unless expressly agreed that such is an
     Addendum to the Charter Party, each Addendum is to be
     numbered, dated, stamped and signed by both parties and
     subsequently attached to the Charter Party in writing.

P&I REVISED TOVALOP CLAUSE 1987

Owners warrant that the vessel is a Participating Tanker in TOVALOP and will so remain during this Charter, provided however that nothing herein shall prevent Owners, upon prior notice to Charterers, from withdrawing from TOVALOP under Clauses III(B) or X thereof, and provided further that upon any withdrawal under Clause III(B) or under Clause X, following an amendment to TOVALOP which does not materially increase the obligations of the Parties thereunder, Charterers shall have the option to terminate this Charter.

When an escape or discharge of Oil occurs from the vessel and causes or threatens to cause Pollution Damage, or when there is the Threat of an escape or discharge of Oil (i.e. a grave and imminent danger of the escape or discharge of Oil which, if it occurred, would create a serious danger of Pollution Damage), then Charterers may, at their option, upon notice to Owners or Master, undertake such measures as are reasonably necessary to prevent or minimise such Damage or to remove the Threat, unless Owners promptly undertake the same. Charterers shall keep Owners advised of the nature and result of any such measures taken by them, and if time permits, the nature of the measures intended to be taken by them. Any of the aforementioned measures taken by Charterers shall be deemed taken on Owners' authority and as Owners' agent, and shall be at Owners' expense except to the extent that :

(1)  Any such escape or discharge or Threat was caused or contributed to by Charterers, or

(2)  By reason of the exceptions set out in Article III, Paragraph 2, of the 1969 International Convention on Civil Liability for Oil Pollution Damage, Owners are or, had the said Convention applied to such escape or discharge or to the Threat, would have been exempt from liability for the same, or

(3)  The costs of such measures together with all other liabilities, costs and expenses of Owners arising out of or in connection with such escape or discharge or Threat removal exceeds One Hundred and Sixty U.S. Dollars per ton or Sixteen Million Eight Hundred Thousand U.S. Dollars, whichever is the lesser, save insofar as Owners shall be entitled to recover such excess under either the 1971 International Convention on the Establishment of an International Fund for Compensation for Oil Pollution Damage or under CRISTAL, provided that in any incident to which the TOVALOP Supplement applies the Owners limit of liability hereunder shall be that provided for in the said Supplement;

PROVIDED ALWAYS that if Owners in their absolute discretion consider said measures should be discontinued, Owners shall so notify Charterers and thereafter Charterers shall have no right to continue said measures under the provisions of this Clause and all further liability to Charterers under this Clause shall thereupon cease.

The above provisions are not in derogation of such other rights as Charterers or Owners may have under the Charter or may otherwise have or acquire by Law or any International Convention or TOVALOP.

For the purpose of this Clause, the meaning of the term "Oil" and "Pollution Damage" shall be as defined in TOVALOP and "ton" shall be understood in relation to "tonnage" as defined therein.

# EXHIBIT B

Your Ref: NEW MATTER
Our  Ref: DG/325/95/7

Liverpool & London P&I Management Limited
Royal Liver Building
Liverpool
L3 1HU                                                    9 April, 1999

**Attention:  Mrs Nicola Worthington**

Dear Sirs,

**<u>VENTURE C/P 21.10.95</u>**

Please find enclosed the relevant papers in support of Owners' claim in the sum of
US$ 38,729.17.

You will note the dispute runs on the early presentation of the vessel in respect of laycan
dates.

Yours faithfully,
**POLEMBROS SHIPPING LTD**
(As Agents Only)

**David Gare**

Enclosures

30/10  0000-~~1130~~ Loading – Hoses off            001130

```
                 15 15  ⎫
                 12 00  ⎬  UNBERTHING + STEAMING
                 23 30  ⎭
                 ─────
                 50 45
```

02D 02H 45M.

1/11  14 15 – 2015   Notice time
      2015 – 2400   Waiting at anchorage        000345
2/11  0000 – 2400        – // –                 010000
3/11  0000 – 2400        – // –                 010000
4/11  0000 – 2400        – // –                 010000
5/11  0000 – 2400        – // –                 000845    001515
6/11  0000 – 2400   Time counts                 – – –     010000
7/11  0000 – 2400        – // –                 – – –     010000
8/11  0000 – 0815        – // –                 – – –     000815
                                               ─────────  ─────────
                              TOTAL             040000    022330


                              USD 38,728.17

# EXHIBIT C

2/1999 06:20                                                                                            p. 1 of 3

*[handwritten]* 5/2  Thanor - Chrtrs were under impression
              ≈ 13~   period was 7/45 D.
                        Can they have this?

*[MERIDIAN BROKERAGE INC. logo]*

                                                                    11, AG. SPYRIDONOS STR.,
                                                                    PIRAEUS 18535
                                                                    GREECE

*[handwritten]* Arf / Jf / Thanor - 7/45 O.K.
                13~

                                                                    PHONE: (301) 422-6670
                                                                    FAX: (301) 422-6679
                                                                    TELEX: 212000 MRDN GR
                                                                    E-MAIL: CHARTERING@MERIDTANK.GR

                                                        *[handwritten box]* Venture / I.O.O.I.
                                                                            Tkp 5/2/99

FROM: Meridian Brokerage Inc. - Tlx 212000 mrdn gr
DATE: 4-Feb-99 16:20
MSG.: TBK-03259

TO:   INTERNATIONAL OIL OVERSEAS
ATTN: SAYED AGHA

TO:   POLEMBROS SHIPPING
ATTN: JOHN PATTAS

WE ARE PLEASED TO SET OUT THE FOLLOWING TRANSPORTATION AGREEMENT FOR
ACCOUNT INTERNATIONAL OIL OVERSEAS INC AS CHARTERERS, SUBJECT STEM/
✓SHIPPERS/RECEIVERS/MANAGEMENT APPROVAL WITHIN 1500HRS LONDON TOMORROW
5/2/1999.

✓M.T. VENTURE
   GREEK FLAG
   BUILT 1976
   SDWT 82,212 MT
   DRAFT 14.63 M
   LOA 232 M
   BEAM 36 M
   CGO CAP 102,047 M3 100PCT COW MODE
   IGS/COW/COILED

✓ APPROX DAILY SPEED/CONSUMPTION UPTO AND INCL BEAUFORT SCALE 4 AND
   DOUGLAS SEA STATE 4 :

   12KN ON 45FO AVERAGE LADEN/BALLAST
   LOADING 15T FO
   DISCHARGING 65T FO
   IDLE 6T FO
   ALL ABOVE PLUS 3.5T MDO

   EXPECTED BUNKERS ON DELY - ABT XXX MT IFO + ABT XXX MT MDO
   PRICES - PLATTS BUNKER WIRE FUJAIRAH PRICES (MID PRICE) AT TIME OF
   REDELY

✓PERIOD: MIN 7 UPTO MAX 30 DAYS IN CHOPT. CHRS TO GIVE 7 DAYS
         PROVISIONAL REDEL NOTICE AND THEN 5/3/2/1 DAYS FIRM REDEL
         NOTICE.
✓TRADING:AG EXCL IRAQ, RSEA-INDIA-EAFR (NOT SOUTH OF D-E-S) EXC ISRAEL
✓DELY:   OFF FUJAIRAH
✓REDEL:  OFF FUJAIRAH
✓L/CAN:  6-7 FEBRUARY 1999
✓HIRE    USD 9,000 PD/PR
         HIRE PAYABLE EVERY 7 DAYS IN ADVANCE

   LOI IF ANY PER OWNERS P+I CLUB USUAL WORDING WITHOUT BANK GTEE
   OR COUNTERSIGNATURE

OWNERS CONFIRM THAT IGS IS OPERATIVE AND VESSEL WILL ARRIVE
LOADPORT INERTED, IF INSTRUCTED.

ALL NEGOTIATIONS/EVENTUAL FIXTURE TO BE KEPT STRICTLY P+C AND NOT TO
BE DISCUSSED WITH ANY THIRD PARTY.

MASTER TO ALLOW AGENTS AT LOADPORT TO ISSUE/SIGN B/L ON HIS BEHALF,
CHRTS PROVIDING NECESSARY DOCS TO PROTECT OWNERS POSITION IN ALL
RESPECTS (PER ADDENDUM TO BE AGREED).

OWNERS CONFIRM THAT VESSEL WILL USE WIRES INSTEAD OF ROPES AT HER
MOORING AT PAKISTAN.

SHELLTIME 4 C/P EXCEPT:

9  -    DELETE - SEE ADDITIONAL CL3
11 -    DELETE
15 -    DELETE - SEE ADDITIONAL CL5
19 -    LINE 186 - DELETE 'CHARTERERS' INSERT 'OWNERS'
        LINE 187 - DELETE AFTER 'REDELIVERY' TILL END LINE 191
        LINE 192/3 DELETE FROM 'OR' TILL END OF SENTENCE.
24 -    DELETE (SEE DESCRIPTION ABOVE)
39 -    DELETE AND INSERT 'OWNERS TO MAINTAIN MEMBERSHIP OF
        ITOPF FOR DURATION OF THIS CHARTER'

IOOI ADDITIONAL CLAUSES 1-40 DTD 1.8.93 EXCEPT:

3       DELETE AND REPLACE WITH THE FOLLOWING:
        'CHRTS TO PAY FIRST HIRE ON DELIVERY FOR 7 DAYS THEREAFTER
        HIRE PAYABLE EVERY 7 DAYS IN ADVANCE WITHOUT DEDUCTION EXCEPT
        IF REDELIVERY NOTICE ALREADY GIVEN WHEN HIRE DUE, IN WHICH
        CASE OWNERS ESTIMATED NUMBER OF DAYS TO APPLY.
        IF ANY PAYMENT IS NOT RECEIVED BY THE DUE DATE, OR IT IS
        APPARENT THAT IT WILL NOT BE RECEIVED DUE TO CHARTERERS FAULT
        OWNERS TO HAVE THE RIGHT TO SUSPEND VOYAGE OR OPERATIONS AND
        NOT RESUME UNTIL HIRE RECEIVED. ANY TIME SO LOST TO COUNT IN
        FULL.'
4       DELETE FIRST SENTENCE.
5       LINE 3 TO READ 'AT LEAST THE SAME QUANTITY AS ON DELIVERY BUT
        MAX 10 PCT MORE'
        ADD AT END OF PARA 1 - 'IN ANY EVENT CHARTERERS TO PROVIDE
        BUNKERS PRIOR TO SAILING 1ST LOADPORT SUFFICIENT FOR RETURN
        VOYAGE TO PAKISTAN SO THAT VESSEL WILL HAVE MIN QUANTITY
        AS ON DELIVERY'
        PARA 2 DELETE 'OR SHORTFALL' AND 'OR CHARTERERS RESPECTIVELY'
7       DELETE - SEE DESCRIPTION AS ADVISED
11      DELETE FIRST SENTENCE
14      DELETE PARA 2
15      DELETE
16      DELETE FROM 'AND, HAVING BEEN' IN LINE 3 UNTIL 'AND AREAS'
        IN LINE 7
21      ADD 'CHRTS FULLY INDEMNIFY OWNERS FOR ANY CLAIMS ARISING
        AS A RESULT OF ADMIXING/CO-MINGLING CARGO.'
22      PARA1 LINE 2 INSERT 'AVERAGE' PRIOR TO '100 PSI' AND DELETE
        'AND/' AND DELETE 'A FULL'
        LINE 3 AFTER '24 HRS' INSERT 'EXCEPT FOR STRIPPING AND COW'
        LINE 4 AFTER 'PERMIT' ADD 'AND DISCHARGE IS NOT INTERRUPTED'
        PARA 2 LINE 4 AFTER '400 MT/HR' ADD 'PROVIDED RECEIVING
        VESSEL IS CAPABLE OF RECEIVING SAME'
33      DELETE
35      ADD AT END 'ANY DELAYS NOT ATTRIBUTABLE TO VESSEL TO BE FOR
        CHRTS A/C'

```
        DELETE 'WHICHEVER IS SOONER'
37      LINES 3/4 - DELETE FROM 'EXCEPT' UNTIL 'OWNERS A/C'
38      DELETE
39      DELETE
```

IOOI ADDITIONAL CL 52 (ASBATANKVOY) DATED 8/7/98 SHALL BE DEEMED TO
BE INCORPORATED TO THIS CHARTER PARTY.

BP ISM CLAUSE TO APPLY

2.5PCT ADDCOMM ON HIRE PLUS 1.25 PCT TO MERIDIAN BROKERAGE INC.

END

THANK YOU VERY MUCH INDEED.

REGARDS
THANOS KAIRAKTIDIS
MERIDTANK

# EXHIBIT D

```
TYPE...: Telex
TO.....: MERIDIAN
MSG.NR.: 43623
CREATED: 27-Apr-99 11:54
SENT...: 01-Jan-00 00:00
AUTHOR.: ANTONISS
COMMENT:
```

TO: MERIDIAN BROKERAGE
FM: POLEMBROS LONDON

M/T VENTURE/IOOI   C/P 05/02/99

WE REFER TO CHRTRS FAX OF 26/04/99 WHICH AN ALLEGED DEDUCTION MADE
FOR OVERCONSUMPTION AND OWNERS WOULD LIKE TO COMMENT AS FOLLOWS:

1. SPEED/CONSUMPTION
AS PER CHARTER PARTY VESSEL'S DESCRIPTION IS APPRX 12KNOTS BALLAST ON
APPRX 45T FUEL OIL AND APPRX 3.50T DIESEL OIL. THE ALLOWANCE FOR THE
WORD APPRX IS ACCEPTABLE IN ARBITRATIONS (SEE LONDON ARBITRATION LMLN
233) TO BE 0.5KNOTS ON SPEED AND CONSUMPTION TO BE 5PCT EITHER WAY
THAT IS BETWEEN 42.75T AND 47.25T FUEL OIL AND BETWEEN 3.33T AND
3.68T DIESEL OIL.
TAKING ABOVE INTO ACCOUNT THE VESSEL OVERCONSUMED ONLY DIESEL OIL OF
133.10MT - 91.85MT= 41.25MT
FURTHER TO THE ABOVE CHRTRS ARE REFERED TO THE OFF HIRE PERIOD 24-
26/03/99 IN RESPECT OF VOYAGE FUJAIRAH - BANDAR MAHSHAHR.
CHRTRS HAVE ALREADY DEDUCTED CONSUMPTION OR SUCH PERIOD OF 4.70MT
DIESEL OIL.
THIS AMOUNT SHOULD THEREFORE, BE SIMILARLY DEDUCTED FROM THE ABOVE
FIGURE OF 41.25MT LEAVING A NET OVERCONSUMPTION OF 36.55MT

2. PORT/CONSUMPTION
VESSEL DURING MANOEUVRING CONSUMES 2T DIESEL OIL PER HOUR SEE
PREVIOUS CHARTER PARTY OF M/T VENTURE C/P 09/03/98. TAKING ABOVE TO
CONSIDERATION VESSEL DID NOT OVERCONSUME DURING PORT STAY.

IN VIEW OF ABOVE OWNERS FINAL HIRE STATEMENT REVISED AS FOLLOWS:

FM 07/02/99 0120HRS LT
TO 22/04/99 0200HRS LT

74D 00H 40M OR
74.027778DAYS X USD 9,000.00=                    USD 666,250.00

LESS COMM 2.50PCT                               (USD  16,656.25)

BUNKERS DIFFERENCE DELY/REDELY
F.O. 1174.70MT - 1133.294MT= 41.406MT
41.406MT X USD  80=                              USD   3,312.48
D.O.  101.70MT -    85.827MT= 15.873MT
15.873MT X USD 143=                              USD   2,269.84

LESS OFF HIRE
24/03/99 1915HRS
26/03/99 0330HRS
1.343DAYS X USD 9,000.00=                        (USD  12,087.00)

COMM 2.50PCT                                     USD     302.18

BUNKERS DURING OFF HIRE                          (USD   1,276.00)

```
OVERCONSUMPTION 36.55MT X USD 143=          (USD   5,226.65)

LESS RCVD ON A/C  09/02/99 USD 61,411.00
                  16/02/99 USD 61,411.00
                  22/02/99 USD 61,411.00
                  01/03/99 USD 61,411.00
                  05/03/99 USD 22,532.87
                  08/03/99 USD 38,864.00
                  15/03/99 USD 61,411.00
                  23/03/99 USD 87,736.00
                  01/04/99 USD 61,411.00
                  08/04/99 USD 48,050.00
                  14/04/99 USD 43,861.00
                  ----------------------    (USD 609,509.87)
                                            --------------
DUE OWNERS                                  USD  27,378.73
```

_Less: Received on 24/6/99 (USD 12,916.94)_
_Amount due   USD 14,461.79_

```
PLEASE REMIT BY TELEGRAPHIC TRANSFER TO

CHASE MANHATTAN BANK NA
PO BOX 127
CHASE HOUSE
GRENVILLE STREET
ST.HELLIER
JERSEY JE4 8QH
CHANNEL ISLANDS
FOR CREDIT WINTERSEA MARITIME CORPORATION
USD ACCOUNT NR 6710018513
REF M/T VENTURE


REGARDS
POLEMBROS
```

```
TYPE...: Telex
FROM...: RIBLSARI
MSG.NR.: 146697
CREATED: 24-Jun-99 15:24
COMMENT: Received.
```

```
921544 POLEGB G

407490/1 RDX SJ
YZYZ

WARNING - A COMPUTER GENERATED MESSAGE FOLLOWS.
         PLEASE DO NOT INTERRUPT TRANSMISSION


FROM:RIBLSARI
     RIYAD BANK
     RIYADH

TO  :WINTERSE
     WINTERSEA MARITIME CORP.
     U.K.

DATE:   624
MT:NTX      : NON TESTED TELEX FREE FORMAT
PR:N        : NORMAL

     :20 /TRANSACTION REFERENCE NUMBER  :101991741150A
     :79X/NARRATIVE                     :ATTN:ACCOUNTS DEPT.
     .
FOR YOUR INFORAMTION ONLY.
.
ASPER REQUEST OF OUR CUSTOMER MARINA WORLD SHIPPING CORP./JEDDAH
WE HAVE TRANSFERRED THRU OUR CORRESP. CHASE MANHATTAN BANK/NEWYORK
THE SUM OF USD:12916,94  VALUE DATE 24/06/99 UNDER OUR TRN.REF.
101991741150  TO CREDIT YOUR A/C NO.6710018513 WITH CHASE MANHATTAN
BANK/CHASE HOUSE, GRENVILLE STR. ST.HELLIER,JERSEY JE4 8QH,
CHANNEL ISLAND. BEING REF. M/T VENTURE FINAL HIRE
PLEASE FOLLOW UP THE MATTER.
.
TKS N RGDS,
RIYAD BANK,
SWIFT OPER./RIYADH
-



NNNN
407490/1 RDX SJ
921544 POLEGB G
```

EXHIBIT E

**Association of Ship Brokers**
**& Agents (U.S.A.), Inc.**

**October 1977**



**CODE WORD FOR THIS**
**CHARTER PARTY:**

**ASBATANKVOY**

## PETRIAN SHIPBROKERS LIMITED

# TANKER VOYAGE CHARTER PARTY

**PREAMBLE**

| LONDON | 21st October 1995 |
|---|---|
| Place | Date |

IT IS THIS DAY AGREED between CYCLADES SHIPPING COMPANY LIMITED, VALLETTA, MALTA

~~chartered owner~~/owner (hereinafter called the "Owner") of the Maltese flag

~~SS/MS~~ AGAPI _____ (hereinafter called the "Vessel")

and INTERNATIONAL OIL OVERSEAS INC. _____ (hereinafter called the "Charterer")

that the transportation herein provided for will be performed subject to the terms and conditions of this Charter Party, which includes this Preamble and Part I and Part II. In the event of a conflict, the provisions of Part I will prevail over those contained in Part II.

**PART I**

A.   Description and Position of Vessel:

Deadweight:   29,687 tons metric ~~(2240 lbs.)~~        Classed:   ABS

Loaded draft of Vessel on assigned summer freeboard   11.0 metres ~~ft.____in. in salt water.~~

Capacity for cargo:   38,275 cubic metres at 100 percent including slops ~~tons (of 2240 lbs. each)____% more or less, Vessel's option.~~

Coated:   ☒ Yes   ☐ No

Coiled:   ☒ Yes   ☐ No      Last ~~two~~ three cargoes:   Clean Petroleum Products Unleaded Undarker 2.5 NPA

Now:   Dubai Roads      Expected Ready:   28th October 1995

B.   Laydays:

Commencing:   28th October 1995      Cancelling:   28th October 1995

C.   Loading Port(s)   One safe port RAS TANURA

Charterer's Option

D.   Discharging Port(s):   One safe port PORT SUDAN

Charterer's Option

E.   Cargo:   See Special Provision 1.

Charterer's Option

F.   Freight Rate:   Lumpsum US$230,000.00   ~~per ton (of 2240 lbs. each)~~

G.   Freight Payable to:   See Special Provision 2.      at

H.   Total Laytime in Running Hours:   96 hours Sundays and Holidays included

I.   Demurrage per day:   US$10,000.00 per day or pro rata

J.   Commission of       % is payable by Owner to   See Special Provision 6.

     on the actual amount freight, when and as freight is paid.

K.   The place of General Average and arbitration proceedings to be London/~~New York (strike out one)~~.  – English Law.

L.   Tovalop: Owner warrants vessel to be a member of TOVALOP scheme and will be so maintained throughout duration of this charter. (as attached)

M.   Special Provisions:

     Special Provisions Nos 1 to 7 as attached are deemed incorporated in this Charter Party.

     IN WITNESS WHEREOF, the parties have caused this Charter, consisting of a Preamble, Parts I and II, to be executed in duplicate as of the day and year first above written.

Witness the signature of: _____

By: _____

Witness the Signature of: _____

By: _____

# PART II

1. WARRANTY—VOYAGE—CARGO. The vessel, classed as specified in Part I hereof, and to be so maintained during the currency of this Charter, shall, with all convenient dispatch, proceed as ordered to Loading Port(s) named in accordance with Clause 4 hereof, or so near thereunto as she may safely get (always afloat), and being seaworthy, and having all pipes, pumps and heater coils in good working order, and being in every respect fitted for the voyage, so far as the foregoing conditions can be attained by the exercise of due diligence, perils of the sea and any other cause of whatsoever kind beyond the Owner's and/or Master's control excepted, shall load (always afloat) from the factors of the Charterer a full and complete cargo of petroleum and/or its products in bulk, not exceeding what she can reasonably stow and carry over and above her bunker fuel, consumable stores, boiler feed, culinary and drinking water, and complement and their effects (sufficient space to be left in the tanks to provide for the expansion of the cargo), and being so loaded shall forthwith proceed, as ordered on signing Bills of Lading, direct to the Discharging Port(s), or so near thereunto as she may safely get (always afloat), and deliver said cargo. If heating of the cargo is requested by the Charterer, the Owner shall exercise due diligence to maintain the temperatures requested.

2. FREIGHT. Freight shall be at the rate stipulated in Part I and shall be computed on intake quantity (except deadfreight as per Clause 3) as shown on the Inspector's Certificate of Inspection. Payment of freight shall be made by Charterer without discount upon delivery of cargo at destination, less any disbursements or advances made to the Master or Owner's agents at ports of loading and/or discharge and cost of insurance thereon. No deduction of freight shall be made for water and/or sediment contained in the cargo. The services of the Petroleum Inspector shall be arranged and paid for by the Charterer who shall furnish the Owner with a copy of the Inspector's Certificate.

3. DEADFREIGHT. Should the Charterer fail to supply a full cargo, the Vessel may, at the Master's option, and shall, upon request of the Charterer, proceed on her voyage, provided that the tanks in which cargo is loaded are sufficiently filled to put her in seaworthy condition. In that event, however, deadfreight shall be paid at the rate specified in Part I hereof on the difference between the intake quantity and the quantity the Vessel would have carried if loaded to her minimum permissible freeboard for the voyage.

4. NAMING LOADING AND DISCHARGE PORTS.
(a) The Charterer shall name the loading port or ports at least twenty-four (24) hours prior to the Vessel's readiness to sail from the last previous port of discharge, or from bunkering port for the voyage, or upon signing this Charter if the Vessel has already sailed. However, Charterer shall have the option of ordering the Vessel to the following destinations for wireless orders:

| Place | On a voyage to a port or ports in: |
|---|---|
| ST. KITTS | Caribbean or U.S. Gulf loading port(s) |
| PORT SAID | Eastern Mediterranean or Persian Gulf loading port(s) (from ports west of Port Said.) |

(b) If lawful and consistent with Part I and with the Bills of Lading, the Charterer shall the option of nominating a discharging port or ports by radio to the Master on or before the l's arrival at or off the following places:

| Place | On a voyage to a port or ports in: |
|---|---|
| LAND'S END | United Kingdom/Continent (Bordeaux/Hamburg range) or Scandinavia (including Denmark) |
| SUEZ | Mediterranean (from Persian Gulf) |
| GIBRALTAR | Mediterranean (from Western Hemisphere). |

(c) Any extra expense incurred in connection with any change in loading or discharging ports (so named) shall be paid for by the Charterer and any time thereby lost to the Vessel shall count as used laytime.

5. LAYDAYS. Laytime shall not commence before the date stipulated in Part I, except with the Charterer's sanction. Should the Vessel not be ready to load by 4:00 o'clock P.M. (local time) on the cancelling date stipulated in Part I, the Charterer shall have the option of cancelling this Charter by giving Owner notice of such cancellation within twenty-four (24) hours after such cancellation date; otherwise this Charter to remain in full force and effect.

6. NOTICE OF READINESS. Upon arrival at customary anchorage at each port of loading or discharge, the Master or his agent shall give the Charterer or his agent notice by letter, telegraph, wireless or telephone that the Vessel is ready to load or discharge cargo, berth or no berth, and laytime, as hereinafter provided, shall commence upon the expiration of six (6) hours after receipt of such notice, or upon the Vessel's arrival in berth (i.e., finished mooring when at a sealoading or discharging terminal and all fast when loading or discharging alongside a wharf), whichever first occurs. However, where delay is caused to Vessel getting into berth after giving notice of readiness for any reason over which Charterer has no control, such delay shall not count as used laytime.

7. HOURS FOR LOADING AND DISCHARGING. The number of running hours specified as laytime in Part I shall be permitted the Charterer as laytime for loading and discharging cargo; but any delay due to the Vessel's condition or breakdown or inability of the Vessel's facilities to load or discharge cargo within the time allowed shall not count as used laytime. If regulations of the Owner or port authorities prohibit loading or discharging of the cargo at night, time so lost shall not count as used laytime; if the Charterer, shipper or consignee prohibits loading or discharging at night, time so lost shall count as used laytime. Time consumed by the vessel in moving from loading or discharge port anchorage to her loading or discharge berth, discharging ballast water or slops, will not count as used laytime.

8. DEMURRAGE. Charterer shall pay demurrage per running hour and pro rata for a part thereof at the rate specified in Part I for all time that loading and discharging and used laytime as elsewhere herein provided exceeds the allowed laytime elsewhere herein provided. If, however, demurrage shall be incurred at ports of loading and/or discharge by reason of fire, on, storm or by a strike, lockout, stoppage or restraint of labor or by breakdown of r, ery or equipment in or about the plant of the Charterer, supplier, shipper or consignee of the cargo, the rate of demurrage shall be reduced one-half of the amount stated in Part I per running hour or pro rata for part of an hour for demurrage so incurred. The Charterer shall not be liable for any demurrage for delay caused by strike, lockout, stoppage or restraint of labor for Master, officers and crew of the Vessel or tugboat or pilots.

9. SAFE BERTHING—SHIFTING. The vessel shall load and discharge at any safe place or wharf, or alongside vessels or lighters reachable on her arrival, which shall be designated and procured by the Charterer, provided the Vessel can proceed thereto, lie at, and depart therefrom always safely afloat, any lighterage being at the expense, risk and peril of the Charterer. The Charterer shall have the right of shifting the Vessel at ports of loading and/or discharge from one safe berth to another on payment of all towage and pilotage shifting to next berth, charges for running lines on arrival and leaving that berth, additional agency charges and expense, customs overtime and fees, and any other extra port charges or port expenses incurred by reason of using more than one berth. Time consumed on account of shifting shall count as used laytime except as otherwise provided in Clause 15.

10. PUMPING IN AND OUT. The cargo shall be pumped into the Vessel at the expense, risk and peril of the Charterer, and shall be pumped out of the Vessel at the expense of the Vessel, but at the risk and peril of the Vessel only so far as the Vessel's permanent hose connections, where delivery of the cargo shall be taken by the Charterer or its consignee. If required by Charterer, Vessel after discharging is to clear shore pipe lines of cargo by pumping water through them and time consumed on this purpose shall apply against allowed laytime. The Vessel shall supply her pumps and the necessary power for discharging in all ports, as well as necessary hands. However, should the Vessel be prevented from supplying such power by reason of regulations prohibiting fires on board, the Charterer or consignee shall supply, at its expense, all power necessary for discharging as well as loading, but the Owner shall pay for power supplied to the Vessel for other purposes. If cargo is loaded from lighters, the Vessel shall furnish steam at Charterer's expense for pumping cargo into its Vessel, if required by the Charterer, providing the Vessel has facilities for generating steam and is permitted to have fires on board. All overtime of officers and crew incurred in loading and/or discharging shall be for account of the Vessel.

11. HOSES, MOORING AT SEA TERMINALS. Hoses for loading and discharging shall be furnished by the Charterer and shall be connected and disconnected by the Charterer, or, at the option of the Owner, by the Owner at the Charterer's risk and expense. Laytime shall continue until the hoses have been disconnected. When Vessel loads or discharges at a sea terminal, the Vessel shall be properly equipped by Owner's expense for loading or discharging at such place, including suitable ground tackle, mooring lines and equipment for handling submarine hoses.

12. DUES—TAXES—WHARFAGE. The Charterer shall pay all taxes, dues and other charges on the cargo, including but not limited to Customs overtime on the cargo, Venezuelan Habitation Tax, C.I.M. Taxes at Le Havre and Portuguese Imposto de Comercio Maritime. The Charterer shall also pay all taxes on freight at loading or discharging ports and any unusual taxes, assessments and governmental charges which are not presently in effect but which may be imposed in the future on the Vessel or freight. The Owner shall pay all dues and other charges on the Vessel (whether or not such dues or charges are assessed on the basis of quantity of cargo), including but not limited to French droits de quai and Spanish derramas taxes. The Vessel shall be free of charges for the use of any wharf, dock, place or mooring facility arranged by the

or barratry of the Master, pilots, mariners or other servants of the Owner in the navigation or management of the Vessel; fire, unless caused by the personal design or neglect of the Owner; collision, stranding or peril, danger or accident of the sea or other navigable waters; saving or attempting to save life or property; wastage in weight or bulk, or any other loss or damage arising from inherent defect, quality or vice of the cargo; any act or omission of the Charterer or Owner, shipper or consignee of the cargo, their agents or representatives; insufficiency of packing; insufficiency or inadequacy of marks; explosion, bursting of boilers, breakage of shafts, or any latent defect in hull, equipment or machinery; unseaworthiness of the Vessel unless caused by want of due diligence on the part of the Owner to make the Vessel seaworthy or to have her properly manned, equipped and supplied; or from any other cause of whatsoever kind arising without the actual fault of privity of the Owner. And neither the Vessel nor Master or Owner, nor the Charterer, shall, unless otherwise in this Charter expressly provided, be responsible for any loss of damage or delay or failure in performing hereunder, arising or resulting from:—Act of God; act of war; perils of the seas; act of public enemies, pirates or assailing thieves; arrest or restraint of princes, rulers or people; or seizure under legal process provided bond is promptly furnished to release the Vessel or cargo; strike or lockout or stoppage or restraint of labor from whatever cause, either partial or general; or riot or civil commotion.

20. ISSUANCE AND TERMS OF BILLS OF LADING.
(a) The Master shall, upon request, sign Bills of Lading in the form appearing below for all cargo shipped but without prejudice to the rights of the Owner and Charterer under the terms of this Charter. The Master shall not be required to sign Bills of Lading for any port which, the Vessel cannot enter, remain at and leave in safety and always afloat nor for any blockaded port.
(b) The carriage of cargo under this Charter Party and under all Bills of Lading issued for the cargo shall be subject to the statutory provisions and other terms set forth or specified in sub-paragraphs (i) through (vii) of this clause and such terms shall be incorporated verbatim or be deemed incorporated by the reference in any such Bill of Lading. In such sub-paragraphs and in any Act referred to therein, the word "carrier" shall include the Owner and the Chartered Owner of the Vessel.

(i) CLAUSE PARAMOUNT. This Bill of Lading shall have effect subject to the provisions of the Carriage of Goods by Sea Acts of the United States, approved April 16, 1936, except that if this Bill of Lading is issued at a place where any other Act, ordinance or legislation gives statutory effect to the International Convention for the Unification of Certain Rules relating to Bills of Lading at Brussels, August 1924, then this Bill of Lading shall have effect, subject to the provisions of such Act, ordinance or legislation. The applicable Act, ordinance or legislation (hereinafter called the "Act") shall be deemed to be incorporated herein and nothing herein contained shall be deemed a surrender by the Owner of any of its rights or immunities or an increase of any of its responsibilities or liabilities under the Act if any term of this Bill of Lading be repugnant to the Act to any extent, such term shall be void to the extent but no further.

(ii) JASON CLAUSE. In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Owner is not responsible, by statute, contract or otherwise, the cargo shippers, consignees or owners of the cargo shall contribute with the Owner in General Average to the payment of any sacrifices, losses or expenses of a General Average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo. If a salving ship is owned or operated by the Owner, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the Owner or his agents may deem sufficient to cover the estimated contribution of the cargo and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the cargo to the carrier before delivery.

(iii) GENERAL AVERAGE. General Average shall be adjusted, stated and settled according to York-Antwerp Rules 1950 and, as to matters not provided for by these rules, according to the laws and usages at the port of New York or at the port of London, whichever place is specified in Part I of this Charter. If a General Average statement is required, it shall be prepared at such port or place in the United States or United Kingdom, whichever country is specified in Part I of this Charter, as may be selected by the Owner, unless otherwise mutually agreed, by an Adjuster appointed by the Owner and approved by the Charterer. Such Adjuster shall attend to the settlement and the collection of the General Average, subject to customary charges. General Average Agreements and/or security shall be furnished by Owner and/or Charterer, and/or Owner and/or Consignee of cargo, if requested. Any cash deposit being made as security to pay General Average and/or salvage shall be remitted to the Average Adjuster and shall be held by him at his risk in a special account in a duly authorized and licensed bank at the place where the General Average statement is prepared.

(iv) BOTH TO BLAME. If the Vessel comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the Owner in the navigation or in the management of the Vessel, the owners of the cargo carried hereunder shall indemnify the Owner against all loss or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said cargo, paid or payable by the other or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or Owner. The foregoing provisions shall also apply where the owners, operators or those in charge of any ships or objects other than, or in addition to, the colliding ships or object are at fault in respect of a collision or contact.

(v) LIMITATION OF LIABILITY. Any provision of this Charter to the contrary notwithstanding, the Owner shall have the benefit of all limitations of, and exemptions from, liability accorded to the owner or chartered owner of vessels by any statute or rule of law for the time being in force.

(vi) WAR RISKS. (a) If any port of loading or of discharge named in this Charter Party or to which the Vessel may properly be ordered pursuant to the terms of the Bills of Lading be blockaded, or
(b) If owing to any war, hostilities, warlike operations, civil war, civil commotions, revolutions or the operation of international law or entry to any such port of loading or of discharge or the loading or discharging of cargo at any such port be considered by the Master or Owners in his or their discretion dangerous or prohibited or (b) it be considered by the Master or Owners in his or their discretion dangerous or impossible for the Vessel to reach any such port of loading or discharge—the Charterers shall have the right to order the cargo or such part of it as may be affected to be loaded or discharged at any other safe port of loading or of discharge within the range of loading or discharging ports respectively established under the provisions of the Charter Party (provided such other port is not blockaded or that entry thereto or loading or discharge of cargo thereat is not in the Master's or Owner's discretion dangerous or prohibited: If in respect of a port of discharge no orders be received from the Charterers within 48 hours after they or their agents have received from the Owners a request for the nomination of a substitute port, the Owners shall then be at liberty to discharge the cargo at any safe port which they or the Master may in their or his discretion decide on (whether within the range of discharging ports established under the provisions of the Charter Party or not) and such discharge shall be deemed to be due fulfilment of the contract or contracts of affreightment so far as cargo so discharged is concerned. In the event of the cargo being loaded or discharged at any such other port within the respective range of loading or discharging ports established under the provisions of the Charter Party, the Charter Party shall be read in respect of freight and all other conditions whatsoever as if the voyage performed were that originally designated. In the event, however, that the Vessel discharges the cargo at a port outside the range of discharging ports established under the provisions of the Charter Party, freight shall be paid as for the voyage originally designated and all extra expenses involved in reaching the actual port of discharge and or discharging the cargo thereat shall be paid by the Charterers or Cargo Owners. In the latter event the Owners shall have a lien on the cargo for all such extra expenses.
(c) The Vessel shall have liberty to comply with any directions or recommendations as to departure, arrival, routes, ports of call, stoppages, destinations, zones, waters, delivery or in any otherwise whatsoever given by the government of the nations under whose flag the Vessel sails or any other government or local authority including any de facto government or local authority or by any person or body acting or purporting to act as or with the authority of any such government or authority or by any committee or person having under the terms of the war risks insurance on the vessel the right to give any such directions or recommendations. If by reason of or in compliance with any such directions or recommendations, anything is done or is not done such shall not be deemed a deviation.

If by reason of or in compliance with any such direction or recommendation the Vessel does not proceed to the port or ports of discharge originally designated or to which she may have been ordered pursuant to the terms of the Bills of Lading, the Vessel may proceed to any safe port of discharge which the Master or Owners in his or their discretion may decide on and there discharge the cargo. Such discharge shall be deemed to be due fulfillment of the contract or contracts of affreightment and the Owners shall be entitled to freight as if discharge has been effected at the port or ports originally designated or to which the vessel may have been ordered pursuant to the terms of the Bills of Lading. All extra expenses involved in reaching and discharging the cargo at any such other port shall be paid by the Charterers and/or Cargo Owners and the Owners shall have a lien on the cargo for freight and all such expenses.

(vii) DEVIATION CLAUSE. The Vessel shall have liberty to call at any ports in any order, to sail with or without pilots, to tow or to be towed, to go to the assistance of vessels in

on the vessel (whether or not such dues or charges are assessed on the basis of quantity of cargo), including but not limited to French droits de quai and Spanish derramas taxes. The Vessel shall be free of charges for the use of any wharf, dock, place or mooring facility arranged by the Charterer for the purpose of loading or discharging cargo; however, the Owner shall be responsible for charges for such berth when used solely for Vessel's purposes, such as awaiting Owner's orders, tank cleaning, repairs, etc. before, during or after loading or discharging.

13. (a). CARGOES EXCLUDED VAPOR PRESSURE. Cargo shall not be shipped which has a vapor pressure at one hundred degrees Fahrenheit (100°F.) in excess of thirteen and one-half pounds (13.5 lbs.) as determined by the current A.S.T.M. Method (Reid) D-323.

(b) FLASH POINT. Cargo having a flash point under one hundred and fifteen degrees Fahrenheit (115°F.) (closed cup) A.S.T.M. Method D-56 shall not be loaded from lighters but this clause shall not restrict the Charterer from loading or topping off Crude Oil from vessels or barges inside or outside the bar at any port or place where bar conditions exist.

14. (a). ICE. In the case port of loading or discharge should be inaccessible owing to ice, the Vessel shall direct her course according to Master's judgment, notifying by telegraph or radio, if available, the Charterers, shipper or consignee, who is bound to telegraph or radio orders for another port, which is free from ice and where there are facilities for the loading or reception of the cargo in bulk. The whole of the time occupied from the time the Vessel is diverted by reason of the ice until her arrival at an ice-free port of loading or discharge, as the case may be, shall be paid for by the Charterer at the demurrage rate stipulated in Part I.

(b) If on account of ice the Master considers it dangerous to enter or remain at any loading or discharging place for fear of the Vessel being frozen in or damaged, the Master shall communicate by telegraph or radio, if available, with the Charterer, shipper or consignee of the cargo, who shall telegraph or radio him in reply, giving orders to proceed to another port as per Clause 14 (a) where there is no danger of ice and where there are the necessary facilities for the loading or reception of the cargo in bulk, or to remain at the original port at their risk, and in either case Charterer to pay for the time that the Vessel may be delayed, at the demurrage rate stipulated in Part I.

15. TWO OR MORE PORTS COUNTING AS ONE. To the extent that the freight rate standard of reference specified in Part I F hereof provides for special groupings or combinations of ports or terminals, any two or more ports or terminals within each such grouping or combination shall count as one port for purposes of calculating freight and demurrage only, subject to the following conditions:

(a) Charterer shall pay freight at the highest rate payable under Part I F hereof for a voyage between the loading and discharge ports used by Charterer.

(b) All charges normally incurred by reason of using more than one berth shall be for Charterer's account as provided in Clause 9 hereof.

(c) Time consumed shifting between the ports or terminals within the particular grouping or combination shall not count as used laytime.

(d) Time consumed shifting between berths within one of the ports or terminals of the particular grouping or combination shall count as used laytime.

16. GENERAL CARGO. The Charterer shall not be permitted to ship any packaged goods or non-liquid bulk cargo of any description; the cargo the Vessel is to load under this Charter is to consist only of liquid bulk cargo as specified in Clause I.

17. (a). QUARANTINE. Should the Charterer send the Vessel to any port or place where quarantine exists, any delay thereby caused to the Vessel shall count as used laytime; but should the quarantine not be declared until the Vessel is on passage to such port, the Charterer shall not be liable for any resulting delay.

(b). FUMIGATION. If the Vessel, prior to or after entering upon this Charter, has docked or docks at any wharf which is not rat-free or stegomyia-free, she shall, before proceeding to a rat-free or stegomyia-free wharf, be fumigated by the Owner at his expense, except that if the Charterer ordered the Vessel to an infected wharf the Charterer shall bear the expense of fumigation.

18. CLEANING. The Owner shall clean the tanks, pipes and pumps of the Vessel to the satisfaction of the Charterer's Inspector. The Vessel shall not be responsible for any admixture if more than one quality of oil is shipped, nor for leakage, contamination or deterioration in quality of the cargo unless the admixture, leakage, contamination or deterioration results from (a) unseaworthiness existing at the time of loading or at the inception of the voyage which was discoverable by the exercise of due diligence, or (b) error or fault of the servants of the Owner in the loading, care or discharge of the cargo.

19. GENERAL EXCEPTIONS CLAUSE. The Vessel, her Master and Owner shall not, unless otherwise in this Charter expressly provided, be responsible for any loss or damage, or delay or failure in performing hereunder, arising or resulting from:—any act, neglect, default

Cargo Owners with the Owners under such terms and on the cargo or freight and all such expenses.

(vii) DEVIATION CLAUSE. The Vessel shall have liberty to call at any ports in any order, to sail with or without pilots, to tow or to be towed, to go to the assistance of vessels in distress, to deviate for the purpose of saving life or property or of landing any ill or injured person on board, and to call for fuel at any port or ports in or out of the regular course of the voyage. Any salvage shall be for the sole benefit of the Owner.

21. LIEN. The Owner shall have an absolute lien on the cargo for all freight, deadfreight, demurrage and costs, including attorney fees, of recovering the same, which lien shall continue after delivery of the cargo into the possession of the Charterer, or of the holders of any Bills of Lading covering the same or of any storageman.

22. AGENTS. The Owner shall appoint Vessel's agents at all ports.

23. BREACH. Damages for breach of this Charter shall include all provable damages, and all costs of suit and attorney fees incurred in any action hereunder.

24. ARBITRATION. Any and all differences and disputes of whatsoever nature arising out of this Charter shall be put to arbitration in the City of New York or in the City of London whichever place is specified in Part I of this charter pursuant to the laws relating to arbitration there in force, before a board of three persons, consisting of one arbitrator to be appointed by the Owner, one by the Charterer, and one by the two so chosen. The decision of any two of the three on any point or points shall be final. Either party hereto may call for such arbitration by service upon any officer of the other, wherever he may be found, of a written notice specifying the name and address of the arbitrator chosen by the first moving party and a brief description of the disputes or differences which such party desires to put to arbitration. If the other party shall not, by notice served upon an officer of the first moving party within twenty days of the service of such first notice, appoint its arbitrator to arbitrate the dispute or differences specified, then the first moving party shall have the right without further notice to appoint a second arbitrator, who shall be a disinterested person with precisely the same force and effect as if said second arbitrator has been appointed by the other party. In the event that the two arbitrators fail to appoint a third arbitrator within twenty days of the appointment of the second arbitrator, either arbitrator may apply to a Judge of any court of maritime jurisdiction in the city abovementioned for the appointment of a third arbitrator, and the appointment of such arbitrator by such Judge on such application shall have precisely the same force and effect as if such arbitrator had been appointed by the two arbitrators. Until such time as the arbitrators finally close the hearings either party shall have the right by written notice served on the arbitrators and on an officer of the other party to specify further disputes or differences under this Charter for hearing and determination. Awards made in pursuance to this clause may include costs, including a reasonable allowance for attorney's fees, and judgement may be entered upon any award made hereunder in any Court having jurisdiction in the premises.

25. SUBLET. Charterer shall have the right to sublet the Vessel. However, Charterer shall always remain responsible for the fulfillment of this Charter in all its terms and conditions.

26. OIL POLLUTION CLAUSE. Owner agrees to participate in Charterer's program covering oil pollution avoidance. Such program prohibits discharge overboard of all oily water, oily ballast or oil in any form of a persistent nature, except under extreme circumstances whereby the safety of the vessel, cargo or life at sea would be imperiled.

Upon notice being given to the Owner that Oil Pollution Avoidance controls are required, the Owner will instruct the Master to retain on board the vessel all oily residues from consolidated tank washings, dirty ballast, etc., in one compartment, after separation of all possible water has taken place. All water separated to be discharged overboard.

If the Charterer requires that demulsifiers shall be used for the separation of oil/water, such demulsifiers shall be obtained by the Owner and paid for by Charterer.

The oil residues will be pumped ashore at the loading or discharging terminal, either as segregated oil, dirty ballast or co-mingled with cargo as it is possible for Charterers to arrange. If it is necessary to retain the residue on board co-mingled with or segregated from the cargo to be loaded, Charterers shall pay for any deadfreight so incurred.

Should it be determined that the residue is to be co-mingled or segregated on board, the Master shall arrange that the quantity of tank washings be measured in conjunction with cargo suppliers and a note of the quantity measured made in the vessel's ullage record.

The Charterer agrees to pay freight as per the terms of the Charter Party on any consolidated tank washings, dirty ballast, etc., retained on board under Charterer's instructions during the loaded portion of the voyage up to a maximum of 1% of the total deadweight of the vessel that could be legally carried for such voyage. Any extra expenses incurred by the vessel at loading or discharging port in pumping ashore oil residues shall be for Charterer's account, and extra time, if any, consumed for this operation shall count as used laytime.

## BILL OF LADING

Shipped in apparent good order and condition by _____

on board the _____ Steamship
Motorship

whereof _____ is Master, at the port of _____

_____

_____

_____

_____

_____

to be delivered at the port of _____

or so near thereto as the Vessel can safely get, always afloat, unto _____

_____

or order on payment of freight at the rate of _____

                                                              contract
This shipment is carried under and pursuant to the terms of the charter dated New York/London

between _____ and _____ , as
                                                              contract
Charterer, and all the terms whatsoever of the said charter except the rate and payment of freight specified therein apply to and govern the rights of the parties concerned in this shipment.

In witness whereof the Master has signed _____ Bills of Lading

of this tenor and date, one of which being accomplished, the others will be void.

Dated at _____ this _____ day of _____

_____
                                                              Master

Form 30-165 Printed and Sold by UNXCO 190 Baldwin Ave., Jersey City, NJ 07306 • (800) 631-3098

AGAPI - Charter Party dated 21st October 1995
                              Special Provisions - Page 1.

1.   With reference to Clause E - Cargo:
     Minimum 29,000 metric tons Charterers' option to full  cargo.
     One/two  grades  Gasoil  Unleaded Undarker 2.5 NPA (intention
     Gasoil).

     Owners advise no slops on board and vessel can load  in  slop
     tanks.

     Subject to any draft limitation,  Owners  advise  vessel  can
     lift  about/close  to  29,500  metric  tons,  but  guaranteed
     minimum quantity is 29,000 metric tons

2.   With reference to Clause G - Freight payable in US Dollars by
     telegraphic transfer, before breaking bulk at final discharge
     port, to:
     Chase Manhattan Bank N.A.,
     PO Box 127.,
     Chase House,
     Grenville Street,
     St Helier,
     Jersey JE4 8QH
     Channel Islands.
     Credit:        Wintersea Maritime Corporation
     Account No:  6710018513
     Reference:   m/t Agapi - CP 21/10/95

3.   Charterers' option to part discharge en  route  at  Fujairah.
     Port costs, if any, to be for Charterers' account.  Time used
     to count as used laytime, unless vessel on demurrage in which
     case  demurrage  accrued to Fujairah to be paid together with
     freight.

4.   Conoco Weather Clause:
     Delays in berthing for loading or discharging and any  delays
     after  berthing  which  are  due  to weather conditions shall
     count as one half laytime, or if on demurrage,  at  one  half
     demurrage rate, except during ship to ship transfer where all
     time to count in full, weather permitting or not.

5.   Despite named ports, Charterers always to have responsibility
     of nominating and clearing vessel prior to fixing.

6.   Address  commission  of  2.5 percent payable to Charterers on
     freight and demurrage and deductible from payments made.

     Commission of 1.25  percent  payable  by  Owners  to  Petrian
     Shipbrokers  Limited  London  on  freight and demurrage as and
     when paid.

**AGAPI - Charter Party dated 21st October 1995**
**Special Provisions - Page 2.**

7.   International Oil Overseas Additional Clauses Nos to to 51 as
     amended  and attached are deemed incorporated in this Charter
     Party.

AGAPI - Charter Party dated 21st October 1995
INTERNATIONAL OIL OVERSEAS ADDITIONAL CLAUSES (ASBATANKVOY)
(Dated 11.07.1995)                                         Page 1.


1)   **PRIVACY:**
     All negotiations and every detail of this fixture are to be
     kept strictly private and confidential.


2)   **WORLDSCALE:**
     Unless otherwise provided herein Worldscale terms and
     conditions are to apply to this Charter Party.


3)   **ELIGIBILITY:**                                   AMENDED.
     Owners warrant that the vessel is in all respects eligible
     for trading within and from ranges and areas specified in the
     Charter Party and, is not prevented from discharging in such
     ranges and areas and that at all times she shall have on
     board all certificates, records and other documents and
     equipment required for such service.

     Owners further warrant that they have full knowledge of all
     restrictions and requirements by port authorities and warrant
     that ship is fully acceptable and can perform voyage in both
     loading and discharging ports.

     If Charterers have not declared the exact ports at the time
     of fixture, this Clause shall be applicable to the intended
     ports mentioned in the Charter Party negotiations, such will
     not limit Owners' warranty under this Clause to such ports
     only.


4)   **DRUG AND ALCOHOL CLAUSE:**                       AMENDED.
     Owners warrant that they have a policy on Drug and Alcohol
     Abuse ("Policy") applicable to the vessel which meets or
     exceeds the standards in the Oil Companies' International
     Marine Forum Guidelines for the Control of Drugs and Alcohol
     on Board Ship ("OCIMF Guidelines"). Owners further warrant
     that this Policy will remain in effect during the term of
     this Charter, and that Owners shall exercise due diligence to
     ensure that the Policy is complied with. For the purposes of
     the Clause and the OCIMF Guidelines, alcohol impairment shall
     be defined as a blood alcohol content of 40 mg/100 ml or
     greater; the appropriate seafarers to be tested shall be all
     vessel officers and the drug/alcohol testing and screening
     shall include random testing of the officers with a frequency
     to ensure that each officer is tested at least once a year.


5)   **ETA CLAUSE:**
     Master to give Charterers ETA loading port immediately on
     fixing and 7 days, 72/48/24/12 hours prior arrival at loading
     and discharge ports where time permits also ETA discharge
     port on sailing from load port as well as any change in ETA
     exceeding six (6) hours in all cases. All ETA notices are
     essential for demurrage purposes.

AGAPI - Charter Party dated 21st October 1995
INTERNATIONAL OIL OVERSEAS ADDITIONAL CLAUSES (ASBATANKVOY)
(Dated 11.07.1995)                                    **Page 2.**

6)   **BALLAST, INERT GAS SYSTEM AND CRUDE OIL WASHING:**
     A.                                               AMENDED.
         Vessel shall arrive at load port with clean ballast.

     B.                                               DELETED.

     C.                                               DELETED.


7)   **CERTIFICATES:**
     Vessel to comply with latest effective MARPOL and IMO
     Regulations and to be kept in compliance throughout Charter
     period.

     All other National and International Certificates to be kept
     clean and valid including but not limited to Compliance on
     Civil Liabilities, FMC Certificates as per current Rules and
     Regulations and any changes in such Rules and Regulations.
     Owners warrant that the vessel will conform in all respects
     with the applicable parts of the requirements as defined by
     the "International Convention for the Prevention of Pollution
     from Ships 1973/1978". Such compliance to include but not to
     be limited to requirements as regards efficient stripping.
     The vessel is provided with a dual IOPP Certificate,
     necessitating inspection and certification by Class Surveyor.

     Any delay caused to vessel due to any Certificate being
     unavailable or expired shall be totally for Owners' account.

     Further any detention by any port authority and/or competent
     authority for any reason due to class/flag or port
     requirements shall be totally for Owners' account.


8)   **CARGO:**                                       AMENDED.
     Owners warrant vessel is able to segregate minimum two (2)
     grades with double valve, line and pump segregation. Owner
     warrants vessel able to load/discharge two (2) grades
     simultaneously without contamination.

     The vessel is to present at loading port(s) fit for the
     carriage of cargo.


9)   **PUMPING:**                                     AMENDED.
     Owners warrant that the vessel can maintain at vessel's
     manifolds a pressure of **average 100** PSI or that cargo can be
     discharged within twenty four (24) hours, provided shore
     facilities permit, **and discharge is not interrupted for shore
     reasons.** Owner warrants vessel can discharge two (2) grades
     simultaneously.

AGAPI - Charter Party dated 21st October 1995
INTERNATIONAL OIL OVERSEAS ADDITIONAL CLAUSES (ASBATANKVOY)
(Dated 11.07.1995)                                    Page 3.

10) **SHIP TO SHIP TRANSFER OPERATIONS:**              AMENDED.
Charterers are to provide suitable fenders/lines and hoses to
safely effect **ship to ship transfer** operations. Handling of
such equipment on board the vessel shall be by Owners' crew
at Owners' cost. All such equipment shall be removed from
the vessel by Charterers upon completion of **loading** without
delay.

Vessel's crew shall connect/disconnect cargo hoses, heave
down/heave up fenders, take/throw connection lines, transfer
to/transfer back cargo hoses and any other activities
required for the completion and safe conduct of the ship to
ship transfer operation for their account without any
exclusion.

Owners warrant that the vessel is equipped with minimum ten
(10) ton derricks port and starboard amidships to handle
bunker lines/cargo hoses.

All extra insurance for above ship to ship lighterage
operations shall be for Owners' account and Charterers have
no liability for hull or other damage, if any, that may occur
during such operations, **provided that anchorage is safe and
that ship to ship transfer operation carried out in
accordance with ICS/OCIMF Ship to Ship Transfer Guide.**
Owners warrant that the vessel is equipped and capable of
safely carrying out all procedures as set out in the latest
revised edition of the ICS/OCIMF SHIP TO SHIP TRANSFER GUIDE.

11) **SUPERCARGO:**                                    AMENDED.
Charterers have the option to place on board one supercargo
at any time **at load/discharge port.** Owner is to provide such
supercargo with good accommodation with private bath and food
at Captain's table at a cost of US$7.00 per day at
Charterers' expense. Supercargo will be allowed access, to
investigate, ullage and sample all cargo, slop, bunker, and
ballast tanks, also any void spaces, and access to any other
parts of vessel that may relate to carriage of cargo as he
may require. He shall also have the right to require
selected valves on bunker and cargo systems to be sealed to
preclude the possibility of cargo/product/bunker migration.

12) **VESSEL DESCRIPTION:**

| | | |
|---|---|---|
| Name | : | Agapi |
| Flag | : | Maltese |
| Built | : | 1974 |
| Class | : | A B S |
| SDWT | : | 29,687 metric tons |
| Draft | : | 11.00 metres |
| Cubic capacity | : | 38,275 cubic metres at 100% |
| | : | including slops |

AGAPI - Charter Party dated 21st October 1995
INTERNATIONAL OIL OVERSEAS ADDITIONAL CLAUSES (ASBATANKVOY)
(Dated 11.07.1995)                                    **Page 4.**

| | | |
|---|---|---|
| LOA | : | **170 metres** |
| Beam | : | **26 metres** |
| Coated | : | **Yes** |
| Coiled | : | **Yes** |
| IGS/COW | : | **Not applicable** |
| Size and description of | | |
| Reducers on board | : | **8(12X10) 8(10X6) 6(10X8) 1(8X6)** |
| Pumping capacity | : | **4 X 900 cubic metres** |
| Tank cleaning equipment | : | **Yes** |

13) **PROTECTION & INDEMNITY INSURANCE:**
Owner warrants the vessel is a member of the **Liverpool & London** P&I Club and is complying with the revised P&I TOVALOP Clause 1987 as attached all in good standing. Owner warrants that vessel holds a pollution cover of US$500 million, and additional US$200 million during full time of Charter Party.

Owners agree to allow Charterers to have the benefit of Owners' P&I insurance to the extent the Rules of that Association permits. Owners to be responsible for all third party claims which fall under Owners' responsibility.

14) **SAFETY:**
The vessel is to comply with the latest Safety at Sea and other Safety Regulations.

15) **INSURED VALUE:**
The vessel's insured value is **US$ 5.0 million.**

16) **COMMUNICATIONS:**                                    AMENDED.
The Master is to allow Charterers' supercargo the use of vessel's communication equipment for reasonable operational purposes without charge, **excessive use will be charged.**

Master shall transmit to Charterers, on Owners' account, daily noon positions giving required information regarding vessel's position, distance to go, average speed, ETA next port, cargo temperature maintained and any other information requested.

Vessel shall maintain twenty four (24) hour watch on VHF Channel 16/14.

17) **TRADING HISTORY:**
Owners guarantee that the vessel is not boycotted by the Arab League and has never traded to Israel.

AGAPI - Charter Party dated 21st October 1995
INTERNATIONAL OIL OVERSEAS ADDITIONAL CLAUSES (ASBATANKVOY)
(Dated 11.07.1995)                                    Page 5.

18)  **AGENCY:**                                             AMENDED.
     **Owners to appoint agents nominated by Charterers at both
     ends, provided competitive.**

19)  **ACCESS:**
     The Master shall not allow any vessel or craft, other than
     those of port authorities or pilots, to secure alongside
     without the express authority of Charterers.

20)  **MOORING:**
     Owners shall provide vessel with appropriate wires/lines for
     safe mooring at all terminals within the ranges/areas
     specified herein.

21)  **OVER AGE INSURANCE:**                                 DELETED.

22)  **QUANTITATIVE RESPONSIBILITY:**
     Although Charterers' surveyor may be monitoring any transfer
     operation, this does not relieve Master or Owners of
     responsibility for verifying the quantity involved in each
     oil movement nor for liability under the terms of this
     Charter Party for any oil losses.

23)  **BERTH OCCUPANCY:**                                    AMENDED.
     Owners warrant vessel shall vacate the berth after completion
     of ballasting or within one and a half hours following
     completion of loading/discharging, **maximum six (6) hours for
     ballasting.** If ship is not able to vacate berth after such
     time due to reasons attributed to ship, any extra berth
     occupancy charges by terminal and port shall be for Owners'
     account, all time lost for such occupancy shall not count as
     used laytime.

24)  **CHARTER SIGNATURE:**                                  DELETED.

25)  **INTRANSIT LOSS:**                                     DELETED.

26)  **BLENDING:**                                           DELETED.

27)  **JUBAIL/FUJAIRAH CLAUSE:**                             DELETED.

28)  **CRUDE OIL WASHING:**                                  DELETED.

AGAPI – Charter Party dated 21st October 1995
INTERNATIONAL OIL OVERSEAS ADDITIONAL CLAUSES (ASBATANKVOY)
(Dated 11.07.1995)                                              Page 6.

29) **DEMURRAGE TIME BAR:**                                    AMENDED.
Owners agree that Charterers shall be released from all
liability for payment of demurrage, unless the claim has been
submitted to Charterers in writing with fully certified
original supporting documents, **where available,** such shall
include but not be limited to original signed Notice of
Readiness submitted and accepted and duly signed Time Sheets
and Statement of Facts duly countersigned by shippers and
receivers respectively and original Pumping Logs duly
countersigned by terminal representatives within **ninety (90)**
days of completion of discharge.

**Charterers to pay demurrage within ninety (90) days of
receipt of claim. If claim is disputed counter proposal to
be made by Charterers within twenty one (21) days of receipt
of original or subsequent claims.**

**If Charterers do not reply in time, full amount of original
claim to be paid in full within ninety (90) days of receipt
of original claim. Late payment will be liable to interest
at LIBOR Rate.**

30) **ADHERENCE TO VOYAGE INSTRUCTIONS:**                      AMENDED.
In the event of Owners/Master failing to comply fully with
the voyage instructions of Charterers or any other subsequent
instructions relayed by Charterers, Owners shall be
responsible for such failure and shall indemnify Charterers
for any loss of time, costs and expenses directly suffered by
Charterers arising therefrom and in particular due to
underlift or overlift of cargo, whether or not Owners are
entitled to claim deadfreight, **provided such instructions
given in good time.**

31) **YORK/ANTWERP RULES:**
York/Antwerp Rules 1974, as amended 1990, apply to this
Charter Party.

32) **AVERAGE/ARBITRATION:**
General Average and Arbitration shall take place in London
and English Law applies to this Charter Party.

33) **BILLS OF LADING:**
In the event of a change in discharge port named in Bills of
Lading or if the Bills of Lading are not available at
discharge port(s), the cargo is to be released by Owners
against a Letter of Indemnity signed by an authorised
signatory of Charterers in Owners' P&I Club wording without
bank guarantee or countersignature.

AGAPI - Charter Party dated 21st October 1995
INTERNATIONAL OIL OVERSEAS ADDITIONAL CLAUSES (ASBATANKVOY)
(Dated 11.07.1995)                                    Page 7.

34) ROB'S:                                            AMENDED.
In the event that any cargo remains on board upon  completion
of  discharge, Charterers shall have the right to deduct from
freight an amount equal to the FOB port of loading  value  of
such  cargo  plus  freight due with respect thereto, provided
that the volume of cargo remaining on board is  **liquid  and
pumpable  and reachable by vessel's pumps** as determined by an
independent surveyor.   Any  action  or  lack · of  action  in
accordance  with this provision shall be without prejudice to
any rights or obligations of the parties.

35) **WAR RISKS:**                                        AMENDED.
**Chevron War Risk Clause**
**Any increase of hull and machinery war risk premiums over and
above those in effect on the date of this Charter Party, will
be  for  Charterers'  account.   Any  premiums,  or increases
thereto,  attributable  to  closure   (i.e.,   blocking   and
trapping) insurance shall be for Owners' account.**

**Surcharges  which  are  in effect on the date of this Charter
Party are for Owners' account for the first seven (7) days.**

36) **CHARTERERS' UNDERWRITERS' CLAUSES:**                  AMENDED.
**Owners to telex within one (1) days of fixing  the** following
information:

    1.   Statement confirming that vessel is Classed and  name  of
         Class  and that vessel shall remain Classed with existing
         Class maintained during the entire Charter Party  period/
         voyage.

    2.   Vessel Class Notation.

    3.   All outstanding Class Recommendation, on the vessel.

    4.   Year and month of when vessel was built.

    Above information/warranties are required by the Underwriters
    of Charterers.  Charterers will be unable to accept Notice of
    Readiness/load vessel in the absence of above.

37) **TOVALOP:**
Owners **to  fax  if  requested**  valid TOVALOP Certificate and
**C.L.C.  Certificate** covering the entire Charter Party period.
This is required before payment is made by Charterers.

AGAPI - Charter Party dated 21st October 1995
INTERNATIONAL OIL OVERSEAS ADDITIONAL CLAUSES (ASBATANKVOY)
(Dated 11.07.1995)                                          **Page 8.**

38) **NOTICE OF READINESS:**                                AMENDED.
Laytime and/or demurrage at each loading and discharging port
or place shall commence at the expiry of six (6) hours after
Notice of Readiness to load or discharge has **been tendered** by
the Master, whether ship is on demurrage or not, **except if
vessel berths earlier.** Such notice shall be given at the
customary anchorage **or** the nominated loading place.

39) **ARBITRATION:**
Notwithstanding the contents elsewhere herein, both parties
to this Charter Party agree that any claim for a disputed
amount equal to or below US$25,000.00 (twenty five thousand
United States Dollars), arising out of this Charter Party
whether due to demurrage or any other reason, both parties
herein irrevocably agree to refer such dispute for
arbitration in accordance with the London Martine Arbitrators
Association Small Claims Procedure 1989, and the award of
such procedure shall be final and binding on both the
parties. Any disputes for amounts above US$25,000.00 (twenty
five thousand United States Dollars) arising out of this
Charter Party shall be dealt with according with Clause 24.

40) **DISCHARGE PORTS:**                                     DELETED.

41) **PRO RATION:**                                          DELETED.

42) **DEVIATION**                                            DELETED.

43) **STORAGE:**                                             DELETED.

44) **POSITION AND BALLAST SPEED:**
Owners warrant that the vessel's position at the time of
fixture is **Dubai Roads** and vessel's ballast speed will be
**about 12.0** knots with an expected ETA basis **Ras Tanura** of
**28th October 1995.**

45) **SPEED:**                                               AMENDED.
Vessel will perform the laden voyage at **about 12.0** knots,
weather and safe navigation permitting.

46) **BALLASTING/SHIFTING:**                                 AMENDED.
Deballasting and time proceeding to **first** berth shall not
count as used laytime or time on demurrage, even if vessel on
demurrage.

**AGAPI - Charter Party dated 21st October 1995**
**INTERNATIONAL OIL OVERSEAS ADDITIONAL CLAUSES (ASBATANKVOY)**
**(Dated 11.07.1995)**                                    **Page 9.**

47) **SOUNDING:**
Charterers to have the right to sound vessel's bunker tanks
upon arrival and departure at loading and discharging
port(s).

48) **DOCUMENTATION:**
Owners warrant and undertake that all loading documents shall
be strictly private and confidential and shall not be handed
over to any party other than Charterers or Charterers' agent/
representative, only if instructed by Charterers. Such
confidentiality shall include copies and/or quotes of such
documents to any party other than Charterers.

Owners undertake to instruct Master to strictly adhere to
above and not to release any information under whatsoever
circumstances neither in writing or in verbal unless agreed/
instructed in writing by the Charterers.

49) **TOP MANAGEMENT:**                                 DELETED.

50) **FIXTURE TIME:**                                   DELETED.

51) **ENTIRE AGREEMENT:**
This Charter Party and the attached Clauses 1 to 51 with
amendments constitutes the entire agreement between the
parties. No amendment shall be considered as a part of this
Charter Party unless expressly agreed that such is an
Addendum to the Charter Party, each Addendum is to be
numbered, dated, stamped and signed by both parties and
subsequently attached to the Charter Party in writing.

P&I REVISED TOVALOP CLAUSE 1987

Owners warrant that the vessel is a Participating Tanker in TOVALOP and will so remain during this Charter, provided however that nothing herein shall prevent Owners, upon prior notice to Charterers, from withdrawing from TOVALOP under Clauses III(B) or X thereof, and provided further that upon any withdrawal under Clause III(B) or under Clause X, following an amendment to TOVALOP which does not materially increase the obligations of the Parties thereunder, Charterers shall have the option to terminate this Charter.

When an escape or discharge of Oil occurs from the vessel and causes or threatens to cause Pollution Damage, or when there is the Threat of an escape or discharge of Oil (i.e. a grave and imminent danger of the escape or discharge of Oil which, if it occurred, would create a serious danger of Pollution Damage), then Charterers may, at their option, upon notice to Owners or Master, undertake such measures as are reasonably necessary to prevent or minimise such Damage or to remove the Threat, unless Owners promptly undertake the same.    Charterers shall keep Owners advised of the nature and result of any such measures taken by them, and if time permits, the nature of the measures intended to be taken by them.  Any of the aforementioned measures taken by Charterers shall be deemed taken on Owners' authority and as Owners' agent, and shall be at Owners' expense except to the extent that :

(1)   Any such escape or discharge or Threat was caused or contributed to by Charterers, or

(2)   By reason of the exceptions set out in Article III, Paragraph 2, of the 1969 International Convention on Civil Liability for Oil Pollution Damage, Owners are or, had the said Convention applied to such escape or discharge or to the Threat, would have been exempt from liability for the same, or

(3)   The costs of such measures together with all other liabilities, costs and expenses of Owners arising out of or in connection with such escape or discharge or Threat removal exceeds One Hundred and Sixty U.S. Dollars per ton or Sixteen Million Eight Hundred Thousand U.S. Dollars, whichever is the lesser, save insofar as Owners shall be entitled to recover such excess under either the 1971 International Convention on the Establishment of an International Fund for Compensation for Oil Pollution Damage or under CRISTAL, provided that in any incident to which the TOVALOP Supplement applies the Owners limit of liability hereunder shall be that provided for in the said Supplement;

PROVIDED ALWAYS that if Owners in their absolute discretion consider said measures should be discontinued, Owners shall so notify Charterers and thereafter Charterers shall have no right to continue said measures under the provisions of this Clause and all further liability to Charterers under this Clause shall thereupon cease.

The above provisions are not in derogation of such other rights as Charterers or Owners may have under the Charter or may otherwise have or acquire by Law or any International Convention or TOVALOP.

For the purpose of this Clause, the meaning of the term "Oil" and "Pollution Damage" shall be as defined in TOVALOP and "ton" shall be understood in relation to "tonnage" as defined therein.

# EXHIBIT F

AS/VG

Petrian Shipbrokers Limited
17 Queen Anne's Gate
London SW1H 9BU                                          4 December, 1995

Dear Sirs,

**RE:  M/T AGAPI C/P 21/10/95**

Enclosed please find Owners Demurrage Invoice in the amount of US$ 23,298.61
which please pass on to Charterers requesting prompt settlement.

Yours faithfully,
POLEMBROS SHIPPING LIMITED
(As Agents Only)

**A. Stellas**

Enclosures:

Notice of Readiness at Loadport
Vessel's Statement of facts at Loadport
Notice of Readiness at 1st Disport
Vessel's Statement of Facts at 1st Disport
Pumping Logs

**CYCLADES SHIPPING COMPANY LTD**

c/o

INTERNATIONAL OIL OVERSEAS INC                    4 December, 1995
c/o Petrian Shipbrokers Limited
17 Queen Anne's Gate                                              C/132/3375
London SW1H 9BU
                                                                              M/T AGAPI


**M/T AGAPI C/P 21/10/95**

Demurrage incurred under the above Charter Party
as per enclosed documentation

Demurrage 02D 07H 55M or 2.329861 Days X USD 10,000 =    **USD  23,298.61**




Please remit to:

Chase Manhattan Bank N.A.
P.O. BOX  127
Chase House
Grenville Street
St. Helier
Jersey JE4 8QH
Channel Islands

For Credit Account:  WINTERSEA MARITIME CORPORATION
Account No:  6710018513

E.& O.E.

**M/T AGAPI  C/P 21/10/95**

**LAYTIME STATEMENT**

**LOADING PORT  (RAS TANURA)**

|  |  |  | LAYTIME | DEMURRAGE |
|---|---|---|---|---|
| 26/10 | 2200 Hrs | Notice of readiness tendered |  |  |
| 28/10 | 0000 - 1840 | Waiting at anchorage | 00 18 40 | - - - |
|  | 1840 - 2155 | Shifting to berth | - - - | - - - |
|  | 2155 - 2400 | Preparations | 00 02 05 | - - - |
| 29/10 | 0000 - 2400 | Loading | 01 00 00 | - - - |
| 30/10 | 0000 - 0025 | Hoses off | 00 00 25 | - - - |

**DISCHARGING  PORT (PORT SUDAN)**

|  |  |  |  |  |
|---|---|---|---|---|
| 09/11 | 1530 - 2130 | Notice time | - - - | - - - |
|  | 2130 - 2400 | Waiting at anchorage | 00 02 30 | - - - |
| 10/11 | 0000 - 2400 | Waiting at anchorage | 01 00 00 | - - - |
| 11/11 | 0000 - 2400 | Waiting at anchorage | 01 00 00 | - - - |
| 12/11 | 0000 - 1500 | Waiting at anchorage | 00 00 20 | 00 23 40 |
|  | 1500 - 1615 | Shifting to berth | - - - | - - - |
|  | 1615 - 2400 | Preparations - Discharging | - - - | 00 07 45 |
| 13/11 | 0000 - 2400 | Discharging | - - - | 01 00 00 |
| 14/11 | 0000 - 0030 | Hoses off | - - - | 00 00 30 |
|  |  | **TOTAL** | **04 00 00** | **02 07 55** |

# EXHIBIT G

Code word for this Charter Party
"SHELLTIME 4"

*Issued December 1984*

**PETRIAN
SHIPBROKERS
LIMITED**



**Time Charter Party**

LONDON. 5th May 19 96

IT IS THIS DAY AGREED between  WATERFRONT SHIPPING CORPORATION    1

of MONROVIA, LIBERIA    (hereinafter referred to as "Owners"). being owners of the    2
good Bahamas flag   vessel called   GOLDEN GATE    3
(hereinafter referred to as "the vessel") described as per Clause 1 hereof and   INTERNATIONAL OIL    4

   5

OVERSEAS INC of   PANAMA    (hereinafter referred to as "Charterers"):

| | | |
|---|---|---|
| **Description and Condition of Vessel** | 1.   At the date of delivery of the vessel under this charter<br>  (a)   she shall be classed:<br>  (b)   she shall be in every way fit to carry crude petroleum and/or its products: | 6<br>7<br>8 |

  (c)   she shall be tight, staunch, strong. in good order. and condition. and in every way fit for the    9
service. with her machinery. boilers. hull and other equipment (including but not limited to hull stress calculator    10
and radar) in a good and efficient state:    11
  (d)   her tanks, valves and pipelines shall be oil-tight:    12
  (e)   she shall be in every way fitted for burning    13
     at sea – fueloil with a maximum viscosity of    180   Centistokes at 50 degrees Centigrade/any    14
     ~~commercial grade of fueloil~~ ("~~ACGFO~~") for main propulsion. marine diesel oil/~~ACGFO~~    15
     for auxiliaries    16
     in port – marine diesel oil/~~ACGFO~~ for auxiliaries:    17
  (f)   she shall comply with the regulations in force so as to enable her to pass through the Suez and    18
Panama Canals by day and night without delay:    19
  (g)   she shall have on board all certificates. documents and equipment required from time to time by    20
any applicable law to enable her to perform the charter service without delay:    21
  (h)   she shall comply with the description in ~~Form B~~ appended hereto. provided however that if there    22

> **See International Oil: Overseas Cl 2.**

is any conflict between the provisions of ~~Form B~~ and any other provision. including this Clause 1. of this charter    23
such other provision shall govern.    24

| | | |
|---|---|---|
| **Shipboard Personnel and their Duties** | 2.   (a)   At the date of delivery of the vessel under this charter | 25 |

    (i)   she shall have a full and efficient complement of master. officers and crew for a vessel of her    26
tonnage. who shall in any event be not less than the number required by the laws of the flag state and who shall be    27
trained to operate the vessel and her equipment competently and safely:    28
    (ii)   all shipboard personnel shall hold valid certificates of competence in accordance with the    29
requirements of the law of the flag state:    30
    (iii)   all shipboard personnel shall be trained in accordance with the relevant provisions of the    31
International Convention on Standards of Training. Certification and Watchkeeping for Seafarers. 1978:    32
    (iv)   there shall be on board sufficient personnel with a good working knowledge of the English    33
language to enable cargo operations at loading and discharging places to be carried out efficiently and safely and    34
to enable communications between the vessel and those loading the vessel or accepting discharge therefrom to be    35
carried out quickly and efficiently.    36
  (b)   Owners guarantee that throughout the charter service the master shall with the vessel's officers    37
and crew, unless otherwise ordered by Charterers.    38
    (i)   prosecute all voyages with the utmost despatch:    39
    (ii)   render all customary assistance: and    40
    (iii)   load and discharge cargo as rapidly as possible when required by Charterers or their agents    41
to do so. by night or by day. but always in accordance with the laws of the place of loading or discharging (as the    42
case may be) and in each case in accordance with any applicable laws of the flag state.    43

| | | |
|---|---|---|
| **Duty to Maintain** | 3.   (i)   Throughout the charter service Owners shall. whenever the passage of time. wear and tear or any | 44 |

event (whether or not coming within Clause 27 hereof) requires steps to be taken to maintain or restore the    45
conditions stipulated in Clauses 1 and 2(a). exercise due diligence so to maintain or restore the vessel.    46
    (ii)   If at any time whilst the vessel is on hire under this charter the vessel fails to comply with the    47
requirements of Clauses 1. 2(a) or 10 then hire shall be reduced to the extent necessary to indemnify Charterers    48
for such failure. If and to the extent that such failure affects the time taken by the vessel to perform any services    49
under this charter. hire shall be reduced by an amount equal to the value. calculated at the rate of hire. of the time    50
so lost.    51
     Any reduction of hire under this sub-Clause (ii) shall be without prejudice to any other remedy    52
available to Charterers. but where such reduction of hire is in respect of time lost. such time shall be excluded    53
from any calculation under Clause 24.    54
    (iii)   If Owners are in breach of their obligation under Clause 3(i) Charterers may so notify Owners in    55
writing: and if. after the expiry of 30 days following the receipt by Owners of any such notice. Owners have failed    56
to demonstrate to Charterers' reasonable satisfaction the exercise of due diligence as required in Clause 3(i). the    57
vessel shall be off-hire. and no further hire payments shall be due. until Owners have so demonstrated that they    58
are exercising such due diligence.    59
     Furthermore. at any time while the vessel is off-hire under this Clause 3 Charterers have the    60
option to terminate this charter by giving notice in writing with effect from the date on which such notice of    61
termination is received by Owners or from any later date stated in such notice. This sub-Clause (iii) is without    62
prejudice to any rights of Charterers or obligations of Owners under this charter or otherwise (including without    63
limitation Charterers' rights under Clause 21 hereof).    64

2

```
minimum seven (7)/maximum thirty
(30) days in Charterers' option.
Charterers to give five (5) days
firm delivery notice
```

| | | |
|---|---|---|
| **Period Trading**<br>**Limits** | 4.   Owners agree to let and Charterers agree to hire the vessel for a period of<br>commencing from the time and date of delivery of the vessel, for the purpose of carrying all lawful merchandise<br>(subject always to Clause 28) including in particular   See International Oil Overseas Cl 21 | 65<br>66<br>67 |

See International Oil Overseas Cl 1.

in any part of the world, as Charterers shall direct, subject to the limits of the current British Institute Warranties  68
and any subsequent amendments thereof. Notwithstanding the foregoing, but subject to Clause 35, Charterers  69
may order the vessel to ice-bound waters or to any part of the world outside such limits provided that Owners  70
consent thereto (such consent not to be unreasonably withheld) and that Charterers pay for any insurance  71
premium required by the vessel's underwriters as a consequence of such order.  72

Charterers shall use due diligence to ensure that the vessel is only employed between and at safe places  73
(which expression when used in this charter shall include ports, berths, wharves, docks, anchorages, submarine  74
lines, alongside vessels or lighters, and other locations including locations at sea) where she can safely lie always  75
afloat. Notwithstanding anything contained in this or any other clause of this charter. Charterers do not warrant  76
the safety of any place to which they order the vessel and shall be under no liability in respect thereof except for  77
loss or damage caused by their failure to exercise due diligence as aforesaid. Subject as above, the vessel shall be  78
loaded and discharged at any places as Charterers may direct, provided that Charterers shall exercise due  79
diligence to ensure that any ship-to-ship transfer operations shall conform to standards not less than those set out  80
in the latest published edition of the ICS/OCIMF Ship-to-Ship Transfer Guide.  81

The vessel shall be delivered by Owners at a port in   Fujairah  82

at Owners' option and redelivered to Owners at a port in   Fujairah  83

at Charterers' option.  84

| | | |
|---|---|---|
| **Laydays/**<br>**Cancelling** | 5.   The vessel shall not be delivered to Charterers before   6th May 1996 and Charterers shall<br>have the option of cancelling this charter if the vessel is not ready and at their disposal on or before   6th May | 85<br>86 |
| **Owners to**<br>**Provide** | 1996.   Time to count from 1800 hours.<br>6.   Owners undertake to provide and to pay for all provisions, wages, and shipping and discharging fees<br>and all other expenses of the master, officers and crew; also, except as provided in Clauses 4 and 34 hereof, for all<br>insurance on the vessel, for all deck, cabin and engine-room stores, and for water; for all drydocking, overhaul,<br>maintenance and repairs to the vessel; and for all fumigation expenses and de-rat certificates. Owners'<br>obligations under this Clause 6 extend to all liabilities for customs or import duties arising at any time during the<br>performance of this charter in relation to the personal effects of the master, officers and crew, and in relation to<br>the stores, provisions and other matters aforesaid which Owners are to provide and pay for and Owners shall<br>refund to Charterers any sums Charterers or their agents may have paid or been compelled to pay in respect of<br>any such liability. Any amounts allowable in general average for wages and provisions and stores shall be credited<br>to Charterers insofar as such amounts are in respect of a period when the vessel is on-hire. | 87<br>88<br>89<br>90<br>91<br>92<br>93<br>94<br>95<br>96 |
| **Charterers to**<br>**Provide** | 7.   Charterers shall provide and pay for all fuel (except fuel used for domestic services), towage and<br>pilotage and shall pay agency fees, port charges, commissions, expenses of loading and unloading cargoes, canal<br>dues and all charges other than those payable by Owners in accordance with Clause 6 hereof, provided that all<br>charges for the said items shall be for Owners' account when such items are consumed, employed or incurred for<br>Owners' purposes or while the vessel is off-hire (unless such purposes reasonably relate to any service given or<br>distance made good and taken into account under Clause 21 or 22); and provided further that any fuel used in<br>connection with a general average sacrifice or expenditure shall be paid for by Owners. | 97<br>98<br>99<br>100<br>101<br>102<br>103 |
| **Rate of**<br>**Hire** | 8.   Subject as herein provided, Charterers shall pay for the use and hire of the vessel at the rate of<br>US$10,000.00   per day, and pro rata for any part of a day, from the time and date of her delivery (local<br>time) until the time and date of her redelivery (local time) to Owners. | 104<br>105<br>106 |
| **Payment of**<br>**Hire** | 9.   Subject to Clause 3 (iii), payment of hire shall be made in immediately available funds to:<br>See Special Provision 1. | 107 |

| | | |
|---|---|---|
| **See International**<br>**Oil Overseas Cl 3.** | in   Account<br>per calendar month in advance, less:<br>(i)   any hire paid which Charterers reasonably estimate to relate to off-hire periods, and<br>(ii)   any amounts disbursed on Owners' behalf, any advances and commission thereon, and<br>charges which are for Owners' account pursuant to any provision hereof, and<br>(iii)   any amounts due or reasonably estimated to become due to Charterers under Clause 3 (ii) or<br>24 hereof. | 108<br>109<br>110<br>111<br>112<br>113<br>114 |

any such adjustments to be made at the due date for the next monthly payment after the facts have been  115
ascertained. Charterers shall not be responsible for any delay or error by Owners' bank in crediting Owners'  116
account provided that Charterers have made proper and timely payment.  117

In default of such proper and timely payment,  118

(a)   Owners shall notify Charterers of such default and Charterers shall within seven days of receipt of  119
such notice pay to Owners the amount due including interest, failing which Owners may withdraw the vessel from  120
the service of Charterers without prejudice to any other rights Owners may have under this charter or otherwise,  121
and  122

(b)   Interest on any amount due but not paid on the due date  shall accrue from the day after that date  123
up to and including the day when payment is made, at a rate per annum which shall be 1% above the U.S. Prime  124
Interest Rate as published by the Chase Manhattan Bank in New York at 12.00 New York time on the due date,  125
or, if no such interest rate is published on that day, the interest rate published on the next preceding day on which  126
such a rate was so published, computed on the basis of a 360 day year of twelve 30-day months, compounded  127
semi-annually.  128

3

| | |
|---|---|
| Space Available to Charterers | 10. The whole reach, burthen and decks of the vessel and any passenger accommodation (including Owners' suite) shall be at Charterers' disposal, reserving only proper and sufficient space for the vessel's master, officers, crew, tackle, apparel, furniture, provisions and stores, provided that the weight of stores on board shall not, unless specially agreed, exceed                    tonnes at any time during the charter period. |
| Overtime | 11. Overtime pay of the master, officers and crew in accordance with ship's articles shall be for Charterers' account when incurred, as a result of complying with the request of Charterers or their agents, for loading, discharging, heating of cargo, bunkering or tank cleaning. |
| Instructions and Logs | 12. Charterers shall from time to time give the master all requisite instructions and sailing directions, and he shall keep a full and correct log of the voyage or voyages, which Charterers or their agents may inspect as required. The master shall when required furnish Charterers or their agents with a true copy of such log and with properly completed loading and discharging port sheets and voyage reports for each voyage and other returns as Charterers may require. Charterers shall be entitled to take copies at Owners' expense of any such documents which are not provided by the master. |
| Bills of Lading | 13. (a) The master (although appointed by Owners) shall be under the orders and direction of Charterers as regards employment of the vessel, agency and other arrangements, and shall sign bills of lading as Charterers or their agents may direct (subject always to Clauses 35(a) and 40) without prejudice to this charter. Charterers hereby indemnify Owners against all consequences or liabilities that may arise<br><br>(i) from signing bills of lading in accordance with the directions of Charterers or their agents, to the extent that the terms of such bills of lading fail to conform to the requirements of this charter, or (except as provided in Clause 13(b)) from the master otherwise complying with Charterers' or their agents' orders:<br><br>(ii) from any irregularities in papers supplied by Charterers or their agents.<br><br>(b) Notwithstanding the foregoing, Owners shall not be obliged to comply with any orders from Charterers to discharge all or part of the cargo<br><br>(i) at any place other than that shown on the bill of lading and/or<br><br>(ii) without presentation of an original bill of lading<br><br>unless they have received from Charterers both written confirmation of such orders and an indemnity in a form acceptable to Owners. |
| Conduct of Vessel's Personnel | 14. If Charterers complain of the conduct of the master or any of the officers or crew, Owners shall immediately investigate the complaint. If the complaint proves to be well founded, Owners shall, without delay, make a change in the appointments and Owners shall in any event communicate the result of their investigations to Charterers as soon as possible. |
| Bunkers at Delivery and Redelivery<br><br>See International Oil Overseas Cl 5. | 15. ~~Charterers shall accept and pay for all bunkers on board at the time of delivery, and Owners shall on redelivery~~ (whether it occurs at the end of the charter period or on the earlier termination ~~of this charter~~) accept and pay for all bunkers remaining on board, at the then-current market prices ~~at the port of delivery or redelivery,~~ as the case may be, or if such prices are not available ~~payment shall~~ be at the then-current market prices at the nearest port at which such prices are available: ~~provided~~ that if delivery or redelivery does not take place in a port payment shall be at the price paid at the vessel's last port of bunkering before delivery or redelivery, as the case may be. ~~Owners shall give Charterers the use and benefit of any fuel contracts they may have in force from time to time, if so required by Charterers, provided suppliers agree.~~ |
| Stevedores, Pilots, Tugs | 16. Stevedores when required shall be employed and paid by Charterers, but this shall not relieve Owners from responsibility at all times for proper stowage, which must be controlled by the master who shall keep a strict account of all cargo loaded and discharged. Owners hereby indemnify Charterers, their servants and agents against all losses, claims, responsibilities and liabilities arising in any way whatsoever from the employment of pilots, tugboats or stevedores, who although employed by Charterers shall be deemed to be the servants of and in the service of Owners and under their instructions (even if such pilots, tugboat personnel or stevedores are in fact the servants of Charterers their agents or any affiliated company): provided, however, that<br><br>(i) the foregoing indemnity shall not exceed the amount to which Owners would have been entitled to limit their liability if they had themselves employed such pilots, tugboats or stevedores, and<br><br>(ii) Charterers shall be liable for any damage to the vessel caused by or arising out of the use of stevedores, fair wear and tear excepted, to the extent that Owners are unable by the exercise of due diligence to obtain redress therefor from stevedores. |
| Supernumeraries | 17. Charterers may send representatives in the vessel's available accommodation upon any voyage made under this charter, Owners finding provisions and all requisites as supplied to officers, except liquors. Charterers paying at the rate of  $7.00  per day for each representative while on board the vessel. |
| Sub-letting | 18. Charterers may sub-let the vessel, but shall always remain responsible to Owners for due fulfilment of this charter. |
| Final Voyage<br><br>Owners' | 19. If when a payment of hire is due hereunder Charterers reasonably expect to redeliver the vessel before the next payment of hire would fall due, the hire to be paid shall be assessed on ~~Charterers'~~ reasonable estimate of the time necessary to complete Charterers' programme up to redelivery, ~~and from which estimate Charterers~~ may deduct amounts due or reasonably expected to become due for<br><br>(i) disbursements on Owners' behalf ~~or charges for Owners' account pursuant to any provision~~ hereof, and<br><br>~~(ii) bunkers on board at redelivery pursuant to Clause 15~~<br><br>Promptly after redelivery any overpayment shall be refunded by Owners ~~or any underpayment made good by Charterers.~~<br><br>If at the time this charter would otherwise terminate in accordance with Clause 4 the vessel is on a ballast voyage to a port of redelivery or is upon a laden voyage, Charterers shall continue to have the use of the vessel at the same rate and conditions as stand herein for as long as necessary to complete such ballast voyage, or to complete such laden voyage and return to a port of redelivery as provided by this charter, as the case may be. |

129
130
131
132
133
134
135
136
137
138
139
140
141
142
143
144
145
146
147
148
149
150
151
152
153
154
155
156
157
158
159
160
161
162
163
164
165
166
167
168
169
170
171
172
173
174
175
176
177
178
179
180
181
182
183
184
185
186
187
188
189
190
191
192
193
194
195
196
197

4

20. Should the vessel be lost, this charter shall terminate and hire shall cease at noon on the day of her loss; .. 198
should the vessel be a constructive total loss, this charter shall terminate and hire shall cease at noon on the day on   : : 199
which the vessel's underwriters agree that the vessel is a constructive total loss; should the vessel be missing, this 200
charter shall terminate and hire shall cease at noon on the day on which she was last heard of. Any hire paid in 201
advance and not earned shall be returned to Charterers and Owners shall reimburse Charterers for the value of 202
the estimated quantity of bunkers on board at the time of termination, at the price paid by Charterers at the last 203
bunkering port. 204

Off-hire

21. (a) On each and every occasion that there is loss of time (whether by way of interruption in the 205
vessel's service or, from reduction in the vessel's performance, or in any other manner) 206
   (i)  due to deficiency of personnel or stores, repairs; gas-freeing for repairs; time in and waiting 207
to enter dry dock for repairs; breakdown (whether partial or total) of machinery, boilers or other parts of the 208
vessel or her equipment (including without limitation tank coatings); overhaul, maintenance or survey; collision, 209
stranding, accident or damage to the vessel; or any other similar cause preventing the efficient working of the 210
vessel; and such loss continues for more than three consecutive hours (if resulting from interruption in the vessel's 211
service) or cumulates to more than three hours (if resulting from partial loss of service); or · ., 212
   (ii) due to industrial action, refusal to sail, breach of orders or neglect of duty on the part of the 213
master, officers or crew; or 214
   (iii) for the purpose of obtaining medical advice or treatment for or landing any sick or injured 215
person (other than a Charterers' representative carried under Clause 17 hereof) or for the purpose of landing the 216
body of any person (other than a Charterers' representative), and such loss continues for more than three 217
consecutive hours; or 218
   (iv) due to any delay in quarantine arising from the master, officers or crew having had 219
communication with the shore at any infected area without the written consent or instructions of Charterers or 220
their agents, or to any other authorities caused by smuggling or other infraction of local 221 ·
law on the part of the master, officers, or crew; or 222
   (v)  due to detention of the vessel by authorities at home or abroad attributable to legal action 223
against or breach of regulations by the vessel, the vessel's owners, or Owners (unless brought about by the act or 224
neglect of Charterers); then 225
   without prejudice to Charterers' rights under Clause 3 or to any other rights of Charterers 226
hereunder or otherwise the vessel shall be off-hire from the commencement of such loss of time until she is again 227
ready and in an efficient state to resume her service from a position not less favourable to Charterers than that at 228
which such loss of time commenced; provided, however, that any service given or distance made good by the 229
vessel whilst off-hire shall be taken into account in assessing the amount to be deducted from hire. 230
   (b) If the vessel fails to proceed at any guaranteed speed pursuant to Clause 24, and such failure 231
arises wholly or partly from any of the causes set out in Clause 21(a) above, then the period for which the vessel 232
shall be off-hire under this Clause 21 shall be the difference between 233
   (i)  the time the vessel would have required to perform the relevant service at such guaranteed 234
speed, and 235
   (ii) the time actually taken to perform such service (including any loss of time arising from 236
interruption in the performance of such service). 237
   For the avoidance of doubt, all time included under (ii) above shall be excluded from any 238
computation under Clause 24. 239
   (c) Further and without prejudice to the foregoing, in the event of the vessel deviating (which 240
expression includes without limitation putting back, or putting into any port other than that to which she is bound 241
under the instructions of Charterers) for any cause or purpose mentioned in Clause 21(a), the vessel shall be 242
off-hire from the commencement of such deviation until the time when she is again ready and in an efficient state 243
to resume her service from a position not less favourable to Charterers than that at which the deviation 244
commenced, provided, however, that any service given or distance made good by the vessel whilst so off-hire 245
shall be taken into account in assessing the amount to be deducted from hire. If the vessel, for any cause or 246
purpose mentioned in Clause 21 (a), puts into any port other than the port to which she is bound on the 247
instructions of Charterers, the port charges, pilotage and other expenses at such port shall be borne by Owners. 248
Should the vessel be driven into any port or anchorage by stress of weather hire shall continue to be due and · 249
payable during any time lost thereby. 250
   (d) If the vessel's flag state becomes engaged in hostilities, and Charterers in consequence of such 251
hostilities find it commercially impracticable to employ the vessel and have given Owners written notice thereof 252
then from the date of receipt by Owners of such notice until the termination of such commercial impracticability 253
the vessel shall be off-hire and Owners shall have the right to employ the vessel on their own account. 254
   (e) Time during which the vessel is off-hire under this charter shall count as part of the charter 255
period. 256

22. (a) Owners have the right and obligation to drydock the vessel at regular intervals of 257
   On each occasion Owners shall propose to Charterers a date on which they wish to 258
drydock the vessel, not less than           before such date, and Charterers shall offer a port for 259
such periodical drydocking and shall take all reasonable steps to make the vessel available as near to such date as 260
practicable. 261
   Owners shall put the vessel in drydock at their expense as soon as practicable after Charterers 262
place the vessel at Owners' disposal clear of cargo other than tank washings and residues. Owners shall be 263
responsible for and pay for the disposal into reception facilities of such tank washings and residues and shall have 264
the right to retain any monies received therefor, without prejudice to any claim for loss of cargo under any bill of 265
lading or this charter. 266
   (b) If a periodical drydocking is carried out in the port offered by Charterers (which must have 267
suitable accommodation for the purpose and reception facilities for tank washings and residues), the vessel shall 268
be off-hire from the time she arrives at such port until drydocking is completed and she is in every way ready to 269
resume Charterers' service and is at the position at which she went off-hire from a position no less favourable to 270
Charterers, whichever she first attains. However, 271
   (i)  provided that Owners exercise due diligence in gas-freeing, any time lost in gas-freeing to 272
the standard required for entry into drydock for cleaning and painting the hull shall not count as off-hire, whether 273
lost on passage to the drydocking port or after arrival there (notwithstanding Clause 21), and 274

5

(ii) any additional time lost in further gas-freeing to meet the standard required for hot work or entry to cargo tanks shall count as off-hire, whether lost on passage to the drydocking port or after arrival there.

Any time which, but for sub-Clause (i) above, would be off-hire, shall not be included in any calculation under Clause 24.

The expenses of gas-freeing, including without limitation the cost of bunkers, shall be for Owners account.

(c) If Owners require the vessel, instead of proceeding to the offered port, to carry out periodical drydocking at a special port selected by them, the vessel shall be off-hire from the time when she is released to proceed to the special port until she next presents for loading in accordance with Charterers' instructions, provided, however, that Charterers shall credit Owners with the time which would have been taken on passage at the service speed had the vessel not proceeded to drydock. All fuel consumed shall be paid for by Owners but Charterers shall credit Owners with the value of the fuel which would have been used on such notional passage calculated at the guaranteed daily consumption for the service speed, and shall further credit Owners with any benefit they may gain in purchasing bunkers at the special port.

(d) Charterers shall, insofar as cleaning for periodical drydocking may have reduced the amount of tank-cleaning necessary to meet Charterers' requirements, credit Owners with the value of any bunkers which Charterers calculate to have been saved thereby, whether the vessel drydocks at an offered or a special port.

**Ship Inspection**

23. Charterers shall have the right at any time during the charter period to make such inspection of the vessel as they may consider necessary. This right may be exercised as often and at such intervals as Charterers in their absolute discretion may determine and whether the vessel is in port or on passage. Owners affording all necessary co-operation and accommodation on board provided, however,

(i) that neither the exercise nor the non-exercise, nor anything done or not done in the exercise or non-exercise, by Charterers of such right shall in any way reduce the master's or Owners' authority over, or responsibility to Charterers or third parties for, the vessel and every aspect of her operation, nor increase Charterers' responsibilities to Owners or third parties for the same; and

(ii) that Charterers shall not be liable for any act, neglect or default by themselves, their servants or agents in the exercise or non-exercise of the aforesaid right.

**Detailed Description and Performance**

24. ~~(a) Owners guarantee that the speed and consumption of the vessel shall be as follows:~~

| Average speed in knots | Maximum average bunker consumption main propulsion    –    auxiliaries fuel oil.diesel oil    fuel oil/diesel oil |
| --- | --- |
| ~~Laden~~ | ~~tonnes~~    tonnes |

See International Oil Overseas Clause 7.

**Ballast**

~~The foregoing bunker consumptions are for all purposes except cargo heating and tank-cleaning~~ and shall be pro-rated between the speeds shown.

The service speed of the vessel is         knots laden and         knots in ballast and in the absence of Charterers' orders to the contrary the vessel shall proceed at the service speed. However if more than one laden and one ballast speed are shown in the table above Charterers shall have the right to order the vessel to steam at any speed within the range set out in the table (the "ordered speed").

If the vessel is ordered to proceed at any speed other than the highest speed shown in the table, and the average speed actually attained by the vessel during the currency of such order exceeds such ordered speed plus 0.5 knots (the "maximum recognised speed"), then for the purpose of calculating any increase or decrease of hire under this Clause 24 the maximum recognised speed shall be used in place of the average speed actually attained.

For the purposes of this charter the "guaranteed speed" at any time shall be the then-current ordered speed or the service speed, as the case may be

The average speeds and bunker consumptions shall for the purposes of this Clause 24 be calculated by reference to the observed distance from pilot station to pilot station on all sea passages during each period stipulated in Clause 24 (c), but excluding any time during which the vessel is (or but for Clause 22 (b) (i) would be) off-hire and also excluding "Adverse Weather Periods", being (i) any periods during which reduction of speed is necessary for safety in congested waters or in poor visibility (ii) any days, noon to noon, when winds ~~exceed force 8 on the Beaufort Scale for more than 12 hours.~~

6

(b) If during any year from the date on which the vessel enters service (anniversary to anniversary) the vessel falls below or exceeds the performance guaranteed in Clause 24(a) then if such shortfall or excess results

(i)  from a reduction or an increase in the average speed of the vessel, compared to the speed guaranteed in Clause 24(a), then an amount equal to the value at the hire rate of the time so lost or gained, as the case may be, shall be deducted from or added to the hire paid;

(ii)  from an increase or a decrease in the total bunkers consumed, compared to the total bunkers which would have been consumed had the vessel performed as guaranteed in Clause 24(a), an amount equivalent to the value of the additional bunkers consumed or the bunkers saved, as the case may be, based on the average price paid by Charterers for the vessel's bunkers in such period, shall be deducted from or added to the hire paid.

The addition to or deduction from hire so calculated for laden and ballast mileage respectively shall be adjusted to take into account the mileage steamed in each such condition during Adverse Weather Periods, by dividing such addition or deduction by the number of miles over which the performance has been calculated and multiplying by the same number of miles plus the miles steamed during the Adverse Weather Periods, in order to establish the total addition to or deduction from hire to be made for such period.

Reduction of hire under the foregoing sub-Clause (b) shall be without prejudice to any other remedy available to Charterers.

(c)  Calculations under this Clause 24 shall be made for the yearly periods terminating on each successive anniversary of the date on which the vessel enters service, and for the period between the last such anniversary and the date of termination of this charter if less than a year. Claims in respect of reduction of hire arising under this Clause during the final year or part year of the charter period shall in the first instance be settled in accordance with Charterers' estimate made two months before the end of the charter period. Any necessary adjustment after this charter terminates shall be made by payment by Owners to Charterers or by Charterers to Owners as the case may require.

Payments in respect of increase of hire arising under this Clause shall be made promptly after receipt by Charterers of all the information necessary to calculate such increase.

**Salvage**

25.  Subject to the provisions of Clause 21 hereof, all loss of time and all expenses (excluding any damage to or loss of the vessel or tortious liabilities to third parties) incurred in saving or attempting to save life or in successful or unsuccessful attempts at salvage shall be borne equally by Owners and Charterers provided that Charterers shall not be liable to contribute towards any salvage payable by Owners arising in any way out of services rendered under this Clause 25.

All salvage and all proceeds from derelicts shall be divided equally between Owners and Charterers after deducting the master's, officers' and crew's share.

**Lien**

26.  Owners shall have a lien upon all cargoes and all freights, sub-freights and demurrage for any amounts due under this charter; and Charterers shall have a lien on the vessel for all monies paid in advance and not earned, and for all claims for damages arising from any breach by Owners of this charter.

**Exceptions**

27.  (a)  The vessel, her master and Owners shall not, unless otherwise in this charter expressly provided, be liable for any loss or damage or delay or failure arising or resulting from any act, neglect or default of the master, pilots, mariners or other servants of Owners in the navigation or management of the vessel; fire, unless caused by the actual fault or privity of Owners; collision or stranding; dangers and accidents of the sea; explosion, bursting of boilers, breakage of shafts or any latent defect in hull, equipment or machinery; provided, however, that Clauses 1, 2, 3 and 24 hereof shall be unaffected by the foregoing. Further, neither the vessel, her master or Owners, nor Charterers shall, unless otherwise in this charter expressly provided, be liable for any loss or damage or delay or failure in performance hereunder arising or resulting from act of God, act of war, seizure under legal process, quarantine restrictions, strikes, lock-outs, riots, restraints of labour, civil commotions or arrest or restraint of princes, rulers or people.

(b)  The vessel shall have liberty to sail with or without pilots, to tow or go to the assistance of vessels in distress and to deviate for the purpose of saving life or property.

(c)  Clause 27(a) shall not apply to or affect any liability of Owners or the vessel or any other relevant person in respect of

(i)  loss or damage caused to any berth, jetty, dock, dolphin, buoy, mooring line, pipe or crane or other works or equipment whatsoever at or near any place to which the vessel may proceed under this charter, whether or not such works or equipment belong to Charterers, or

(ii)  any claim (whether brought by Charterers or any other person) arising out of any loss of or damage to or in connection with cargo. All such claims shall be subject to the Hague-Visby Rules or the Hague Rules, as the case may be, which ought pursuant to Clause 38 hereof to have been incorporated in the relevant bill of lading (whether or not such bill of lading is issued, and whether or not such Rules were so incorporated) or, if no such bill of lading is issued, to the Hague-Visby Rules.

(d)  In particular and without limitation, the foregoing subsections (a) and (b) of this Clause shall not apply to or in any way affect any provision in this charter relating to off-hire or to reduction of hire.

**Injurious Cargoes**

28.  No acids, explosives or cargoes injurious to the vessel shall be shipped and without prejudice to the foregoing any damage to the vessel caused by the shipment of any such cargo, and the time taken to repair such damage, shall be for Charterers' account. No voyage shall be undertaken, nor any goods or cargoes loaded, that would expose the vessel to capture or seizure by rulers or governments.

**Grade of Bunkers**

29.  Charterers shall supply marine diesel oil/fuel oil with a maximum viscosity of 180 Centistokes at 50 degrees Centigrade/AGGFO for main propulsion and diesel oil/AGGFO for the auxiliaries. If Owners require the vessel to be supplied with more expensive bunkers they shall be liable for the extra cost thereof.

Charterers warrant that all bunkers provided by them in accordance herewith shall be of a quality complying with the International Marine Bunker Supply Terms and Conditions of Shell International Trading Company and with its specification for marine fuels as amended from time to time.

**Disbursements**

30.  Should the master require advances for ordinary disbursements at any port, Charterers or their agents shall make such advances to him, in consideration of which Owners shall pay a commission of two and a half per cent, and all such advances and commission shall be deducted from hire

327
328
329
330
331
332
333
334
335
336
337
338
339
340
341
342
343
344
345
346
347
348
349
350
351
352
353
354
355
356
357
358
359
360
361
362
363
364
365
366
367
368
369
370
371
372
373
374
375
376
377
378
379
380
381
382
383
384
385
386
387
388
389
390
391
392
393
394
395
396
397
398
399

7

**Laying-up**

31. Charterers shall have the option, after consultation with Owners, of requiring Owners to lay up the vessel at a safe place nominated by Charterers, in which case the hire provided for under this charter shall be adjusted to reflect any net increases in expenditure reasonably incurred or any net saving which should reasonably be made by Owners as a result of such lay-up. Charterers may exercise the said option any number of times during the charter period.

**Requisition**

32. Should the vessel be requisitioned by any government, de facto or de jure, during the period of this charter, the vessel shall be off-hire during the period of such requisition, and any hire paid by such government in respect of such requisition period shall be for Owners' account. Any such requisition period shall count as part of the charter period.

**Outbreak of War**

33. If war or hostilities break out between any two or more of the following countries: U.S.A., U.S.S.R., P.R.C., U.K., Netherlands—both Owners and Charterers shall have the right to cancel this charter.

**Additional War Expenses**

34. If the vessel is ordered to trade in areas where there is war (de facto or de jure) or threat of war, Charterers shall reimburse Owners for any additional insurance premia, crew bonuses and other expenses which are reasonably incurred by Owners as a consequence of such orders, provided that Charterers are given notice of such expenses as soon as practicable and in any event before such expenses are incurred, and provided further that Owners obtain from their insurers a waiver of any subrogated rights against Charterers in respect of any claims by Owners under their war risk insurance arising out of compliance with such orders.

**War Risks**

35. (a) The master shall not be required or bound to sign bills of lading for any place which in his or Owners' reasonable opinion is dangerous or impossible for the vessel to enter or reach owing to any blockade, war, hostilities, warlike operations, civil war, civil commotions or revolutions.

(b) If in the reasonable opinion of the master or Owners it becomes, for any of the reasons set out in Clause 35(a) or by the operation of international law, dangerous, impossible or prohibited for the vessel to reach or enter, or to load or discharge cargo at, any place to which the vessel has been ordered pursuant to this charter (a "place of peril"), then Charterers or their agents shall be immediately notified by telex or radio messages, and Charterers shall thereupon have the right to order the cargo, or such part of it as may be affected, to be loaded or discharged, as the case may be, at any other place within the trading limits of this charter (provided such other place is not itself a place of peril). If any place of discharge is or becomes a place of peril, and no orders have been received from Charterers or their agents within 48 hours after dispatch of such messages, then Owners shall be at liberty to discharge the cargo or such part of it as may be affected at any place which they or the master may in their or his discretion select within the trading limits of this charter and such discharge shall be deemed to be due fulfilment of Owners' obligations under this charter so far as cargo so discharged is concerned.

(c) The vessel shall have liberty to comply with any directions or recommendations as to departure, arrival, routes, ports of call, stoppages, destinations, zones, waters, delivery or in any other wise whatsoever given by the government of the state under whose flag the vessel sails or any other government or local authority or by any person or body acting or purporting to act as or with the authority of any such government or local authority including any de facto government or local authority or by any person or body acting or purporting to act as or with the authority of any such government or local authority or by any committee or person having under the terms of the war risks insurance on the vessel the right to give any such directions or recommendations. If by reason of or in compliance with any such directions or recommendations anything is done or is not done, such shall not be deemed a deviation.

If by reason of or in compliance with any such direction or recommendation the vessel does not proceed to any place of discharge to which she has been ordered pursuant to this charter, the vessel may proceed to any place which the master or Owners in his or their discretion select and there discharge the cargo or such part of it as may be affected. Such discharge shall be deemed to be due fulfilment of Owners' obligations under this charter so far as cargo so discharged is concerned.

Charterers shall procure that all bills of lading issued under this charter shall contain the Chamber of Shipping War Risks Clause 1952.

**Both to Blame Collision Clause**

36. If the liability for any collision in which the vessel is involved while performing this charter falls to be determined in accordance with the laws of the United States of America, the following provision shall apply:

"If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the master, mariner, pilot or the servants of the carrier in the navigation or in the management of the ship, the owners of the cargo carried hereunder will indemnify the carrier against all loss, or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of the said cargo, paid or payable by the other or non-carrying ship or her owners to the owners of the said cargo and set off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or carrier."

"The foregoing provisions shall also apply where the owners, operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect of a collision or contact."

Charterers shall procure that all bills of lading issued under this charter shall contain a provision in the foregoing terms to be applicable where the liability for any collision in which the vessel is involved falls to be determined in accordance with the laws of the United States of America.

**New Jason Clause**

37. General average contributions shall be payable according to the York/Antwerp Rules, 1974, and shall be adjusted in London in accordance with English law and practice but should adjustment be made in accordance with the law and practice of the United States of America, the following provision shall apply:

"In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible by statute, contract or otherwise, the cargo, shippers, consignees or owners of the cargo shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo."

"If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover

8

the estimated contribution of the cargo and any salvage and special charges thereon shall, if required, be made by    473
the cargo, shippers, consignees or owners of the cargo to the carrier before delivery." '    474
    Charterers shall procure that all bills of lading issued under this charter shall contain a provision in the    475
foregoing terms, to be applicable where adjustment of general average is made in accordance with the laws and    476
practice of the United States of America.    477

**Clause Paramount**

    38.  Charterers shall procure that all bills of lading issued pursuant to this charter shall contain the    478
following clause:    479
    "(1) Subject to sub-clause (2) hereof, this bill of lading shall be governed by, and have effect subject    480
to, the rules contained in the International Convention for the Unification of Certain Rules relating to Bills of    481
Lading signed at Brussels on 25th August 1924 (hereafter the "Hague Rules") as amended by the Protocol signed    482
at Brussels on 23rd February 1968 (hereafter the "Hague-Visby Rules"). Nothing contained herein shall be    483
deemed to be either a surrender by the carrier of any of his rights or immunities or any increase of any of his    484
responsibilities or liabilities under the Hague-Visby Rules."    485
    "(2) If there is governing legislation which applies the Hague Rules compulsorily to this bill of lading,    486
to the exclusion of the Hague-Visby Rules, then this bill of lading shall have effect subject to the Hague Rules.    487
Nothing herein contained shall be deemed to be either a surrender by the carrier of any of his rights or immunities    488
or an increase of any of his responsibilities or liabilities under the Hague Rules."    489
    "(3) If any term of this bill of lading is repugnant to the Hague-Visby Rules, or Hague Rules if    490
applicable, such term shall be void to that extent but no further."    491
    "(4) Nothing in this bill of lading shall be construed as in any way restricting, excluding or waiving the    492
right of any relevant party or person to limit his liability under any available legislation and/or law."    493

**TOVALOP**

    39.  Owners warrant that the vessel is:    494
    (i)  a tanker in TOVALOP and,    495
    (ii)  properly entered in  Liverpool & London    P & I Club    496

and will so remain during the currency of this charter.    497
    When an escape or discharge of Oil occurs from the vessel and causes or threatens to cause Pollution    498
Damage, or when there is the threat of an escape or discharge of Oil (i.e. a grave and imminent danger of the    499
escape or discharge of Oil which, if it occurred, would create a serious danger of Pollution Damage, whether or    500
not an escape or discharge in fact subsequently occurs), then Charterers may, at their option, upon notice to    501
Owners or master, undertake such measures as are reasonably necessary to prevent or minimise such Pollution    502
Damage or to remove the Threat, unless Owners promptly undertake the same. Charterers shall keep Owners    503
advised of the nature and result of any such measures taken by them and, if time permits, the nature of the    504
measures intended to be taken by them. Any of the aforementioned measures taken by Charterers shall be    505
deemed taken on Owners' authority as Owners' agent, and shall be at Owners' expense except to the extent that:    506
    (1)  any such escape or discharge or Threat was caused or contributed to by Charterers, or    507
    (2)  by reason of the exceptions set out in Article III, paragraph 2, of the 1969 International    508
Convention on Civil Liability for Oil Pollution Damage, Owners are or, had the said Convention applied to such    509
escape or discharge or to the Threat, would have been exempt from liability for the same, or    510
    (3)  the cost of such measures together with all other liabilities, costs and expenses of Owners arising    511
out of or in connection with such escape or discharge or Threat exceeds one hundred and sixty United States    512
Dollars (US $160) per ton of the vessel's Tonnage or sixteen million eight hundred thousand United States    513
Dollars (US $16,800,000), whichever is the lesser, save and insofar as Owners shall be entitled to recover such    514
excess under either the 1971 International Convention on the Establishment of an International Fund for    515
Compensation for Oil Pollution Damage or under CRISTAL:    516
    PROVIDED ALWAYS that if Owners in their absolute discretion consider said measures    517
should be discontinued, Owners shall so notify Charterers and thereafter Charterers shall have no right to    518
continue said measures under the provisions of this Clause 39 and all further liability to Charterers under this    519
Clause 39 shall thereupon cease.    520
    The above provisions are not in derogation of such other rights as Charterers or Owners may have    521
under this charter or may otherwise have or acquire by law or any International Convention or TOVALOP.    522
    The term "TOVALOP" means the Tanker Owners' Voluntary Agreement Concerning Liability    523
for Oil Pollution dated 7th January 1969, as amended from time to time, and the term "CRISTAL" means the    524
Contract Regarding an Interim Supplement to Tanker Liability for Oil Pollution dated 14th January 1971, as    525
amended from time to time. The terms "Oil", "Pollution Damage", and "Tonnage" shall for the purposes of this    526
Clause 39 have the meanings ascribed to them in TOVALOP.    527

**Export Restrictions**

    40.  The master shall not be required or bound to sign bills of lading for the carriage of cargo to any place to    528
which export of such cargo is prohibited under the laws, rules or regulations of the country in which the cargo was    529
produced and/or shipped.    530
    Charterers shall procure that all bills of lading issued under this charter shall contain the following    531
clause:    532
    "If any laws rules or regulations applied by the government of the country in which the cargo was    533
produced and/or shipped, or any relevant agency thereof, impose a prohibition on export of the cargo    534
to the place of discharge designated in or ordered under this bill of lading, carriers shall be entitled to    535
require cargo owners forthwith to nominate an alternative discharge place for the discharge of the    536
cargo, or such part of it as may be affected, which alternative place shall not be subject to the    537
prohibition, and carriers shall be entitled to accept orders from cargo owners to proceed to and    538
discharge at such alternative place, If cargo owners fail to nominate an alternative place within 72    539
hours after they or their agents have received from carriers notice of such prohibition, carriers shall be    540
at liberty to discharge the cargo or such part of it as may be affected by the prohibition at any safe place    541
on which they or the master may in their or his absolute discretion decide and which is not subject to the    542
prohibition, and such discharge shall constitute due performance of the contract contained in this bill    543
of lading so far as the cargo so discharged is concerned".    544
    The foregoing provision shall apply mutatis mutandis to this charter, the references to a bill of lading    545
being deemed to be references to this charter.    546

9

**Law and Litigation**

41. (a) This charter shall be construed and the relations between the parties determined in accordance with the laws of England. | 547 / 548

(b) Any dispute arising under this charter shall be decided by the English Courts to whose jurisdiction the parties hereby agree. | 549 / 550

(c) Notwithstanding the foregoing, but without prejudice to any party's right to arrest or maintain the arrest of any maritime property, either party may, by giving written notice of election to the other party, elect to have any such dispute referred to the arbitration of a single arbitrator in London in accordance with the provisions of the Arbitration Act 1950, or any statutory modification or re-enactment thereof for the time being in force. | 551 / 552 / 553 / 554 / 555

(i) A party shall lose its right to make such an election only if: | 556

  (a) it receives from the other party a written notice of dispute which – | 557

    (1) states expressly that a dispute has arisen out of this charter; | 558

    (2) specifies the nature of the dispute; and | 559

    (3) refers expressly to this clause 41(c) | 560

  and | 561

  (b) it fails to give notice of election to have the dispute referred to arbitration not later than 30 days from the date of receipt of such notice of dispute. | 562 / 563

(ii) The parties hereby agree that either party may – | 564

  (a) appeal to the High Court on any question of law arising out of an award; | 565

  (b) apply to the High Court for an order that the arbitrator state the reasons for his award; | 566

  (c) give notice to the arbitrator that a reasoned award is required; and | 567

  (d) apply to the High Court to determine any question of law arising in the course of the reference. | 568 / 569

(d) It shall be a condition precedent to the right of any party to a stay of any legal proceedings in which maritime property has been, or may be, arrested in connection with a dispute under this charter, that that party furnishes to the other party security to which that other party would have been entitled in such legal proceedings in the absence of a stay. | 570 / 571 / 572 / 573

**Construction**

42. The side headings have been included in this charter for convenience of reference and shall in no way affect the construction hereof. | 574 / 575

Special Provisions Nos 1 to 8 as attached are deemed incorporated in this Charter Party.

**GOLDEN GATE - Time Charter Party dated 5th May 1996**

Special Provisions - Page 1.

1.    With reference to Clause 4, line 65 insert:
      Minimum seven (7) days/maximum thirty (30) days in Charterers' option.
      Charterers to give five (5) days firm redelivery notice.


2.    With reference to Clause 9, line 107 insert:
      In US Dollars by telegraphic transfer to:
      Chase Manhattan Bank N.A.,
      PO Box 1276.,
      Chase House,
      Grenville Street,
      St Helier,
      Jersey, JE4 8QH, Channel Islands.
      Credit:           Wintersea Maritime Corporation
      Account No:       6710018513
      Reference:        GOLDEN GATE / CP 05/05/96


3.    Owners confirm that Inert Gas System is operative and vessel will arrive load
      port inerted, if instructed.


4.    Master to allow agents at load port to issue/sign Bill of Lading on his behalf,
      Charterers providing necessary documents to protect Owners' position in all
      respects.  (If necessary per Addendum to be agreed).


5.    Charterers' intention is to load a first cargo of Fuel Oil at Bandar Mahshahr and
      top-up/blend and/or part discharge at Fujairah.

      Cargo quality and quantity will be remeasured at Fujairah by Charterers'
      appointed surveyor 'Saybolt'.


6.    Charterers will issue new Bills of Lading for total cargo showing load port ship to
      ship transfer Fujairah, and bearing deemed date in Charterers' option 25th April
      1996/date of sailing Fujairah, in view Charterers working against hard currency
      export licence expiry date at receivers' end.

      Charterers will issue necessary Letter of Indemnity as per Owners' format.

      First set (3/3) Original Bill of Lading signed at Kharg Island to be handed to
      Master prior to signing new Bill of Lading.  If Original Bill of Lading not available
      Charterers to issue Letter of Indemnity for discharge of cargo at Fujairah.

**GOLDEN GATE - Time Charter Party dated 5th May 1996**

**Special Provisions - Page 2.**

7.    Address commission of 2.5 percent on hire, deductible when payment made.

Commission of 1.25 percent payable by Owners to Petrian Shipbrokers Limited, |London on hire as and when paid.

8.    International Oil Overseas International Additional Clauses Nos. 1 to 40 as amended and attached are deemed incorporated in this Charter Party.

GOLDEN GATE - Time Charter Party dated 5th May 1996
INTERNATIONAL OIL OVERSEAS ADDITIONAL CLAUSES FOR TIME CHARTER
(SHELLTIME 4) (dated 21.12.1993)                                    (Page 1)

1)    TRADING                                                    AMENDED.
      Within Institute Warranty Limits Arabian Sea **(excluding Iraq), Red
      Sea/India/East Africa (not south of Dar es Salaam), (excluding Israel).**

2)    VESSEL DESCRIPTION:
      Name                          : **m/t Golden Gate**
      Flag                          : **Bahamas**
      Built                         : **1975**
      Class                         : **NKK**
      SDWT                          : **82,543 metric tons**
      Draft                         : **14.63 metres**
      Cubic capacity:               : **96,939.4 cubic metres at 98% excluding slops**
      LOA                           : **232.0 metres**
      Beam                          : **36.0 metres**
      Coated                        : **No**
      Coiled                        : **Yes**
      IGS/COW                       : **Yes / Yes**
      Size and description of
          Reducers on board         :
      Pumping capacity              :
      Tank cleaning equipment       : **Crude Oil Washing**

3)    HIRE PAYMENT:                                              AMENDED.
      **Hire payable every ten (10) days in advance without deduction.  If any
      payment is not received by the due date, or it is apparent that it will not be
      received, Owners to have the right to suspend voyage or operations and
      not resume until hire received.  Any time so lost to count in full.**

4)    CLEANING OF CARGO TANKS, LINES AND PUMPS:                  AMENDED.
      Master of vessel to ensure that all cargo tanks completely dry and free of any
      water when presenting vessel for loading.   The vessel has fixed or portable
      equipment on board necessary to undertake cleaning operation efficiently and
      timely without delay and such equipment will be maintained properly and kept
      on board the vessel throughout the Charter period in good working
      condition.

GOLDEN GATE - Time Charter Party dated 23rd April 1996
INTERNATIONAL OIL OVERSEAS ADDITIONAL CLAUSES FOR TIME CHARTER
Page 2.

5)    BUNKERS: (Revised 14/01/96)                              AMENDED.
      The vessel is to be delivered with bunkers as on board (which if required
      are to be measured by independent cargo surveyor) and redelivered with **at
      least** the same quantity as on delivery, but **maximum ten (10) percent more.**
      During the period of the Charter the Charterers will replenish bunkers as
      necessary in their own time and at their own expense. **In any event Charterers
      to provide bunkers after first voyage so that vessel will have minimum
      quantity as on delivery after subsequent voyage(s).**

      In the event of an excess in quantity on redelivery, Owners shall make
      reimbursement at the following prices:

      Fuel Oil 180 Centistokes        US$        per metric ton
      Diesel Oil                      US$        per metric ton


6)    DRYDOCKING:
      Owner warrants vessel will not dry dock during the period this Charter Party
      except due to Force Majeure.


7)    SPEED/CONSUMPTION:
      Approximate daily Speed/Consumption up to and including B4 and DSS4:

      **12 knots on 42 tons Fuel Oil (180) and 3.5 tons MDO (average laden/ballast)**
      **10 knots average consumption about 37 tons Fuel Oil plus 3.5 tons MDO**
              **(without guarantee)**
      **Load:**                          **7 tons Fuel Oil**
      **Discharge:**                     **60 tons Fuel Oil (excluding COW)**
      **Discharge:**                     **75 tons Fuel Oil (including COW)**
      **Cleaning:**                      **20 tons Fuel Oil**
      **Idle (for safety reasons boiler**
          **always on standby):**        **5 tons + 3.5 tons**
      **Maintain cargo temperature:**    **20 tons**
      **Manoeuvring:**                   **7 tons FO per day + 1.8 tons MDO per hour**
      **Ballasting/deballasting:**       **10 tons FO per operation**

      **Above always plus 3.5 tons MDO per day.**

GOLDEN GATE - Time Charter Party dated 5th May 1996
INTERNATIONAL OIL OVERSEAS ADDITIONAL CLAUSES FOR TIME CHARTER
Page 3.

8)    BUNKERS ON BOARD:                                        AMENDED
     Bunkers on delivery expected to be about 350 metric tons Fuel plus about
     50 metric tons Gasoil.   Prices to be same on delivery/redelivery, i.e.,
     US$110.00/US$210.000 respectively.

9)    FRESHWATER:
     All fresh water required on board including boiler fresh water to be for
     Owners' account.

10)   CARGO RISK:
     Cargo shall be loaded into the vessel at Charterers' expense and risk only up to
     vessel's receiving manifold. Cargo shall be discharged from the vessel at
     Owners' risk only up vessel's discharge manifold.

11)   SLOPS:                                                   AMENDED.
     Thereafter slops on board if any shall not be discharged without prior Charterers'
     approval and all costs for removal of such slops will be for Owners' account.
     Owners undertake to report to Charterers whenever slops accumulate and
     advise stowage, volume and proposed usage/disposal of such slops.

12)   SAFETY AND CONDITION:
     Vessel's equipment, operation and manning shall be in conformity with
     approved and/or accepted international standards such as IMO and
     ICS/OCIMF with regard to safety and pollution prevention.  Any delays arising
     from vessel's failure to meet the above standards shall entitle to place the
     Charterers to place the vessel off-hire without prejudice to other remedies
     available to Charterers.

13)   MANNING:
     In order to properly handle bunkering operations the vessel shall have as a
     minimum requirement the Master, two licensed Deck Officers and four Able
     Seamen available on deck throughout the operations.

14)   PERFORMANCE:                                            AMENDED.
     Owners waive any right to make an overperformance claim. This waiver
     shall not offset any underperformance claim made by Charterers.

**GOLDEN GATE - Time Charter Party dated 5th May 1996**
**INTERNATIONAL OIL OVERSEAS ADDITIONAL CLAUSES FOR TIME CHARTER**

Page 4.

15)  ON HIRE/OFF HIRE SURVEY:                                    DELETED.

16)  ELIGIBILITY:                                                AMENDED.
     Owners warrant that the vessel is in all respects eligible for trading within, to
     and from ranges and areas specified in the Charter Party and at all times she
     shall have on board all certificates, records and other documents and
     equipment required for such service.

17)  DRUG AND ALCOHOL CLAUSE:
     Owners warrant that they have a policy on Drug and Abuse ("Policy")
     applicable to the vessel which meets or exceeds the standards in the Oil
     Companies' Marine Forum Guidelines for the Control of Drugs and Alcohol on
     Board Ship ("OCIMF Guidelines"). Owners further warrant that this Policy is
     complied with. For the purposes of the Clause and the OCIMF Guidelines,
     alcohol impairment shall be defined as a blood alcohol content of 40
     mg/100 ml or greater; the appropriate seafarers to be tested shall be all vessel
     officers and the drug/alcohol testing and screening shall include random testing
     of the officers with a frequency to ensure that each officer is tested at least
     once a year.

18)  ETA CLAUSE:
     Master to give Charterers ETA loading port as soon as ordered and seven (7)
     days, 72/48/24/12 hours prior arrival at loading and discharge ports where
     time permits also ETA discharge port on sailing from load port as well as
     change in ETA exceeding six (6) hours in all cases.

19)  BALLAST, INERT GAS SYSTEM AND CRUDE OIL WASHING:
     A. Vessel shall arrive at load port with clean ballast.

     B. Owner warrants vessel has operable Crude Oil Washing and Inert Gas
        System, and both Systems shall be operational during duration of this
        Charter Party up to standard required by Loading Terminals by fully
        capable and qualified personnel.

20)  CERTIFICATES:
     Vessel to comply with latest effective MARPOL and IMO Regulations and
     to be kept in compliance throughout period.

**GOLDEN GATE - Time Charter Party dated 5th May 1996**
**INTERNATIONAL OIL OVERSEAS ADDITIONAL CLAUSES FOR TIME CHARTER**
**Page 5.**

All other National and International Certificates to be kept clean and valid including but not limited to Compliance on Civil Liabilities, FMC Certificates as per current Rules and Regulations and any changes in such Rules and Regulations. Owners warrant that the vessel will conform in all respects with the applicable parts of the requirements as defined by the "International Convention for the Prevention of Pollution from Ships 1973/1978". Such compliance to include but not to be limited to requirements as regards efficient stripping. The vessel is provided with a dual IOPP Certificate, necessitating inspection and certification by Class Surveyor.

Any delay caused to vessel due to any Certificate being unavailable or expired shall be totally for Owners' account.

21) CARGO:                                                                        AMENDED.
Charterers have the option of loading Crude Oil, Dirty Petroleum Products, Gasoil and Marine Diesel Oil, maximum........grades, but where vessel loads one grade on top of another for admixing purposes same to be treated as one grade.

Owners warrant vessel is able to segregate minimum two (2) grades with double valve, line and pump segregation. Owner warrants vessel able to load/discharge two (2) grades simultaneously without contamination.

**Charterers fully indemnify Owners for any claims arising as a result of admixing/co-mingling cargo.**

22) PUMPING:                                                                    AMENDED.
Owners warrant that the vessel can maintain at vessel's manifolds a pressure of **average** 100 PSI or that cargo can be discharged within twenty four (24) hours, **except for stripping and crude oil washing,** provided shore facilities permit **and discharge is not interrupted.** Owner warrants vessel can discharge two (2) grades simultaneously.

In ship to ship transfer operations, vessel warrants to achieve a discharge rate of up to 2,500 metric tons per hour and any rate requested by Charterer below such maximum down to 400 metric tons per hour, **provided receiving vessel is capable of receiving same.** Vessel has on board a sufficient range of reducers to allow connection to various hose line diameters and terminal cargo manifolds.

GOLDEN GATE - Time Charter Party dated 5th May 1996
INTERNATIONAL OIL OVERSEAS ADDITIONAL CLAUSES FOR TIME CHARTER
Page 6.

23) SHIP TO SHIP TRANSFER OPERATIONS:

If required by the Charterers the vessel shall load and/or discharge full or part cargo alongside other vessel(s) in port or at a safe anchorage or under any other circumstances, provided they are safe and at Master's discretion, which shall not be unreasonably withheld.

Charterers are to provide suitable fenders/lines and hoses to safely effect such operations and have the option to store same on board for the duration of Charter Party. Handling of such equipment on board the vessel shall be by Owners' crew at Owners' cost. All such equipment shall be removed from the vessel by Charterers upon completion of Charter Party without delay.

Vessel's crew shall connect/disconnect cargo hoses, heave down/heave up fenders, take/throw connection lines, transfer to/transfer back cargo hoses and any other activities required for the completion and safe conduct of the ship to ship transfer operation for their account without any exclusion.

Owners warrant that the vessel is equipped with minimum ten (10) ton derricks port and starboard amidships to handle bunker lines/cargo hoses.

All extra insurance for above ship to ship lighterage operations shall be for Owners' account and Charterers have no liability for hull or other damage, if any, that may occur during such operations. Owners warrant that the vessel is equipped and capable of safely carrying out all procedures as set out in the latest revised edition of the ICS/OCIMF SHIP TO SHIP TRANSFER GUIDE.

Ship to Ship Transfer may include Charterers' very large crude barge (VLCB) of about 34,500 tons deadweight chartered to perform such operations.

24) SUPERCARGO:

Charterers shall have the option to place on board one supercargo at any time during this Charter Party. Owner is to provide such supercargo with good accommodation with private bath and food at Captain's table at a cost of US$7.00 per day at Charterers' expense. Supercargo will be allowed access, to investigate, ullage and sample all cargo, slop, bunker, and ballast tanks, also any void spaces, and access to any other parts of vessel that may relate to carriage of cargo as he may require. He shall also have the right to require selected valves on bunker and cargo systems to be sealed to preclude the possibility of cargo/product/bunker migrations.

**GOLDEN GATE - Time Charter Party dated 5th May 1996**
**INTERNATIONAL OIL OVERSEAS ADDITIONAL CLAUSES FOR TIME CHARTER**
Page 7.

25)    PROTECTION & INDEMNITY INSURANCE:
Owner warrants the vessel is a member of the **Liverpool & London** P&I Club
and is complying with the revised P&I TOVALOP Clause 1987 as attached all in
good standing. Owner warrants that vessel holds a pollution cover of US$500
million, and additional US$200 million during full time of Charter Party. Owners
agree to allow Charterers to have the benefit of Owners' P&I insurance to
the extent the Rules of that Association permits.    Owners to be responsible
for all third party claims which fall under Owners' responsibility.

26)    SAFETY:
The vessel is to comply with the latest Safety at Sea and other Safety
Regulations.

27)    INSURED VALUE:
The vessel insured value is **US$ 7.5 million.**

28)    COMMUNICATIONS:
The Master is to allow Charterers' supercargo the use of vessel's communication
equipment for reasonable operational purposes without charge.

Vessel shall maintain twenty four (24) hour listening watch on VHF Channel
16/14.

29)    TRADING HISTORY:
Owners guarantee that the vessel is not boycotted by the Arab League and has
never traded to Israel.

30)    AGENCY:
Charterers' agents shall attend to all   matters   relating   to Charterers'
obligations.    Owners shall appoint their agents to attend to all matters relating
to Owners' obligations.

31)    ACCESS:
The Master shall not allow any vessel or   craft,   other   than those   of port
authorities   or   pilots, to secure alongside without the express authority of
Charterers.

GOLDEN GATE - Time Charter Party dated 5th May 1996
INTERNATIONAL OIL OVERSEAS ADDITIONAL CLAUSES FOR TIME CHARTER
                                                    Page 8.


32)    MOORING:
       Owners shall provide vessel with appropriate wires/lines for safe   mooring  at
       all  terminals  within  the  ranges/areas specified herein.


33)    OVER AGE INSURANCE:                                    DELETED.


34)    QUANTITATIVE RESPONSIBILITY:
       Although Charterers' surveyor may be monitoring any transfer operation, this
       does not relieve  Master or Owners of responsibility for  verifying  the quantity
       involved in each oil movement nor  for  liability  under  the  terms  of  this Charter
       Party for any oil losses.


35)    BERTH OCCUPANCY:                                       AMENDED.
       Owners warrant vessel shall vacate the berth after completion of  ballasting  or
       within  one  and  a  half hours following completion of loading/discharging. **Any
       delays not attributable to vessel to be for Charterers' account.**


36)    PRIVACY:                                              AMENDED.
       **All negotiations/eventual fixture to be kept strictly private and confidential
       and not to be discussed with any third party.**


37)    WAR RISKS:                                            AMENDED.
       Any  increase  of hull and machinery war risk premia over and above those in
       effect on the date of this Charter Party will be  for  Charterers'  account. Any
       premia  or increases thereto attributable to closure (i.e.  blocking and trapping)
       insurance shall be for Owners' account.

       Surcharges which are in effect on the date of this Charter Party are for Owners'
       account.


38)    CHARTERERS' UNDERWRITERS' CLAUSE:                      DELETED.


39)                                                          DELETED.


40)    With  reference  to Shell Time 4 Bill of Lading Clause 13 add at the end of the
       clause the words "Without Bank Guarantee or countersignature."

## P&I REVISED TOVALOP CLAUSE 1987

Owners warrant that the vessel is a Participating Tanker in TOVALOP and will so remain during this Charter, provided however that nothing herein shall prevent Owners, upon prior notice to Charterers, from withdrawing from TOVALOP under Clauses III(B)
or X thereof, and provided further that upon any withdrawal under Clause III(B) or under Clause X, following an amendment to TOVALOP which does not materially increase the obligation of the Parties thereunder, Charterers shall have the option to terminate this Charter.

When an escape or discharge of Oil occurs from the vessel and causes or threatens to cause Pollution Damage, or when there is the Threat of an escape or discharge of Oil (i.e. a grave and imminent danger of the escape or discharge of Oil which, if it occurred, would create a serious danger of Pollution Damage), then Charterers may, at the option, upon notice to Owners or Master, undertake such measures as are reasonably necessary to prevent or minimise such Damage or to remove the Threat, unless Owners promptly undertake the same. Charterers shall keep owners advised of
the nature and result of any such measure taken by them, and if time permits, the nature of the measures intended to be taken by them. Any of the aforementioned measured taken by Charterers shall be deemed taken on Owners' authority and as Owners' agents, and shall be at Owners' expense except to the extent that:

(1) Any such escape or discharge or Threat was caused or contributed to by Charterers, or

(2) By reason of the exception set out in Article III, Paragraph 2, of the 1969 International Convention on Civil Liability for Oil Pollution Damage, Owners are or, had the said Convention applied to such escape or to the Threat, would have been exempt from liability for the same, or

(3) The costs of such measures together with all other liability, costs and expenses of Owners arising out of or in connection with such escape or discharge or Threat removal exceeds One Hundred and Sixty United States Dollars per ton or Sixteen Million Eight Hundred Thousand United States Dollars, whichever is the lesser, save insofar as Owners shall be entitled to remover such excess under    either the 1971 International Convention on the establishment of an International Fund for Compensation for Oil Pollution Damage or under CRISTAL, provided that in any incident to which the TOVALOP Supplement applies the Owners' limit of liability hereunder shall be that provided for in the said Supplement;

PROVIDED ALWAYS that if Owners in their absolute discretion consider said measures should be discontinued, Owners shall so notify Charterers and thereafter Charterers shall have no right to continue said measures under the provisions of this Clause and all further liability to Charterers under this Clause shall thereupon cease.

The above provisions are not in derogation of such other rights as Charterers or Owners may have under the Charter or may otherwise have or acquire by Law or any International Convention or TOVALOP.

For the purpose of this Clause, the meaning of the term "Oil" and "Pollution Damage" shall be defined in TOVALOP and "ton" shall be understood in relation to "tonnage" as defined therein.

# EXHIBIT H

TLXOK ,9413497,,AST36,10/06/96,12:25:50,S,9413497PETIAN G,10/06/96,12:32:56
:04:19,,AST,,,,,,,,,,,,,,,,,,,

9413497

:
9413497+
9413497PETIAN G
921544 POLEGB G
DATE: 10/06/96
TIME: 12:32:56
REF:  16462

M/T GOLDEN GATE/IOOI   C/P 5/5/96

VESSEL DELIVERED TO CHRTRS AT FUJAIRAH ON 6TH OF MAY 1996 1800HRS
LOCAL TIME WITH 387.50MT FUEL OIL AND 182MT DIESEL OIL AND
REDELIVERED TO OWNERS AT FUJAIRAH ON 9TH OF JUNE 1996 1030HRS LOCAL
TIME WITH 103.80MT FUEL OIL AND 88.6MT DIESEL OIL.

FINAL HIRE STATEMENT

FM 6/5 1800HRS TO 9/6 1030HRS
33D 16H 30M OR
33.6875 DAYS X USD 10,000.00=                    USD 336,875.00

LESS COMM 2.5PCT                                 (USD    8,421.88)

BUNKERS ON DELIVERY
F.O. 387.50MT X USD 110= USD 42,625.00
D.O. 182.00MT X USD 210= USD 38,220.00
                         --------------          USD  80,845.00

BUNKERS ON REDELIVERY
F.O. 103.80MT X USD 110= USD 11,418.00
D.O.  88.60MT X USD 210= USD 18,606.00
                         --------------          (USD  30,024.00)

LESS ON ACCOUNT 9/5 USD 97,485.00
               16/5 USD 77,985.00
               28/5 USD 87,735.00
               30/5 USD 29,235.00
                6/6 USD 19,485.00
                7/6 USD 19,485.00
                    --------------              (USD 331,410.00)
                                                 --------------
DUE OWNERS                                       USD  47,864.12
                                                 ==============

OWNERS EXPECT IMMEDIATE REMITTANCE FAILING WHICH MEASURES WILL BE
TAKEN TO PROTECT OUR INTERESTS.

REGARDS
POLEMBROS

921544 POLEGB G
9413497PETIAN G

# EXHIBIT I