Code word for this Charter Party
"SHELLTIME 4"

Issued December 1984



# Time Charter Party

LONDON, 19 Nov 19 96

**PETRIAN SHIPBROKERS LIMITED**

IT IS THIS DAY AGREED between LSP TANKERS CORPORATION     1

of MONROVIA, LIBERIA     (hereinafter referred to as "Owners"), being owners of the     2
good     vessel called     KEIKO     3

(hereinafter referred to as "the vessel") described as per Clause 1 hereof and     INTERNATIONAL OIL     4

OVERSEAS INC. of     PANAMA     (hereinafter referred to as "Charterers"):     5

**Description and Condition of Vessel**

1. At the date of delivery of the vessel under this charter     6
   (a) she shall be classed:    NKK     7
   (b) she shall be in every way fit to carry crude petroleum and/or its products:     8

   (c) she shall be tight, staunch, strong, in good order and condition, and in every way fit for the     9
service, with her machinery, boilers, hull and other equipment (including but not limited to hull stress calculator     10, 11
and radar) in a good and efficient state:     12
   (d) her tanks, valves and pipelines shall be oil-tight:     13
   (e) she shall be in every way fitted for burning     14
      at sea – fueloil with a maximum viscosity of    180    Centistokes at 50 degrees Centigrade/~~any~~     14
      ~~commercial grade of fueloil ("ACGFO")~~ for main propulsion, marine diesel oil/~~ACGFO~~     15
      for auxiliaries     16
      in port – marine diesel oil/~~ACGFO~~ for auxiliaries;     17
   (f) she shall comply with the regulations in force so as to enable her to pass through the Suez and     18
Panama Canals by day and night without delay;     19
   (g) she shall have on board all certificates, documents and equipment required from time to time by     20
any applicable law to enable her to perform the charter service without delay;     21
   (h) she shall comply with the description in ~~Form B appended hereto~~, provided however that if there     22, 23
is any conflict between the provisions of ~~Form B~~ and any other provision, including this Clause 1, of this charter     23
such other provision shall govern.     24

> See International
> Oil Overseas
> Clause 2.

**Shipboard Personnel and their Duties**

2. (a) At the date of delivery of the vessel under this charter     25
   (i) she shall have a full and efficient complement of master, officers and crew for a vessel of her     26
tonnage, who shall in any event be not less than the number required by the laws of the flag state and who shall be     27
trained to operate the vessel and her equipment competently and safely;     28
   (ii) all shipboard personnel shall hold valid certificates of competence in accordance with the     29
requirements of the law of the flag state;     30
   (iii) all shipboard personnel shall be trained in accordance with the relevant provisions of the     31
International Convention on Standards of Training, Certification and Watchkeeping for Seafarers, 1978;     32
   (iv) there shall be on board sufficient personnel with a good working knowledge of the English     33
language to enable cargo operations at loading and discharging places to be carried out efficiently and safely and     34
to enable communications between the vessel and those loading the vessel or accepting discharge therefrom to be     35
carried out quickly and efficiently.     36
   (b) Owners guarantee that throughout the charter service the master shall with the vessel's officers     37
and crew, unless otherwise ordered by Charterers,     38
   (i) prosecute all voyages with the utmost despatch;     39
   (ii) render all customary assistance; and     40
   (iii) load and discharge cargo as rapidly as possible when required by Charterers or their agents     41
to do so, by night or by day, but always in accordance with the laws of the place of loading or discharging (as the     42
case may be) and in each case in accordance with any applicable laws of the flag state.     43

**Duty to Maintain**

3. (i) Throughout the charter service Owners shall, whenever the passage of time, wear and tear or any     44
event (whether or not coming within Clause 27 hereof) requires steps to be taken to maintain or restore the     45
conditions stipulated in Clauses 1 and 2(a), exercise due diligence so to maintain or restore the vessel.     46
   (ii) If at any time whilst the vessel is on hire under this charter the vessel fails to comply with the     47
requirements of Clauses 1, 2(a) or 10 then hire shall be reduced to the extent necessary to indemnify Charterers     48
for such failure. If and to the extent that such failure affects the time taken by the vessel to perform any services     49
under this charter, hire shall be reduced by an amount equal to the value, calculated at the rate of hire, of the time     50
so lost.     51
   Any reduction of hire under this sub-Clause (ii) shall be without prejudice to any other remedy     52
available to Charterers, but where such reduction of hire is in respect of time lost, such time shall be excluded     53
from any calculation under Clause 24.     54
   (iii) If Owners are in breach of their obligation under Clause 3(i) Charterers may so notify Owners in     55
writing; and if, after the expiry of 30 days following the receipt by Owners of any such notice, Owners have failed     56
to demonstrate to Charterers' reasonable satisfaction the exercise of due diligence as required in Clause 3(i), the     57
vessel shall be off-hire, and no further hire payments shall be due, until Owners have so demonstrated that they     58
are exercising such due diligence.     59
   Furthermore, at any time while the vessel is off-hire under this Clause 3 Charterers have the     60
option to terminate this charter by giving notice in writing with effect from the date on which such notice of     61
termination is received by Owners or from any later date stated in such notice. This sub-Clause (iii) is without     62
prejudice to any rights of Charterers or obligations of Owners under this charter or otherwise (including without     63
limitation Charterers' rights under Clause 21 hereof).     64

Minimum seven (7) days/maximum thirty
(30) days in Charterers' option.
Charterers to give Owners five (5)
days' redelivery notice

**Period Trading Limits**

4.   Owners ~~agree to let and~~ Charterers agree to hire the vessel for a period of | 65
commencing from the time and date of delivery of the vessel, for the purpose of carrying all lawful merchandise | 66
(subject always to Clause 28) including in particular **See International Oil Overseas** | 67
**Clause 21,**

**See International Oil Overseas Clause 1.**

~~in any part of the world,~~ as Charterers shall direct, subject to the limits of the current British Institute Warranties | 68
and any subsequent amendments thereof. Notwithstanding the foregoing, but subject to Clause 35. Charterers | 69
may order the vessel to ice-bound waters or to any part of the world outside such limits provided that Owners | 70
consent thereto (such consent not to be unreasonably withheld) and that Charterers pay for any insurance | 71
premium required by the vessel's underwriters as a consequence of such order. | 72
   Charterers shall use due diligence to ensure that the vessel is only employed between and at safe places | 73
(which expression when used in this charter shall include ports, berths, wharves, docks, anchorages, submarine | 74
lines, alongside vessels or lighters, and other locations including locations at sea) where she can safely lie always | 75
afloat. Notwithstanding anything contained in this or any other clause of this charter, Charterers do not warrant | 76
the safety of any place to which they order the vessel and shall be under no liability in respect thereof except for | 77
loss or damage caused by their failure to exercise due diligence as aforesaid. Subject as above, the vessel shall be | 78
loaded and discharged at any places as Charterers may direct, provided that Charterers shall exercise due | 79
diligence to ensure that any ship-to-ship transfer operations shall conform to standards not less than those set out | 80
in the latest published edition of the ICS/OCIMF Ship-to-Ship Transfer Guide. | 81
   The vessel shall be delivered by Owners at a port in   Fujairah | 82

at Owners' option and redelivered to Owners at a port in  Fujairah | 83

at Charterers' option. | 84

**Laydays/ Cancelling**

5.   The vessel shall not be delivered to Charterers before0600  20 Nov  1996  and Charterers shall | 85
have the option of cancelling this charter if the vessel is not ready and at their disposal on or before   0600 | 86
**20 November 1996,**

**Owners to Provide**

6.   Owners undertake to provide and to pay for all provisions, wages, and shipping and discharging fees | 87
and all other expenses of the master, officers and crew; also, except as provided in Clauses 4 and 34 hereof, for all | 88
insurance on the vessel, for all deck, cabin and engine-room stores, and for water; for all drydocking, overhaul, | 89
maintenance and repairs to the vessel; and for all fumigation expenses and de-rat certificates. Owners' | 90
obligations under this Clause 6 extend to all liabilities for customs or import duties arising at any time during the | 91
performance of this charter in relation to the personal effects of the master, officers and crew, and in relation to | 92
the stores, provisions and other matters aforesaid which Owners are to provide and pay for and Owners shall | 93
refund to Charterers any sums Charterers or their agents may have paid or been compelled to pay in respect of | 94
any such liability. Any amounts allowable in general average for wages and provisions and stores shall be credited | 95
to Charterers insofar as such amounts are in respect of a period when the vessel is on-hire. | 96

**Charterers to Provide**

7.   Charterers shall provide and pay for all fuel (except fuel used for domestic services), towage and | 97
pilotage and tug and agency fees, port charges, commissions, expenses of loading and unloading cargoes, canal | 98
dues and all charges other than those payable by Owners in accordance with Clause 6 hereof, provided that all | 99
charges for the said items shall be for Owners' account when such items are consumed, employed or incurred for | 100
Owners' purposes or while the vessel is off-hire (unless such items reasonably relate to any service given or | 101
distance made good and taken into account under Clause 21 or 22); and provided further that any fuel used in | 102
connection with a general average sacrifice or expenditure shall be paid for by Owners. | 103

**Rate of Hire**

8.   Subject as herein provided, Charterers shall pay for the use and hire of the vessel at the rate of | 104
US$10,000,00   per day, and pro rata for any part of a day, from the time and date of her delivery (local | 105
time) until the time and date of her redelivery (local time) to Owners. | 106

**Payment of Hire**

9.   Subject to Clause 3 (iii), payment of hire shall be made in immediately available funds to: | 107
**Owners' designated bank account,**

**See International Oil Overseas Clause 3.**

Account | 108
~~in~~       ~~per calendar month in advance; less:~~ | 109
   (i)   any hire paid which Charterers reasonably estimate to relate to off-hire periods, and | 110
   (ii)   any amounts disbursed on Owners' behalf, any advances and commission thereon, and | 111
charges which are for Owners' account pursuant to any provision hereof, and | 112
   (iii)   any amounts due or reasonably estimated to become due to Charterers under Clause 3 (ii) or | 113
24 hereof, | 114
any such adjustments to be made at the due date for the next monthly payment after the facts have been | 115
ascertained. Charterers shall not be responsible for any delay or error by Owners' bank in crediting Owners' | 116
account provided that Charterers have made proper and timely payment. | 117
   In default of such proper and timely payment | 118
   (a)   Owners shall notify Charterers of such default and Charterers shall within seven days of receipt of | 119
such notice pay to Owners the amount due including interest, failing which Owners may withdraw the vessel from | 120
the service of Charterers without prejudice to any other rights Owners may have under this charter or otherwise; | 121
and | 122
   (b)   Interest on any amount due but not paid on the due date  shall accrue from the day after that date | 123
up to and including the day when payment is made, at a rate per annum which shall be 1% above the U.S. Prime | 124
Interest Rate as published by the Chase Manhattan Bank in New York at 12.00 New York time on the due date, | 125
or, if no such interest rate is published on that day, the interest rate published on the next preceding day on which | 126
such a rate was so published, computed on the basis of a 360 day year of twelve 30-day months, compounded | 127
~~semi-annually.~~ | 128

**Space Available to Charterers**

10. The whole reach, burthen and decks of the vessel and any passenger accommodation (including Owners' suite) shall be at Charterers' disposal, reserving only proper and sufficient space for the vessel's master, officers, crew, tackle, apparel, furniture, provisions and stores, provided that the weight of stores on board shall not, unless specially agreed, exceed                 tonnes at any time during the charter period. `129` `130` `131` `132`

**Overtime**

11. Overtime pay of the master, officers and crew in accordance with ship's articles shall be for Charterers' account when incurred, as a result of complying with the request of Charterers or their agents, for loading, discharging, heating of cargo, bunkering or tank cleaning. `133` `134` `135`

**Instructions and Logs**

12. Charterers shall from time to time give the master all requisite instructions and sailing directions, and he shall keep a full and correct log of the voyage or voyages, which Charterers or their agents may inspect as required. The master shall when required furnish Charterers or their agents with a true copy of such log and with properly completed loading and discharging port sheets and voyage reports for each voyage and other returns as Charterers may require. Charterers shall be entitled to take copies at Owners' expense of any such documents which are not provided by the master. `136` `137` `138` `139` `140` `141`

**Bills of Lading**

13. (a) The master (although appointed by Owners) shall be under the orders and direction of Charterers as regards employment of the vessel, agency and other arrangements, and shall sign bills of lading as Charterers or their agents may direct (subject always to Clauses 35(a) and 40) without prejudice to this charter. Charterers hereby indemnify Owners against all consequences or liabilities that may arise `142` `143` `144` `145`

(i) from signing bills of lading in accordance with the directions of Charterers or their agents, to the extent that the terms of such bills of lading fail to conform to the requirements of this charter, or (except as provided in Clause 13(b)) from the master otherwise complying with Charterers' or their agents' orders; `146` `147` `148`

(ii) from any irregularities in papers supplied by Charterers or their agents. `149`

(b) Notwithstanding the foregoing. Owners shall not be obliged to comply with any orders from Charterers to discharge all or part of the cargo `150` `151`

(i) at any place other than that shown on the bill of lading and/or `152`

(ii) without presentation of an original bill of lading `153`

unless they have received from Charterers both written confirmation of such orders and an indemnity in a form acceptable to Owners. `154` `155`

**Conduct of Vessel's Personnel**

14. If Charterers complain of the conduct of the master or any of the officers or crew, Owners shall immediately investigate the complaint. If the complaint proves to be well founded, Owners shall, without delay, make a change in the appointments and Owners shall in any event communicate the result of their investigations to Charterers as soon as possible. `156` `157` `158` `159`

**Bunkers at Delivery and Redelivery**

15. ~~Charterers shall accept and pay for all bunkers on board at the time of delivery, and Owners shall on~~ redelivery (whether it occurs at the end of the charter period or on the earlier termination ~~of this charter~~) accept and pay for all bunkers remaining on board, ~~at the then-current market prices at the port~~ of delivery or redelivery, as the case may be, or if such prices are not available ~~payment shall be~~ at the then-current market prices at the nearest port at which such prices are available; ~~provided~~ that if delivery or redelivery does not take place in a port payment shall be at the ~~price paid at the~~ vessel's last port of bunkering before delivery or redelivery, as the case may be. ~~Owners shall give Charterers the use and benefit of any fuel contracts they may have in force from time to~~ ~~time, if so required by Charterers, provided suppliers agree.~~ See International Oil Overseas Clause 5. `160` `161` `162` `163` `164` `165` `166` `167`

**Stevedores, Pilots, Tugs**

16. Stevedores when required shall be employed and paid by Charterers, but this shall not relieve Owners from responsibility at all times for proper stowage, which must be controlled by the master who shall keep a strict account of all cargo loaded and discharged. Owners hereby indemnify Charterers, their servants and agents against all losses, claims, responsibilities and liabilities arising in any way whatsoever from the employment of pilots, tugboats or stevedores, who although employed by Charterers shall be deemed to be the servants of and in the service of Owners and under their instructions (even if such pilots, tugboat personnel or stevedores are in fact the servants of Charterers their agents or any affiliated company); provided, however, that `168` `169` `170` `171` `172` `173` `174`

(i) the foregoing indemnity shall not exceed the amount to which Owners would have been entitled to limit their liability if they had themselves employed such pilots, tugboats or stevedores, and `175` `176`

(ii) Charterers shall be liable for any damage to the vessel caused by or arising out of the use of stevedores, fair wear and tear excepted, to the extent that Owners are unable by the exercise of due diligence to obtain redress therefor from stevedores. `177` `178` `179`

**Supernumeraries**

17. Charterers may send representatives in the vessel's available accommodation upon any voyage made under this charter. Owners finding provisions and all requisites as supplied to officers, except liquors, Charterers paying at the rate of                 per day for each representative while on board the vessel. `180` `181` `182`

**Sub-letting**

18. Charterers may sub-let the vessel, but shall always remain responsible to Owners for due fulfilment of this charter. `183` `184`

**Final Voyage**

Owners '

19. If when a payment of hire is due hereunder Charterers reasonably expect to redeliver the vessel before the next payment of hire would fall due, the hire to be paid shall be assessed on Charterers' reasonable estimate of the time necessary to complete Charterers' programme up to redelivery, ~~and from which estimate Charterers~~ ~~may deduct amounts due or reasonably expected to become due for~~ `185` `186` `187` `188`

~~(i) disbursements on Owners' behalf or charges for Owners' account pursuant to any provision~~ ~~hereof, and~~ `189` `190`

~~(ii) bunkers on board at redelivery pursuant to Clause 15.~~ `191`

Promptly after redelivery any overpayment shall be refunded by Owners ~~or any underpayment made~~ ~~good by Charterers.~~ `192` `193`

If at the time this charter would otherwise terminate in accordance with Clause 4 the vessel is on a ballast voyage to a port of redelivery or is upon a laden voyage, Charterers shall continue to have the use of the vessel at the same rate and conditions as stand herein for as long as necessary to complete such ballast voyage, or to complete such laden voyage and return to a port of redelivery as provided by this charter, as the case may be. `194` `195` `196` `197`

4

Loss of
Vessel

20.   Should the vessel be lost, this charter shall terminate and hire shall cease at noon on the day of her loss; should the vessel be a constructive total loss, this charter shall terminate and hire shall cease at noon on the day on which the vessel's underwriters agree that the vessel is a constructive total loss; should the vessel be missing, this charter shall terminate and hire shall cease at noon on the day on which she was last heard of. Any hire paid in advance and not earned shall be returned to Charterers and Owners shall reimburse Charterers for the value of the estimated quantity of bunkers on board at the time of termination, at the price paid by Charterers at the last bunkering port.

Off-hire

21.   (a)   On each and every occasion that there is loss of time (whether by way of interruption in the vessel's service or, from reduction in the vessel's performance, or in any other manner)

(i)   due to deficiency of personnel or stores; repairs; gas-freeing for repairs; time in and waiting to enter dry dock for repairs; breakdown (whether partial or total) of machinery, boilers or other parts of the vessel or her equipment (including without limitation tank coatings); overhaul, maintenance or survey; collision, stranding, accident or damage to the vessel; or any other similar cause preventing the efficient working of the vessel; and such loss continues for more than three consecutive hours (if resulting from interruption in the vessel's service) or cumulates to more than three hours (if resulting from partial loss of service); or

(ii)   due to industrial action, refusal to sail, breach of orders or neglect of duty on the part of the master, officers or crew; or

(iii)   for the purpose of obtaining medical advice or treatment for or landing any sick or injured person (other than a Charterers' representative carried under Clause 17 hereof) or for the purpose of landing the body of any person (other than a Charterers' representative), and such loss continues for more than three consecutive hours; or

(iv)   due to any delay in quarantine arising from the master, officers or crew having had communication with the shore at any infected area without the written consent or instructions of Charterers or their agents, or to any detention by customs or other authorities caused by smuggling or other infraction of local law on the part of the master, officers, or crew; or

(v)   due to detention of the vessel by authorities at home or abroad attributable to legal action against or breach of regulations by the vessel, the vessel's owners, or Owners (unless brought about by the act or neglect of Charterers); then

without prejudice to Charterers' rights under Clause 3 or to any other rights of Charterers hereunder or otherwise the vessel shall be off-hire from the commencement of such loss of time until she is again ready and in an efficient state to resume her service from a position not less favourable to Charterers than that at which loss of time commenced; provided, however, that any service given or distance made good by the vessel whilst off-hire shall be taken into account in assessing the amount to be deducted from hire.

(b)   If the vessel fails to proceed at any guaranteed speed pursuant to Clause 24, and such failure arises wholly or partly from any of the causes set out in Clause 21(a) above, then the period for which the vessel shall be off-hire under this Clause 21 shall be the difference between

(i)   the time the vessel would have required to perform the relevant service at such guaranteed speed, and

(ii)   the time actually taken to perform such service (including any loss of time arising from interruption in the performance of such service).

For the avoidance of doubt, all time included under (ii) above shall be excluded from any computation under Clause 24.

(c)   Further and without prejudice to the foregoing, in the event of the vessel deviating (which expression includes without limitation putting back, or putting into any port other than that to which she is bound under the instructions of Charterers) for any cause or purpose mentioned in Clause 21(a), the vessel shall be off-hire from the commencement of such deviation until the time when she is again ready and in an efficient state to resume her service from a position not less favourable to Charterers than that at which the deviation commenced, provided, however, that any service given or distance made good by the vessel whilst so off-hire shall be taken into account in assessing the amount to be deducted from hire. If the vessel, for any cause or purpose mentioned in Clause 21 (a), puts into any port other than that to which she is bound on the instructions of Charterers, the port charges, pilotage and other expenses at such port shall be borne by Owners. Should the vessel be driven into any port or anchorage by stress of weather then hire shall continue to be due and payable during any time lost thereby.

(d)   If the vessel's flag state becomes engaged in hostilities, and Charterers in consequence of such hostilities find it commercially impracticable to employ the vessel and have given Owners written notice thereof then from the date of receipt by Owners of such notice until the termination of such commercial impracticability the vessel shall be off-hire and Owners shall have the right to employ the vessel on their own account.

(e)   Time during which the vessel is off-hire under this charter shall count as part of the charter period.

Periodical
Drydocking

22.   (a)   Owners have the right and obligation to drydock the vessel at regular intervals of                       On each occasion Owners shall propose to Charterers a date on which they wish to drydock the vessel, not less than                       before such date; and Charterers shall offer a port for such periodical drydocking and shall take all reasonable steps to make the vessel available as near to such date as practicable.

Owners shall put the vessel in drydock at their expense as soon as practicable after Charterers place the vessel at Owners' disposal clear of cargo other than tank washings and residues. Owners shall be responsible for and pay for the disposal into reception facilities of such tank washings and residues and shall have the right to retain any monies received therefor, without prejudice to any claim for loss of cargo under any bill of lading or this charter.

(b)   If a periodical drydocking is carried out in the port offered by Charterers (which must have suitable accommodation for the purpose and reception facilities for tank washings and residues), the vessel shall be off-hire from the time she arrives at such port until drydocking is completed and she is in every way ready to resume Charterers' service and is at the position at which she went off-hire or a position no less favourable to Charterers, whichever she first attains. However,

(i)   provided that Owners exercise due diligence in gas-freeing, any time lost in gas-freeing to the standard required for entry into drydock for cleaning and painting the hull shall not count as off-hire, whether lost on passage to the drydocking port or after arrival there (notwithstanding Clause 21), and

198
199
200
201
202
203
204
205
206
207
208
209
210
211
212
213
214
215
216
217
218
219
220
221
222
223
224
225
226
227
228
229
230
231
232
233
234
235
236
237
238
239
240
241
242
243
244
245
246
247
248
249
250
251
252
253
254
255
256
257
258
259
260
261
262
263
264
265
266
267
268
269
270
271
272
273
274

(ii)   any additional time lost in further gas-freeing to meet the standard required for hot work or entry to cargo tanks shall count as off-hire, whether lost on passage to the drydocking port or after arrival there. | 275, 276

Any time which, but for sub-Clause (i) above, would be off-hire, shall not be included in any calculation under Clause 24. | 277, 278

The expenses of gas-freeing, including without limitation the cost of bunkers, shall be for Owners account. | 279, 280

(c)   If Owners require the vessel, instead of proceeding to the offered port, to carry out periodical drydocking at a special port selected by them, the vessel shall be off-hire from the time when she is released to proceed to the special port until she next presents for loading in accordance with Charterers' instructions, provided, however, that Charterers shall credit Owners with the time which would have been taken on passage at the service speed had the vessel not proceeded to drydock. All fuel consumed shall be paid for by Owners but Charterers shall credit Owners with the value of the fuel which would have been used on such notional passage calculated at the guaranteed daily consumption for the service speed, and shall further credit Owners with any benefit they may gain in purchasing bunkers at the special port. | 281–288

(d)   Charterers shall, insofar as cleaning for periodical drydocking may have reduced the amount of tank-cleaning necessary to meet Charterers' requirements, credit Owners with the value of any bunkers which Charterers calculate to have been saved thereby, whether the vessel drydocks at an offered or a special port. | 289, 290, 291

**Ship Inspection**

23.   Charterers shall have the right at any time during the charter period to make such inspection of the vessel as they may consider necessary. This right may be exercised as often and at such intervals as Charterers in their absolute discretion may determine and whether the vessel is in port or on passage. Owners affording all necessary co-operation and accommodation on board provided, however. | 292–295

(i)   that neither the exercise nor the non-exercise, nor anything done or not done in the exercise or non-exercise, by Charterers of such right shall in any way reduce the master's or Owners' authority over, or responsibility to Charterers or third parties for, the vessel and every aspect of her operation, nor increase Charterers' responsibilities to Owners or third parties for the same; and | 296–299

(ii)   that Charterers shall not be liable for any act, neglect or default by themselves, their servants or agents in the exercise or non-exercise of the aforesaid right. | 300, 301

**Detailed Description and Performance**

24.   ~~(a)   Owners guarantee that the speed and consumption of the vessel shall be as follows:~~ | 302

| Average speed in knots | Maximum average bunker consumption main propulsion – auxiliaries fuel oil/diesel oil fuel oil/diesel oil tonnes tonnes |
| --- | --- |
| ~~Laden~~ | | 303, 304, 305, 306

See International Oil Overseas Clause 7.

~~Ballast~~ | 307

~~The foregoing bunker consumptions are for all purposes except cargo-heating and tank-cleaning~~ and shall be pro-rated between the speeds shown. | 308, 309

The service speed of the vessel is          knots laden and          knots in ballast and in the absence of Charterers' orders to the contrary the vessel shall proceed at the service speed. However if more than one laden and one ballast speed are shown in the table above Charterers shall have the right to order the vessel to steam at any speed within the range set out in the table (the "ordered speed"). | 310–313

If the vessel is ordered to proceed at any speed other than the highest speed shown in the table, and the average speed actually attained by the vessel during the currency of such order exceeds such ordered speed plus 0.5 knots (the "maximum recognised speed"), then for the purpose of calculating any increase or decrease of hire under this Clause 24 the maximum recognised speed shall be used in place of the average speed actually attained. | 314–318

For the purposes of this charter the "guaranteed speed" at any time shall be the then-current ordered speed or the service speed, as the case may be | 319, 320

The average speeds and bunker consumptions shall for the purposes of this Clause 24 be calculated by reference to the observed distance from pilot station to pilot station on all sea passages during each period stipulated in Clause 24 (c), but excluding any time during which the vessel is (or but for Clause 22 (b) (i) would be) off-hire and also excluding "Adverse Weather Periods", being (i) any periods during which reduction of speed is necessary for safety in congested waters or in poor visibility (ii) any days, noon to noon, when winds ~~exceed force 8 on the Beaufort Scale for more than 12 hours.~~ | 321–326

(b) If during any year from the date on which the vessel enters service (anniversary to anniversary) the vessel falls below or exceeds the performance guaranteed in Clause 24(a) then if such shortfall or excess results 327 328 329

(i) from a reduction or an increase in the average speed of the vessel, compared to the speed guaranteed in Clause 24(a), then an amount equal to the value at the hire rate of the time so lost or gained, as the case may be, shall be deducted from or added to the hire paid; 330 331 332

(ii) from an increase or a decrease in the total bunkers consumed, compared to the total bunkers which would have been consumed had the vessel performed as guaranteed in Clause 24(a), an amount equivalent to the value of the additional bunkers consumed or the bunkers saved, as the case may be, based on the average price paid by Charterers for the vessel's bunkers in such period, shall be deducted from or added to the hire paid. 333 334 335 336

The addition to or deduction from hire so calculated for laden and ballast mileage respectively shall be adjusted to take into account the mileage steamed in each such condition during Adverse Weather Periods, by dividing such addition or deduction by the number of miles over which the performance has been calculated and multiplying by the same number of miles plus the miles steamed during the Adverse Weather Periods, in order to establish the total addition to or deduction from hire to be made for such period. 337 338 339 340 341

Reduction of hire under the foregoing sub-Clause (b) shall be without prejudice to any other remedy available to Charterers. 342 343

(c) Calculations under this Clause 24 shall be made for the yearly periods terminating on each successive anniversary of the date on which the vessel enters service, and for the period between the last such anniversary and the date of termination of this charter if less than a year. Claims in respect of reduction of hire arising under this Clause during the final year or part year of the charter period shall in the first instance be settled in accordance with Charterers' estimate made two months before the end of the charter period. Any necessary adjustment after this charter terminates shall be made by payment by Owners to Charterers or by Charterers to Owners as the case may require. 344 345 346 347 348 349 350

Payments in respect of increase of hire arising under this Clause shall be made promptly after receipt by Charterers of all the information necessary to calculate such increase. 351 352

**Salvage**
25. Subject to the provisions of Clause 21 hereof, all loss of time and all expenses (excluding any damage to or loss of the vessel or tortious liabilities to third parties) incurred in saving or attempting to save life or in successful or unsuccessful attempts at salvage shall be borne equally by Owners and Charterers provided that Charterers shall not be liable to contribute towards any salvage payable by Owners arising in any way out of services rendered under this Clause 25. 353 354 355 356 357

All salvage and all proceeds from derelicts shall be divided equally between Owners and Charterers after deducting the master's, officers' and crew's share. 358 359

**Lien**
26. Owners shall have a lien upon all cargoes and all freights, sub-freights and demurrage for any amounts due under this charter; and Charterers shall have a lien on the vessel for all monies paid in advance and not earned, and for all claims for damages arising from any breach by Owners of this charter. 360 361 362

**Exceptions**
27. (a) The vessel, her master and Owners shall not, unless otherwise in this charter expressly provided, be liable for any loss or damage or delay or failure arising or resulting from any act, neglect or default of the master, pilots, mariners or other servants of Owners in the navigation or management of the vessel; fire, unless caused by the actual fault or privity of Owners; collision or stranding; dangers and accidents of the sea; explosion, bursting of boilers, breakage of shafts or any latent defect in hull, equipment or machinery; provided, however, that Clauses 1, 2, 3 and 24 hereof shall be unaffected by the foregoing. Further, neither the vessel, her master or Owners, nor Charterers shall, unless otherwise in this charter expressly provided, be liable for any loss or damage or delay or failure in performance hereunder arising or resulting from act of God, act of war, seizure under legal process, quarantine restrictions, strikes, lock-outs, riots, restraints of labour, civil commotions or arrest or restraint of princes, rulers or people. 363 364 365 366 367 368 369 370 371 372

(b) The vessel shall have liberty to sail with or without pilots, to tow or go to the assistance of vessels in distress and to deviate for the purpose of saving life or property. 373 374

(c) Clause 27(a) shall not apply to or affect any liability of Owners or the vessel or any other relevant person in respect of 375 376

(i) loss or damage caused to any berth, jetty, dock, dolphin, buoy, mooring line, pipe or crane or other works or equipment whatsoever at or near any place to which the vessel may proceed under this charter, whether or not such works or equipment belong to Charterers, or 377 378 379

(ii) any claim (whether brought by Charterers or any other person) arising out of any loss of or damage to or in connection with cargo. All such claims shall be subject to the Hague-Visby Rules or the Hague Rules, as the case may be, which ought pursuant to Clause 38 hereof to have been incorporated in the relevant bill of lading (whether or not such Rules were so incorporated) or, if no such bill of lading is issued, to the Hague-Visby Rules. 380 381 382 383 384

(d) In particular and without limitation, the foregoing subsections (a) and (b) of this Clause shall not apply to or in any way affect any provision in this charter relating to off-hire or to reduction of hire. 385 386

**Injurious Cargoes**
28. No acids, explosives or cargoes injurious to the vessel shall be shipped and without prejudice to the foregoing any damage to the vessel caused by the shipment of any such cargo, and the time taken to repair such damage, shall be for Charterers' account. No voyage shall be undertaken, nor any goods or cargoes loaded, that would expose the vessel to capture or seizure by rulers or governments. 387 388 389 390

**Grade of Bunkers**
29. Charterers shall supply marine diesel oil/fuel oil with a maximum viscosity of 180 Centistokes at 50 degrees Centigrade/ACGFO for main propulsion and diesel oil/ACGFO for the auxiliaries. If Owners require the vessel to be supplied with more expensive bunkers they shall be liable for the extra cost thereof. 391 392 393

Charterers warrant that all bunkers provided by them in accordance herewith shall be of a quality complying with the International Marine Bunker Supply Terms and Conditions of Shell International Trading Company and with its specification for marine fuels as amended from time to time. 394 395 396

**Disbursements**
30. Should the master require advances for ordinary disbursements at any port, Charterers or their agents shall make such advances to him, in consideration of which Owners shall pay a commission of two and a half per cent, and all such advances and commission shall be deducted from hire. 397 398 399

| Laying-up | 31.  Charterers shall have the option, after consultation with Owners, of requiring Owners to lay up the | 400 |
|---|---|---|
| | vessel at a safe place nominated by Charterers, in which case the hire provided for under this charter shall be | 401 |
| | adjusted to reflect any net increases in expenditure reasonably incurred or any net saving which should | 402 |
| | reasonably be made by Owners as a result of such lay-up. Charterers may exercise the said option any number of | 403 |
| | times during the charter period. | 404 |

| Requisition | 32.  Should the vessel be requisitioned by any government, de facto or de jure, during the period of this | 405 |
|---|---|---|
| | charter, the vessel shall be off-hire during the period of such requisition, and any hire paid by such government in | 406 |
| | respect of such requisition period shall be for Owners' account. Any such requisition period shall count as part of | 407 |
| | the charter period. | 408 |

| Outbreak of War | 33.  If war or hostilities break out between any two or more of the following countries: U.S.A., U.S.S.R., | 409 |
|---|---|---|
| | P.R.C., U.K., Netherlands–both Owners and Charterers shall have the right to cancel this charter. | 410 |

| Additional War Expenses | 34.  If the vessel is ordered to trade in areas where there is war (de facto or de jure) or threat of war, | 411 |
|---|---|---|
| | Charterers shall reimburse Owners for any additional insurance premia, crew bonuses and other expenses which | 412 |
| | are reasonably incurred by Owners as a consequence of such orders, provided that Charterers are given notice of | 413 |
| | such expenses as soon as practicable and in any event before such expenses are incurred, and provided further | 414 |
| | that Owners obtain from their insurers a waiver of any subrogated rights against Charterers in respect of any | 415 |
| | claims by Owners under their war risk insurance arising out of compliance with such orders. | 416 |

| War Risks | 35.  (a)  The master shall not be required or bound to sign bills of lading for any place which in his or | 417 |
|---|---|---|
| | Owners' reasonable opinion is dangerous or impossible for the vessel to enter or reach owing to any blockade, | 418 |
| | war, hostilities, warlike operations, civil war, civil commotions or revolutions. . | 419 |
| | (b)  If in the reasonable opinion of the master or Owners it becomes, for any of the reasons set out in | 420 |
| | Clause 35(a) or by the operation of international law, dangerous, impossible or prohibited for the vessel to reach | 421 |
| | or enter, or to load or discharge cargo at, any place to which the vessel has been ordered pursuant to this charter | 422 |
| | (a "place of peril"), then Charterers or their agents shall be immediately notified by telex or radio messages, and | 423 |
| | Charterers shall thereupon have the right to order the cargo, or such part of it as may be affected, to be loaded or | 424 |
| | discharged, as the case may be, at any other place within the trading limits of this charter (provided such other | 425 |
| | place is not itself a place of peril). If any place of discharge is or becomes a place of peril, and no orders have been | 426 |
| | received from Charterers or their agents within 48 hours after dispatch of such messages, then Owners shall be at | 427 |
| | liberty to discharge the cargo or such part of it as may be affected at any place which they or the master may in | 428 |
| | their or his discretion select within the trading limits of this charter and such discharge shall be deemed to be due | 429 |
| | fulfilment of Owners' obligations under this charter so far as cargo so discharged is concerned. | 430 |
| | (c)  The vessel shall have liberty to comply with any directions or recommendations as to departure, | 431 |
| | arrival, routes, ports of call, stoppages, destinations, zones, waters, delivery or in any other wise whatsoever | 432 |
| | given by the government of the state under whose flag the vessel sails or any other government or local authority | 433 |
| | or by any person or body acting or purporting to act as or with the authority of any such government or local | 434 |
| | authority including any de facto government or local authority or by any person or body acting or purporting to | 435 |
| | act as or with the authority of any such government or local authority or by any committee or person having under | 436 |
| | the terms of the war risks insurance on the vessel the right to give any such directions or recommendations. If by | 437 |
| | reason of or in compliance with any such directions or recommendations anything is done or is not done, such | 438 |
| | shall not be deemed a deviation. | 439 |
| | If by reason of or in compliance with any such direction or recommendation the vessel does not | 440 |
| | proceed to any place of discharge to which she has been ordered pursuant to this charter, the vessel may proceed | 441 |
| | to any place which the master or Owners in his or their discretion select and there discharge the cargo or such part | 442 |
| | of it as may be affected. Such discharge shall be deemed to be due fulfilment of Owners' obligations under this | 443 |
| | charter so far as cargo so discharged is concerned. | 444 |
| | Charterers shall procure that all bills of lading issued under this charter shall contain the Chamber of | 445 |
| | Shipping War Risks Clause 1952. | 446 |

| Both to Blame Collision Clause | 36.  If the liability for any collision in which the vessel is involved while performing this charter falls to be | 447 |
|---|---|---|
| | determined in accordance with the laws of the United States of America, the following provision shall apply: | 448 |
| | "If the ship comes into collision with another ship as a result of the negligence of the other ship and any | 449 |
| | act, neglect or default of the master, mariner, pilot or the servants of the carrier in the navigation or in the | 450 |
| | management of the ship, the owners of the cargo carried hereunder will indemnify the carrier against all loss, or | 451 |
| | liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of, or | 452 |
| | damage to, or any claim whatsoever of the owners of the said cargo, paid or payable by the other or non-carrying | 453 |
| | ship or her owners to the owners of the said cargo and set off, recouped or recovered by the other or non-carrying | 454 |
| | ship or her owners as part of their claim against the carrying ship or carrier." | 455 |
| | "The foregoing provisions shall also apply where the owners, operators or those in charge of any ship | 456 |
| | or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect of a collision or | 457 |
| | contact." | 458 |
| | Charterers shall procure that all bills of lading issued under this charter shall contain a provision in the | 459 |
| | foregoing terms to be applicable where the liability for any collision in which the vessel is involved falls to be | 460 |
| | determined in accordance with the laws of the United States of America. | 461 |

| New Jason Clause | 37.  General average contributions shall be payable according to the York/Antwerp Rules, 1974, and shall | 462 |
|---|---|---|
| | be adjusted in London in accordance with English law and practice but should adjustment be made in accordance | 463 |
| | with the law and practice of the United States of America, the following provision shall apply: | 464 |
| | "In the event of accident, danger, damage or disaster before or after the commencement of the | 465 |
| | voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the | 466 |
| | consequence of which, the carrier is not responsible by statute, contract or otherwise, the cargo, shippers, | 467 |
| | consignees or owners of the cargo shall contribute with the carrier in general average to the payment of any | 468 |
| | sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and | 469 |
| | special charges incurred in respect of the cargo." | 470 |
| | "If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said | 471 |
| | salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover | 472 |

the estimated contribution of the cargo and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the cargo to the carrier before delivery."

Charterers shall procure that all bills of lading issued under this charter shall contain a provision in the foregoing terms, to be applicable where adjustment of general average is made in accordance with the laws and practice of the United States of America.

**Clause Paramount**

38. Charterers shall procure that all bills of lading issued pursuant to this charter shall contain the following clause:

"(1) Subject to sub-clause (2) hereof, this bill of lading shall be governed by, and have effect subject to, the rules contained in the International Convention for the Unification of Certain Rules relating to Bills of Lading signed at Brussels on 25th August 1924 (hereafter the "Hague Rules") as amended by the Protocol signed at Brussels on 23rd August 1968 (hereafter the "Hague-Visby Rules"). Nothing contained herein shall be deemed to be either a surrender by the carrier of any of his rights or immunities or any increase of any of his responsibilities or liabilities under the Hague-Visby Rules."

"(2) If there is governing legislation which applies the Hague Rules compulsorily to this bill of lading, to the exclusion of the Hague-Visby Rules, then this bill of lading shall have effect subject to the Hague Rules. Nothing herein contained shall be deemed to be either a surrender by the carrier of any of his rights or immunities or an increase of any of his responsibilities or liabilities under the Hague Rules."

"(3) If any term of this bill of lading is repugnant to the Hague-Visby Rules, or Hague Rules if applicable, such term shall be void to that extent but no further."

"(4) Nothing in this bill of lading shall be construed as in any way restricting, excluding or waiving the right of any relevant party or person to limit his liability under any available legislation and/or law."

**TOVALOP**

*See Revised P&I TOVALOP Clause 1987 attached*

39. ~~Owners warrant that the vessel is:~~
~~(i)   a tanker in TOVALOP and~~
~~(ii)  properly entered in~~                                                          P & I Club

and will so remain during the currency of this charter.

When an escape or discharge of Oil occurs from the vessel and causes or threatens to cause Pollution Damage, or when there is the threat of an escape or discharge of Oil (i.e. a grave and imminent danger of the escape or discharge of Oil which, if it occurred, would create a serious danger of Pollution Damage, whether or not an escape or discharge in fact subsequently occurs), then Charterers may, at their option, upon notice to Owners or master, undertake such measures as are reasonably necessary to prevent or minimise such Pollution Damage or to remove the Threat, unless Owners promptly undertake the same. Charterers shall keep Owners advised of the nature and result of any such measures taken by them and, if time permits, the nature of the measures intended to be taken by them. Any of the aforementioned measures taken by Charterers shall be deemed taken on Owners' authority as Owners' agent, and shall be at Owners' expense except to the extent that:

(1) any such escape or discharge or Threat was caused or contributed to by Charterers, or

(2) by reason of the exceptions in Article III, paragraph 2, of the 1969 International Convention on Civil Liability for Oil Pollution Damage, Owners are or, had the said Convention applied to such escape or discharge or to the Threat, would have been exempt from liability for the same, or

(3) the cost of such measures together with all other liabilities, costs and expenses of Owners arising out of or in connection with such escape or discharge or Threat exceeds one hundred and sixty United States Dollars (US $160) per ton of the vessel's Tonnage or sixteen million eight hundred thousand United States Dollars (US $16,800,000), whichever is the lesser, save and insofar as Owners shall be entitled to recover such excess under either the 1971 International Convention on the Establishment of an International Fund for Compensation for Oil Pollution Damage or under CRISTAL;

PROVIDED ALWAYS that if Owners in their absolute discretion consider said measures should be discontinued, Owners shall so notify Charterers and thereafter Charterers shall have no right to continue said measures under the provisions of this Clause 39 and all further liability to Charterers under this Clause 39 shall thereupon cease.

The above provisions are not in derogation of such other rights as Charterers or Owners may have under this charter or may otherwise have or acquire by law or any International Convention or TOVALOP.

The term "TOVALOP" means the Tanker Owners' Voluntary Agreement Concerning Liability for Oil Pollution dated 7th January 1969, as amended from time to time, and the term "CRISTAL" means the Contract Regarding an Interim Supplement to Tanker Liability for Oil Pollution dated 14th January 1971, as amended from time to time. The terms "Oil", "Pollution Damage", and "Tonnage" shall for the purposes of this ~~Clause 39 have the meanings ascribed to them in TOVALOP.~~

**Export Restrictions**

40. The master shall not be required or bound to sign bills of lading for the carriage of cargo to any place to which export of such cargo is prohibited under the laws, rules or regulations of the country in which the cargo was produced and/or shipped.

Charterers shall procure that all bills of lading issued under this charter shall contain the following clause:

"If any laws rules or regulations applied by the government of the country in which the cargo was produced and/or shipped, or any relevant agency thereof, impose a prohibition on export of the cargo to the place of discharge designated in or ordered under this bill of lading, carriers shall be entitled to require cargo owners forthwith to nominate an alternative discharge place for the discharge of the cargo, or such part of it as may be affected, which alternative place shall not be subject to the prohibition, and carriers shall be entitled to accept orders from cargo owners to proceed to and discharge at such alternative place. If cargo owners fail to nominate an alternative place within 72 hours after they or their agents have received from carriers notice of such prohibition, carriers shall be at liberty to discharge the cargo or such part of it as may be affected by the prohibition at any safe place on which they or the master may in their or his absolute discretion decide and which is not subject to the prohibition, and such discharge shall constitute due performance of the contract contained in this bill of lading so far as the cargo so discharged is concerned".

The foregoing provision shall apply mutatis mutandis to this charter, the references to a bill of lading being deemed to be references to this charter.

473
474
475
476
477
478
479
480
481
482
483
484
485
486
487
488
489
490
491
492
493
494
495
496
497
498
499
500
501
502
503
504
505
506
507
508
509
510
511
512
513
514
515
516
517
518
519
520
521
522
523
524
525
526
527
528
529
530
531
532
533
534
535
536
537
538
539
540
541
542
543
544
545
546

**Law and Litigation**

41. (a) This charter shall be construed and the relations between the parties determined in accordance with the laws of England.

    (b) Any dispute arising under this charter shall be decided by the English Courts to whose jurisdiction the parties hereby agree.

    (c) Notwithstanding the foregoing, but without prejudice to any party's right to arrest or maintain the arrest of any maritime property, either party may, by giving written notice of election to the other party, elect to have any such dispute referred to the arbitration of a single arbitrator in London in accordance with the provisions of the Arbitration Act 1950, or any statutory modification or re-enactment thereof for the time being in force.

    (i) A party shall lose its right to make such an election only if:

        (a) it receives from the other party a written notice of dispute which –

            (1) states expressly that a dispute has arisen out of this charter;

            (2) specifies the nature of the dispute; and

            (3) refers expressly to this clause 41(c)

        and

        (b) it fails to give notice of election to have the dispute referred to arbitration not later than 30 days from the date of receipt of such notice of dispute.

    (ii) The parties hereby agree that either party may –

        (a) appeal to the High Court on any question of law arising out of an award;

        (b) apply to the High Court for an order that the arbitrator state the reasons for his award;

        (c) give notice to the arbitrator that a reasoned award is required; and

        (d) apply to the High Court to determine any question of law arising in the course of the reference.

    (d) It shall be a condition precedent to the right of any party to a stay of any legal proceedings in which maritime property has been, or may be, arrested in connection with a dispute under this charter, that that party furnishes to the other party security to which that other party would have been entitled in such legal proceedings in the absence of a stay.

**Construction**

42. The side headings have been included in this charter for convenience of reference and shall in no way affect the construction hereof.

Special Provisions Nos. 1 to 3 as attached are deemed incorporated in this Charter Party.

**KEIKO - Time Charter Party dated 19th November 1996**

**Special Provisions -  Page 1.**

1.    Master to allow agents at load port to issue/sign Bills of Lading on his behalf, Charterers providing necessary documents to protect Owners' position in all respects, (per Addendum to be agreed).

2.    Commission of 1.25 percent payable by Owners to Petrian Shipbrokers Limited, London on hire, as and when paid.

3.    International Oil Overseas Additional Clauses for Time Charter Nos. 1) to 67) as amended and attached are deemed incorporated in this Charter Party.

KEIKO - Time Charter Party dated 19th November 1996
INTERNATIONAL OIL OVERSEAS ADDITIONAL CLAUSES FOR TIME CHARTER
(SHELLTIME 4) (dated 21.12.1993)                                        (Page 1)

1)   **TRADING**                                                          AMENDED
     **Within Institute Warranty Limits Arabian Gulf (excluding Iraq), Red Sea, India,
     East Africa (not south of Dar es Salaam, excluding Israel).**

2)   **VESSEL DESCRIPTION:**                                              AMENDED
     Name                           :    **Keiko**
     Flag                           :    **Greek**
     Built                          :    **1976**
     Class                          :    **NKK**
     SDWT                           :    **87,682 metric tons**
     Draft                          :    **14.226 metres**
     Cubic capacity:                :
     LOA                            :    **236.85 metres**
     Beam                           :    **40.0 metres**
     Coated                         :
     Coiled                         :
     IGS/COW                        :    **Yes / Yes**
     Size and description of
        Reducers on board :
     Pumping capacity               :
     Tank cleaning equipment        :

3)   **HIRE PAYMENT:**                                                    AMENDED
     **Charterers to pay first hire on delivery for seven (7) days, thereafter hire
     payable every seven (7) days in advance without deduction.  If payment is not
     received by the due date, or it is apparent that it will not be received, Owners to
     have the right to suspend voyage or operations and not resume until hire
     received.  Any time so lost to count in full.**

4)   **CLEANING OF CARGO TANKS, LINES AND PUMPS:**                        AMENDED
     Master of vessel to ensure that all cargo tanks completely dry and free of any water
     or residue when presenting vessel for loading.   The vessel has fixed or portable
     equipment on board necessary to undertake cleaning operation efficiently and timely
     without delay and such equipment will be maintained properly and kept on board
     the vessel throughout the Charter period in good working condition.

5)   **BUNKERS: (Revised 14/01/96)**                                      AMENDED
     The vessel is to be delivered with bunkers as on board but not less than 300
     metric tons Fuel Oil and 50 metric tons Gasoil (which if required are to be
     measured by an independent cargo surveyor) and redelivered with **at least the
     same quantity as on delivery, but maximum ten percent (10%) more**. During the
     period of the Charter the Charterers will replenish bunkers as necessary in their

KEIKO - Time Charter Party dated 19th November 1996
INTERNATIONAL OIL OVERSEAS ADDITIONAL CLAUSES FOR TIME CHARTER

(Page 2)

own time and at their own expense.   **In any event Charterers to provide bunkers prior to sailing first load port sufficient for return voyage to Pakistan so that vessel will have minimum quantity as on delivery.**

In the event  of  an   excess in   quantity on redelivery,   Owners  shall  make reimbursement at:

| | |
|---|---|
| **Fuel Oil** | **US$117.00** |
| **MDO** | **US$225.00** |

**6)     DRYDOCKING:**
Owner  warrants vessel will not dry dock during the period of this Charter Party.

**7)     SPEED/CONSUMPTION:                                     AMENDED**
With reference to Clause (24) of the  Charter  Party, Owners guarantee  that  the average  speed  and  consumption of the vessel shall be as follows:-

**Guaranteed daily speed/consumption up to and including Beaufort 4 and DSS4:**

**12 knot on 45 m/tons FO (180) and 3.5 m/tons MDO (average laden/ballast)**

| | |
|---|---|
| **Discharge** | **65 tons + 3.5 tons per day** |
| **Idle** | **6 tons + 3.5 tons per day** |
| **Maintain cargo temperature** | **25 tons FO per day** |
| **Manoeuvring** | **2 mtons DO per hour** |
| **Loading** | **15 tons FO** |
| **Inerting** | **20 tons FO** |
| **Ballasting** | **15 tons FO** |
| **Deballasting** | **15 tons FO** |
| **Cleaning** | **25 tons FO** |

**All above plus 3.5 mtons MDO per day.**

**8)     BUNKERS ON BOARD:**
On  delivery  vessel will have about 300 metric tons Fuel Oil and about 50 metric tons Gasoil.

**9)     FRESHWATER:**
All fresh water required  on  board  including boiler  fresh water to  be  for Owners' account.   Charterers will not be responsible for any expenses relating to fresh water.

KEIKO - Time Charter Party dated 19th November 1996
INTERNATIONAL OIL OVERSEAS ADDITIONAL CLAUSES FOR TIME CHARTER

(Page 3)

**10)   CARGO RISK:**
Cargo shall be loaded into the vessel at Charterers' expense and risk only up to vessel's receiving manifold.  Cargo shall be discharged from the vessel at Owners' risk only up to vessel's discharge manifold.

**11)   SLOPS:**                                               **AMENDED**
Thereafter slops on board if any shall not be discharged without prior Charterers' approval and all costs for removal of such slops will be for Owners' account. Owners undertake to report to Charterers whenever slops accumulate and advise stowage, volume and proposed usage/disposal of such slops.  Owners warrant that in case vessel trading one cargo grade and Charterers have not instructed vessel to clean cargo tanks no slops will be accumulated on board vessel.

**12)   SAFETY AND CONDITION:**
Vessel's equipment, operation and manning shall be in conformity with approved and/or accepted international standards such as IMO and ICS/OCIMF with regard to safety and pollution prevention.  Any delays arising from vessel's failure to meet the above standards shall entitle Charterers to place the vessel off-hire without prejudice to other remedies available to Charterers.

**13)   MANNING:**
In order to properly handle bunkering operations the vessel shall have as a minimum requirement the Master, two licensed Deck Officers and four Able Seamen available on deck throughout the operations.

**14)   PERFORMANCE:**                                         **AMENDED**
Owners waive any right to make an overperformance claim. This waiver shall not offset any underperformance claim made by Charterers.

**15)   ON HIRE/OFF HIRE SURVEY:**                             **DELETED**

**16)   ELIGIBILITY:**                                         **AMENDED**
Owners warrant that the vessel is in all respects eligible for trading within, to and from ranges and areas specified in the Charter Party and that at all times she shall have on board all certificates, records and other documents and equipment required for such service.

**17)   DRUG AND ALCOHOL CLAUSE:**
Owners warrant that they have a policy on Drug and Alcohol Abuse ("Policy") applicable to the vessel which meets or exceeds the standards in the Oil Companies' International Marine Forum Guidelines for the Control of Drugs and Alcohol on Board Ship ("OCIMF Guidelines").  Owners further warrant that this Policy is complied with.  For the purposes of the Clause and the OCIMF Guidelines,

KEIKO - Time Charter Party dated 19th November 1996
INTERNATIONAL OIL OVERSEAS ADDITIONAL CLAUSES FOR TIME CHARTER
(Page 4)

alcohol impairment shall be defined as a blood alcohol content of 40 mg/100 ml or greater; the appropriate seafarers to be tested shall be all vessel officers and the drug/alcohol testing and screening shall include random testing of the officers with a frequency  to ensure that each officer is tested at least once a year.

18)   **ETA CLAUSE:**
Master to give Charterers ETA loading port as soon as ordered and  seven  (7) days, 72/48/24/12 hours prior arrival at loading and discharge ports where time permits also ETA discharge port on sailing from load  port as well as any change in ETA exceeding six (6) hours in all cases.

19)   **BALLAST, INERT GAS SYSTEM AND CRUDE OIL WASHING:**
A. Vessel shall arrive at load port with clean ballast.

B.   Owner warrants vessel has operable Crude Oil Washing and Inert  Gas Systems, and both Systems shall be operational during duration of this  Charter Party up to standard required by Loading Terminals by  fully  capable  and qualified personnel.

20)   **CERTIFICATES:**
Vessel to comply with latest effective MARPOL and IMO Regulations and to be kept in compliance throughout Charter period.

All other National and International Certificates to be  kept clean  and  valid including but not limited to Compliance on Civil Liabilities, FMC Certificates as per current Rules and Regulations  and any  changes in such Rules and Regulations. Owners warrant that the vessel will conform in  all  respects with  the  applicable parts of  the  requirements as defined by the "International Convention for the Prevention of Pollution from Ships 1973/1978". Such compliance to include but not to be limited to requirements as  regards  efficient  stripping.  The vessel  is provided with  a  dual IOPP  Certificate, necessitating inspection and certification by Class Surveyor.

Any delay caused to vessel due to any  Certificate  being unavailable or expired shall be totally for Owners' account.

21)   **CARGO:**                                                **AMENDED**
Charterers have the option of loading Crude Oil, Dirty Petroleum Products, Gasoil and Marine Diesel Oil, maximum (2) grades, but where  vessel loads  one grade  on top of another for admixing purposes same  to  be treated as one grade.

Owners warrant vessel is able to segregate minimum two (2) grades with double valve, line and pump segregation. Owner warrants  vessel able to load/discharge two  (2)  grades simultaneously without contamination.

KEIKO - Time Charter Party dated 19th November 1996
INTERNATIONAL OIL OVERSEAS ADDITIONAL CLAUSES FOR TIME CHARTER

(Page 5)

**Charterers fully indemnify Owners for any claims arising as a result of admixing/co-mingling cargo.**

22)   PUMPING:                                                    AMENDED

Owners warrant that the vessel can maintain at vessel's manifolds a pressure of **average** 100 PSI or that cargo can be discharged within twenty four (24) hours, **except for stripping and crude oil washing,** or pro rata for part cargo, provided shore facilities permit **and discharge is not interrupted.** Owner warrants vessel can discharge two (2) grades simultaneously.

In ship to ship transfer operations, vessel warrants to achieve a discharge rate of up to 2,500 metric tons per hour and any rate requested by Charterer below such maximum down to 400 metric tons per hour, **provided receiving vessel is capable of receiving same.** Vessel has on board a sufficient range of reducers to allow connection to various hose line diameters and terminal cargo manifolds.

23)   SHIP TO SHIP TRANSFER OPERATIONS:

If required by the Charterers the vessel shall load and/or discharge full or part cargo alongside other vessel(s) in port or at a safe anchorage or under any other circumstances, provided they are safe and at Master's discretion, which shall not be unreasonably withheld.

Charterers are to provide suitable fenders and hoses to safely effect such operations and have the option to store same on board for the duration of Charter Party. Handling of such equipment on board the vessel shall be by Owners' crew at Owners' cost. All such equipment shall be removed from the vessel by Charterers upon completion of Charter Party without delay.

Vessel's crew shall connect/disconnect cargo hoses, heave down/heave up fenders, take/throw connection lines, transfer to/transfer back cargo hoses and any other activities required for the completion and safe conduct of the ship to ship transfer operation for their account without any exclusion.

Owners warrant that the vessel is equipped with minimum fifteen (15) ton derricks port and starboard amidships to handle bunker lines/cargo hoses.

All extra insurance for above ship to ship lighterage operations shall be for Owners' account and Charterers have no liability for hull or other damage, if any, that may occur during such operations. Owners warrant that the vessel is equipped and capable of safely carrying out all procedures as set out in the latest revised edition of the ICS/OCIMF SHIP TO SHIP TRANSFER GUIDE.

Ship to Ship Transfer may include Charterers' very large crude barge (VLCB) of about 34,500 tons deadweight chartered to perform such operations.

KEIKO - Time Charter Party dated 19th November 1996
INTERNATIONAL OIL OVERSEAS ADDITIONAL CLAUSES FOR TIME CHARTER

(Page 6)

**24) SUPERCARGO:**

Charterers have the option to place on board one supercargo at any time during this Charter Party. Owner is to provide such supercargo with good accommodation with private bath and food at Captain's table at a cost of US$4.00 per day at Charterers' expense. Supercargo will be allowed access, to investigate, ullage and sample all cargo, slop, bunker, and ballast tanks, also any void spaces, and access to any other parts of vessel that may relate to carriage of cargo as he may require. He shall also have the right to require selected valves on bunker and cargo systems to be sealed to preclude the possibility of cargo/product/bunker migrations.

**25) PROTECTION & INDEMNITY INSURANCE:**

Owner warrants the vessel is a member of the................. P&I Club and is complying with the revised P&I TOVALOP Clause 1987 as attached all in good standing. Owner warrants that vessel holds a pollution cover of US$500 million, and additional US$200 million during full time of Charter Party. Owners agreed to allow Charterers to have the benefit of Owners' P&I insurance to the extent the Rules of that Association permits. Owners to be responsible for all third party claims which fall under Owners' responsibility. All insurance clause required by insurance department plus Owner notifying Charterer.

**26) SAFETY:**

The vessel is to comply with the latest Safety at Sea and other Safety Regulations.

**27) INSURED VALUE:**

The vessel insured value is US$.............................

**28) COMMUNICATIONS:**

The Master is to allow Charterers' supercargo the use of vessel's communication equipment for reasonable operational purposes without charge.

Vessel shall maintain twenty four (24) hour listening watch on VHF Channel 16/14.

Vessel is equipped with Telex No:.........which shall be in good operational condition throughout Charter Party.

All communication expenses will be for Owners' account.

**29) TRADING HISTORY:**

Owners guarantee that the vessel is not boycotted by the Arab League and has never traded to Israel.

KEIKO - Time Charter Party dated 19th November 1996
INTERNATIONAL OIL OVERSEAS ADDITIONAL CLAUSES FOR TIME CHARTER
(Page 7)

30) **AGENCY:**
Charterers' agents shall attend to all  matters  relating  to Charterers' obligations. Owners shall appoint their agents to attend to all matters relating to Owners' obligations. In case Owners  request Charterers' agent services then Charterers may request such agent to provide required services which shall be at Owners' time and risk and Charterers shall deduct from hire  disbursements of agent plus fifteen percent (15%).

31) **ACCESS:**
The Master shall not allow any vessel or  craft,  other  than those  of  port authorities  or  pilots, to secure alongside without  the  express  authority of Charterers.

32) **MOORING:**
Owners shall provide vessel with appropriate wires/lines for safe  mooring  at  all terminals  within  the  ranges/areas specified herein.

33) **OVER AGE INSURANCE:**                              DELETED

34) **QUANTITATIVE RESPONSIBILITY:**
Although Charterers' surveyor may be monitoring any transfer operation, this does not relieve  Master or Owners of responsibility  for  verifying  the quantity involved in each oil movement nor  for  liability  under  the  terms  of  this Charter Party for any oil losses.

35) **BERTH OCCUPANCY:**                                 AMENDED
Owners warrant vessel shall vacate the berth after completion of  ballasting  or within  one  and  a  half hours following completion of loading/discharging.  **Any delays not attributable to vessel to be for Charterers' account.**

36) **PRIVACY:**                                         AMENDED
All negotiations/**eventual fixture** to be kept strictly private and confidential **and not to be discussed with any third party**.

37) **WAR RISKS:**                                       AMENDED
Any  increase  of hull and machinery war risk premia over and above those in effect on the date of this Charter Party  will be for Charterers' account.   Any premia or increases thereto attributable to closure (i.e.  blocking and trapping) insurance shall be for Owners' account.

Surcharges which are in effect on the date of this Charter Party are for Owners' account.

KEIKO - Time Charter Party dated 19th November 1996
INTERNATIONAL OIL OVERSEAS ADDITIONAL CLAUSES FOR TIME CHARTER

(Page 8)

**38)**   **CHARTERERS' UNDERWRITERS' CLAUSE:**                          **DELETED**

**39)**                                                                  **DELETED**

**40)**   With  reference  to Shell Time 4 Bill of Lading Clause 13 add at the end of the clause the words "Without Bank Guarantee or countersignature."

**41)**   Payment of first hire will be against telex invoice plus full telex recap, payment of subsequent hires requires an original signed Charter Party received by Charterer.

**42)**   **REDUCTION OF HIRE:**
If vessel shall not fulfil Owner's warranty or any other part of her description as warranted in Clause 4, Charterer  shall be  entitled  without prejudice to a reduction in the hire to correct for the deficiency and to any other rights  Charterer may have.

**43)**   **DEFAULT:**
In   default of punctual and  regular  payment as  herein  specified, Owner will notify  Charterer  whereupon  Charterer shall make payment of the amount due within fifteen (15) days  of  receipt  of  notification from Owner, failing which Owner will have the right to withdraw vessel from  the  service  of Charterer  without prejudice to any claim Owner may otherwise have against Charterer under this Charter.

**44)**   **WARRANTIES:**
Owner  warrants that at  the  time  vessel  is  placed   at Charterer's disposal, vessel  shall fulfil the description, particulars and capabilities set further in Clause 2 above, and shall be tight,  staunch,  and  strong,  in thoroughly efficient order and condition and in every way  fit,  manned, equipped,  and  supplied  for the service contemplated, with holds, cargo tanks, pipelines, and valves clear,  clean,  and tight and with pumps, heating coils, and all other equipment in good working order.  Such description,  particulars,  and  capabilities  of  vessel   shall be maintained by Owner throughout the period of vessel's service hereunder so far as possible by the exercise of due diligence.

**45)**   **CARGO:**
Charterer  shall  have  the option of shipping any lawful dry cargo in bulk for which vessel and her tanks are suitable and any lawful merchandise in cases and/or can and/or packages in vessel's forehold, 'between decks, and/or other suitable  space available,  subject,  however, to the Master's approval as to kind and character, amount  and  stowage.    All   charges  for dunnage,  loading, stowing, and discharging so incurred shall be paid by Charterer.

KEIKO - Time Charter Party dated 19th November 1996
INTERNATIONAL OIL OVERSEAS ADDITIONAL CLAUSES FOR TIME CHARTER
(Page 9)

46) **DISTANCE FOR SPEED/FUEL WARRANTIES:**
For speed or fuel consumption warranties, Charterer agrees to use voyage distances established by the BP Distance Tables, or, if not contained in the BP Distances Tables, as published in Worldscale or, if not published in Worldscale, as obtained from BP.

47) **WIRELESS TELEGRAPH:**
Owner shall ensure vessel is equipped with wireless telegraph to comply with existing International Regulations and to allow vessel to communicate with land stations.

48) **BILGE TRANSFER:**
Owner shall ensure vessel shall have efficient and safe means of transferring engine room/pump room bilge liquids to designated holding tanks on board for disposal in accordance with International Regulations.

49) **IMO AND OTHER REGULATION:**
Owner shall ensure vessel meets IMO Classification Society and regulations as may be applicable at time of delivery and throughout the entire term of Charter and has on board at all time Certificate of Compliance. Owner shall ensure vessel meets existing OCIMF Guidelines.

50) **PRESSURE GAUGES:**
Owner shall ensure vessel is equipped with pressure gauges at each discharge manifold which will be maintained in a proper working condition and each gauge shall have a valid test certificate.

51) **CHARTERER'S TECHNICAL REPRESENTATIVE:**
Charterers shall have the right of having its technical representatives visit vessel to observe operations while in port or during lightering operations. Such visits shall include but not be limited to access to pump room, engine room, cargo control room, navigation bridge and deck area. Charterer's representative shall not interfere in the normal operation of vessel nor in the duties of vessel's officers and crew.

52) **LANGUAGE PROFICIENCY:**
Conversational English language proficiency is required for the Master and Officer in charge of cargo or bunker oil handling and shall be warranted under the Charter.

53) **BUNKERS:**
Owner shall allow Charterers' representative(s) to survey and take samples of all vessel bunker tanks and cofferdams at loading and/or discharge port.

KEIKO - Time Charter Party dated 19th November 1996
INTERNATIONAL OIL OVERSEAS ADDITIONAL CLAUSES FOR TIME CHARTER
(Page 10)

**54)** **ASSIGNMENT BY CHARTERER:**
A) Notwithstanding any other provision of this Charter Party, Charterer may assign all of its rights and obligations under this Charter Party to any affiliate of Charterer, Charterer always remaining fully responsible for the fulfilment of all terms and conditions of this Charter Party.

B) Charterer shall also have the right to sublet vessel, but in the event of a sublet, Charterer shall always remain responsible for the fulfilment of this Charter in all its terms and conditions.

**55)** **VESSEL DRAWINGS/DATA:**
Owner shall submit following drawings/data prior to vessel delivery:

a) General Arrangement Plan
b) Capacity Plan
c) Midships Plan
d) Piping Arrangement in Pump Room, including profile and plan view
e) Manufacturer's cargo pump performance curves
f) Results of sea trials

**56)** **CRUDE OIL WASHING:**
Charterer shall have the option to require Crude OIL Washing of all or part of vessel's cargo tanks in accordance with IMO requirements.

**57)** **OVERBOARD DISCHARGES:**
Charterer shall ensure pump room stripping line overboard discharges are suitably blanked off before arriving in port. Owner shall ensure these blanks are installed and retained in line through the entire period that vessel is in coastal water.

**58)** **SAFETY LAWS AND REGULATIONS:**
Owner shall ensure that the vessel at time of delivery and throughout term of Charter complies with all laws and regulations of country of registry and vessel class concerning the safe condition and operation of vessel including pollution prevention.

**59)** **SBM FITTINGS:**
Owner warrants vessel shall have SBM fittings, are required by OCIMF "Standard for Equipment Employed in the Mooring of Ships at Single Point Moorings", 1978, throughout the terms of this Charter Party.

KEIKO - Time Charter Party dated 19th November 1996
INTERNATIONAL OIL OVERSEAS ADDITIONAL CLAUSES FOR TIME CHARTER

(Page 11)

**60)** **SPEED ADJUSTMENTS:**
Charterer shall have the right to order Owner to slow down or speed  up vessel consistent with the safe operation of vessel and its machinery on ballast or loaded sea passages.

**61)** **WARRANTY CALCULATION:**
A) Charterer shall have the right to require the  Master to provide  statistical  data from the sea logs, port logs, and pumping logs if necessary  to  perform  the warranty  calculations  required  under  Clauses  47  and  48.   Charterer  shall separately  review  speed  and  fuel  consumption performance for each leg of any voyage and pumping performance for each discharge and the   payment provided for  in  such  Clauses shall be calculated per leg or per discharge.

B) Owner  shall have fifteen (15) days to review, and provide Charterer with the results thereof, any  Charterer  claim  for  compensation  under Clauses 47 and 48, commencing on the date Charterer gives  Owner · notice  of  such  claim. Charterer  shall  have  the right to deduct from hire any compensation due to it under Clauses 47 and 48  upon  the expiration  of  twenty  five  (25)  days after the notice date.

C) Charterer's claims for compensation under Clauses 47  and 48  arising from  the last performance review during the Charter period, shall be deducted from hire in accordance with Charterer's  estimate  made  about  two  (2)  months before  the expiration  of  the Charter and any necessary adjustment after the end of the Charter shall be made Owner  to Charterer or Charterer to Owner as the case may require.

**62)** **COMMISSION CLAUSE:**
Commission of   2.5 percent is  payable  by  Owners  to  Charterer's  Shipping Department on the actual amount of hire, when and as hire is paid.

**63)** **INSURANCE:**
For the period of the Charter, Owner shall have and maintain:
a) subject to  Clause...., hull  insurance for the current market value of vessel, or if vessel's hull  is self-insured, full collision liability insurance shall be included in Owner's Protection and  Indemnity (P&I) insurance coverage; and

b) the  Standard  Oil  Pollution  Insurance  Cover (Currently  US$500  million  and US$200 million) available from Owner's P&I Clubs: and

**64)** In case Charterers instruct vessel to discharge cargo into a receiver or at a destination other than that mentioned on Bill of Lading or without presentation of Original Bill of Lading  at  discharge port the Charterers shall provide Owner with a Letter of Indemnity per Owner's wording  without  Bank Guarantee and not counter signed by bank. Charterer's option to  issue one standby Letter of Indemnity for the full duration of the Charter Party.

KEIKO - Time Charter Party dated 19th November 1996
INTERNATIONAL OIL OVERSEAS ADDITIONAL CLAUSES FOR TIME CHARTER
(Page 12)

65)     In addition to other guarantees with respect to the quality and quantity of vessel's cargo hereof Owners shall be responsible and accountable for product losses which shall be determined semi-annually from the difference between ship's cargo upon completion of loading and ship's cargo prior to discharging in the discharge port, all volumes corrected to 60 degrees Fahrenheit in excess of point two percent (0.2%).

66)     CLAIMS OFFSET CLAUSE:
        This Charter Party shall be treated as an independent contract and neither party shall have the right of off-setting and/or claim any amounts due or not due from any other Charter Parties or dealings of whatsoever nature, whether or not the same may be due or justified.

        The Owner warrants that the Master and vessel will fully comply with Charter Party and will not lien cargo or delay or suspend operations due to any claim arising out of Charter Parties/Contracts between Owner and Charterers and/or any Charterers' affiliates and/or any of Charterers' subsidiary companies.

67.     In case the vessel calling Port Sudan Master of vessel should obtain signature and stamp of receivers and agents/all concerned on following documents without fail:

        Notice of Readiness
        Ullage Report before discharge
        Ship Ullage Report after discharge
        Dry Tank Certificates
        Time Sheets
        Letters of Protest (if any)

**P&I REVISED TOVALOP CLAUSE 1987**

Owners warrant that the vessel is a Participating Tanker in TOVALOP and will so remain during this Charter, provided however that nothing herein shall prevent Owners, upon prior notice to Charterers, from withdrawing from TOVALOP under Clauses III(B) or X thereof, and provided further that upon any withdrawal under Clause III(B) or under Clause X, following an amendment to TOVALOP which does not materially increase the obligation of the Parties thereunder, Charterers shall have the option to terminate this Charter.

When an escape or discharge of Oil occurs from the vessel and causes or threatens to cause Pollution Damage, or when there is the Threat of an escape or discharge of Oil (i.e. a grave and imminent danger of the escape or discharge of Oil which, if it occurred, would create a serious danger of Pollution Damage), then Charterers may, at the option, upon notice to Owners or Master, undertake such measures as are reasonably necessary to prevent or minimise such Damage or to remove the Threat, unless Owners promptly undertake the same. Charterers shall keep owners advised of the nature and result of any such measure taken by them, and if time permits, the nature of the measures intended to be taken by them. Any of the aforementioned measured taken by Charterers shall be deemed taken on Owners' authority and as Owners' agents, and shall be at Owners' expense except to the extent that:

(1)     Any such escape or discharge or Threat was caused or contributed to by Charterers, or

(2)     By reason of the exception set out in Article III, Paragraph 2, of the 1969 International Convention on Civil Liability for Oil Pollution Damage, Owners are or, had the said Convention applied to such escape or discharge or to the Threat, would have been exempt from liability for the same, or

(3)     The costs of such measures together with all other liability, costs and expenses of Owners arising out of or in connection with such escape or discharge or Threat removal exceeds One Hundred and Sixty United States Dollars per ton or Sixteen Million Eight Hundred Thousand United States Dollars, whichever is the lesser, save insofar as Owners shall be entitled to remover such excess under either the 1971 International Convention on the establishment of an International Fund for Compensation for Oil Pollution Damage or under CRISTAL, provided that in any incident to which the TOVALOP Supplement applies the Owners' limit of liability hereunder shall be that provided for in the said Supplement;

PROVIDED ALWAYS that if Owners in their absolute discretion consider said measures should be discontinued, Owners shall so notify Charterers and thereafter Charterers shall have no right to continue said measures under the provisions of this Clause and all further liability to Charterers under this Clause shall thereupon cease.

The above provisions are not in derogation of such other rights as Charterers or Owners may have under the Charter or may otherwise have or acquire by Law or any International Convention or TOVALOP.

For the purpose of this Clause, the meaning of the term "Oil" and "Pollution Damage" shall be defined in TOVALOP and "ton" shall be understood in relation to "tonnage" as defined therein.

# PETRIAN SHIPBROKERS LIMITED

**COPY**

18th December 1996

**ADDENDUM NO. 1.**
**to**
**m.t. KEIKO**
**Charter Party dated 19th November 1996**

With reference to the above mentioned Charter Party between LSP TANKERS CORPORATION, of MONROVIA, LIBERIA, as Owners, and INTERNATIONAL OIL OVERSEAS INC., of PANAMA, as Charterers, it is hereby mutually agreed that:

**Maximum period of Time Charter to be extended by minimum ten (10) days up to sixty (60) days in Charterers' option.**

**Additional period to commence from 0600 hours on 20th December 1996.**

**Redelivery notice minimum seven (7) days for additional period.**

**Hire US$13,000.00 (thirteen thousand United States Dollars) for additional period.**

**Hire payable every ten (10) days in advance for additional period.**

All other terms, conditions, exceptions and exemptions from liability of above referenced Charter Party to remain unaltered.

FOR OWNERS:                    FOR CHARTERERS:

# PETRIAN SHIPBROKERS LIMITED

# COPY

31st December 1996

**ADDENDUM NO. 2.**
**to**
**m.t. KEIKO**
**Charter Party dated 19th November 1996**
**and**
**Addendum No. 1. dated 18th December 1996**

With reference to the above mentioned Charter Party between LSP TANKERS CORPORATION, of MONROVIA, LIBERIA, as Owners, and INTERNATIONAL OIL OVERSEAS INC., of PANAMA, as Charterers, it is hereby mutually agreed that:

**The vessel will be redelivered after present voyage discharging Pakistan at a position direction Quoin Island equidistant from discharge port to Fujairah.**

All other terms, conditions, exceptions and exemptions from liability of above referenced Charter Party to remain unaltered.

FOR OWNERS:                    FOR CHARTERERS:

# EXHIBIT J

**2. KEIKO C/P 19/11/96**

The matters in dispute are as follows:

| | |
|---|---:|
| a) Bunker prices | $ 460.15 |
| b) Alleged overconsumption of D.O. | $2,917.88 |
| c) Unsupported deductions on Owners expenses and alleged but unspecified underperformance re pumping | $10,000.00 |
| T O T A L | $13,378.04 |

Redelivery Date:  20/12/97

# EXHIBIT K

TLXOK ,8812396,,AST84,30/05/97,12:52:13,S,8812396PETIAN G,30/05/97,12:57:56
,00:03:10,,AST,,,,,,,,,,,,,,,,,,,,

8812396

:
8812396+
8812396PETIAN G
921544 POLEGB G
DATE: 30/05/97
TIME: 12:57:56
REF:  29819


M/T ATLAS/IOOI  C/P 20/5/97

VESSEL DELIVERED TO CHRTRS AT FUJAIRAH ON 21ST MAY 1997 0600HRS LOCAL
TIME WITH 1,698.32MT FUEL OIL AND 147.89MT DIESEL OIL AND REDELIVERED
TO OWNERS AT FUJAIRAH ON 30TH MAY 1997 1400HRS LOCAL TIME WITH
1,698.30MT FUEL OIL AND 147.89MT DIESEL OIL.

FINAL HIRE STATEMENT

FM 21/5/97 0600HRS LT
TO 30/5/97 1400HRS LT

09D 08H 00M OR 9.333333DAYS X USD 13,000=        USD 121,333.32

LESS COMM 2.5PCT                                 (USD   3,033.33)

LESS RCVD ON A/C                                 (USD  88,725.00)
                                                 ---------------
DUE OWNERS                                       USD  29,574.99
                                                 ===============


 PLEASE REMIT BY TELEGRAPHIC TRANSFER TO

CHASE MANHATTAN BANK NA
PO BOX 127
CHASE HOUSE
GRENVILLE STREET
ST.HELLIER
JERSEY JE4 8QH
CHANNEL ISLANDS
FOR CREDIT WINTERSEA MARITIME CORPORATION
USD ACCOUNT NR 6710018513


REGARDS
POLEMBROS

# EXHIBIT L

Code word for this Charter Party
"SHELLTIME 4"

*Issued December 1984*

PETRIAN
SHIPBROKERS
LIMITED

ORIGINAL

# Time Charter Party

LONDON, 11 July 1997

IT IS THIS DAY AGREED between SILVERSTONE ENTERPRISES CORPORATION  1

of MONROVIA, LIBERIA    (hereinafter referred to as "Owners"), being owners of the  2
good  Liberian flag  vessel called   ATLAS  3

(hereinafter referred to as "the vessel") described as per Clause 1 hereof and INTERNATIONAL OIL  4

OVERSEAS INC. of   PANAMA    (hereinafter referred to as "Charterers"):  5

| | |
|---|---|
| Description and Condition of Vessel | 1.   At the date of delivery of the vessel under this charter  6 |

(a)   she shall be classed:    NKK  7
(b)   she shall be in every way fit to carry crude petroleum and/or its products:  8

(c)   she shall be tight, staunch, strong, in good order and condition, and in every way fit for the  9
service, with her machinery, boilers, hull and other equipment (including but not limited to hull stress calculator  10
and radar) in a good and efficient state;  11
(d)   her tanks, valves and pipelines shall be oil-tight;  12
(e)   she shall be in every way fitted for burning  13

at sea – fuel oil with a maximum viscosity of  180   Centistokes at 50 degrees Centigrade/~~any~~  14
~~commercial grade of fuel oil ("ACGFO")~~ for main propulsion, marine diesel oil/~~ACGFO~~  15
for auxiliaries  16
in port – marine diesel oil/~~ACGFO~~ for auxiliaries;  17

(f)   she shall comply with the regulations in force so as to enable her to pass through the Suez and  18
Panama Canals by day and night without delay:  19
(g)   she shall have on board all certificates, documents and equipment required from time to time by  20
any applicable law to enable her to perform the charter service without delay:  21
(h)   she shall comply with the description in ~~Form B~~ appended hereto, provided however that if there  22
is any conflict between the provisions of ~~Form B~~ and any other provision, including this Clause 1, of this charter  23
such other provision shall govern.  24

*See 100I Clause 2.*

| | |
|---|---|
| Shipboard Personnel and their Duties | 2.   (a)   At the date of delivery of the vessel under this charter  25 |

(i)   she shall have a full and efficient complement of master, officers and crew for a vessel of her  26
tonnage, who shall in any event be not less than the number required by the laws of the flag state and who shall be  27
trained to operate the vessel and her equipment competently and safely;  28
(ii)   all shipboard personnel shall hold valid certificates of competence in accordance with the  29
requirements of the law of the flag state;  30
(iii)   all shipboard personnel shall be trained in accordance with the relevant provisions of the  31
International Convention on Standards of Training. Certification and Watchkeeping for Seafarers, 1978,  32
(iv)   there shall be on board sufficient personnel with a good working knowledge of the English  33
language to enable cargo operations at loading and discharging places to be carried out efficiently and safely and  34
to enable communications between the vessel and those loading the vessel or accepting discharge therefrom to be  35
carried out quickly and efficiently.  36
(b)   Owners guarantee that throughout the charter service the master shall with the vessel's officers  37
and crew, unless otherwise ordered by Charterers.  38
(i)   prosecute all voyages with the utmost despatch;  39
(ii)   render all customary assistance; and  40
(iii)   load and discharge cargo as rapidly as possible when required by Charterers or their agents  41
to do so, by night or by day, but always in accordance with the laws of the place of loading or discharging (as the  42
case may be) and in each case in accordance with any applicable laws of the flag state.  43

| | |
|---|---|
| Duty to Maintain | 3.   (i)   Throughout the charter service Owners shall, whenever the passage of time, wear and tear or any  44 |

event (whether or not coming within Clause 27 hereof) requires steps to be taken to maintain or restore the  45
conditions stipulated in Clauses 1 and 2(a), exercise due diligence so to maintain or restore the vessel.  46
(ii)   If at any time whilst the vessel is on hire under this charter the vessel fails to comply with the  47
requirements of Clauses 1, 2(a) or 10 then hire shall be reduced to the extent necessary to indemnify Charterers  48
for such failure. If and to the extent that such failure affects the time taken by the vessel to perform any services  49
under this charter, hire shall be reduced by an amount equal to the value, calculated at the rate of hire, of the time  50
so lost.  51
Any reduction of hire under this sub-Clause (ii) shall be without prejudice to any other remedy  52
available to Charterers, but where such reduction of hire is in respect of time lost, such time shall be excluded  53
from any calculation under Clause 24.  54
(iii)   If Owners are in breach of their obligation under Clause 3(i) Charterers may so notify Owners in  55
writing; and if, after the expiry of 30 days following the receipt by Owners of any such notice, Owners have failed  56
to demonstrate to Charterers' reasonable satisfaction the exercise of due diligence as required in Clause 3(i), the  57
vessel shall be off-hire, and no further hire payments shall be due, until Owners have so demonstrated that they  58
are exercising such due diligence.  59
Furthermore, at any time while the vessel is off-hire under this Clause 3 Charterers have the  60
option to terminate this charter by giving notice in writing with effect from the date on which such notice of  61
termination is received by Owners or from any later date stated in such notice. This sub-Clause (iii) is without  62
prejudice to any rights of Charterers or obligations of Owners under this charter or otherwise (including without  63
limitation Charterers' rights under Clause 21 hereof).  64

2

See Special Provision 1.

| Period Trading Limits | 4.    Owners agree to let and Charterers agree to hire the vessel for a period of commencing from the time and date of delivery of the vessel, for the purpose of carrying all lawful merchandise (subject always to Clause 28) including in particular See IOOI Clause 21. | 65 66 67 |

See IOOI Clause 1,

~~in any part of the world,~~ as Charterers shall direct, subject to the limits of the current British Institute Warranties and any subsequent amendments thereof. Notwithstanding the foregoing, but subject to Clause 35. Charterers may order the vessel to ice-bound waters or to any part of the world outside such limits provided that Owners consent thereto (such consent to be unreasonably withheld) and that Charterers pay for any insurance premium required by the vessel's underwriters as a consequence of such order.
    Charterers shall use due diligence to ensure that the vessel is only employed between and at safe places (which expression when used in this charter shall include ports, berths, wharves, docks, anchorages, submarine lines, alongside vessels or lighters, and other locations including locations at sea) where she can safely lie always afloat. Notwithstanding anything contained in this or any other clause of this charter, Charterers do not warrant the safety of any place to which they order the vessel and shall be under no liability in respect thereof except for loss or damage caused by their failure to exercise due diligence as aforesaid. Subject as above, the vessel shall be loaded and discharged at any places as Charterers may direct, provided that Charterers shall exercise due diligence to ensure that any ship-to-ship transfer operations shall conform to standards not less than those set out in the latest published edition of the ICS/OCIMF Ship-to-Ship Transfer Guide.
    The vessel shall be delivered by Owners at a port in   Fujairah

at Owners' option and redelivered to Owners at a port in   Fujairah

at Charterers' option.

68
69
70
71
72
73
74
75
76
77
78
79
80
81
82

83

84

| Laydays/ Cancelling | 5.    The vessel shall not be delivered to Charterers before 12 July 1997 and Charterers shall have the option of cancelling this charter if the vessel is not ready and at their disposal on or before   13 July 1997.   One day in Charterers' option to be nominated upon lifting subjects. | 85 86 |
| Owners to Provide | 6.    Owners undertake to provide and to pay for all provisions, wages, and shipping and discharging fees and all other expenses of the master, officers and crew; also, except as provided in Clauses 4 and 34 hereof, for all insurance on the vessel, for all deck, cabin and engine-room stores, and for water; for all drydocking, overhaul, maintenance and repairs to the vessel; and for all fumigation expenses and de-rat certificates. Owners' obligations under this Clause 6 extend to all liabilities for customs or import duties arising at any time during the performance of this charter in relation to the personal effects of the master, officers and crew, and in relation to the stores, provisions and other matters aforesaid which Owners are to provide and pay for and Owners shall refund to Charterers any sums Charterers or their agents may have paid or been compelled to pay in respect of any such liability. Any amounts allowable in general average for wages and provisions and stores shall be credited to Charterers insofar as such amounts are in respect of a period when the vessel is on-hire. | 87 88 89 90 91 92 93 94 95 96 |
| Charterers to Provide | 7.    Charterers shall provide and pay for all fuel (except fuel used for domestic services), towage and pilotage and shall pay agency fees, port charges, commissions, expenses of loading and unloading cargoes, canal dues and all charges other than those payable by Owners in accordance with Clause 6 hereof, provided that all charges for the said items shall be for Owners' account when such items are consumed, employed or incurred for Owners' purposes or while the vessel is off-hire (unless such items reasonably relate to any service given or distance made good and taken into account under Clause 21 or 22); and provided further that any fuel used in connection with a general average sacrifice or expenditure shall be paid for by Owners. | 97 98 99 100 101 102 103 |
| Rate of Hire | 8.    Subject as herein provided, Charterers shall pay for the use and hire of the vessel at the rate of US$9,500.00     per day, and pro rata for any part of a day, from the time and date of her delivery (local time) until the time and date of her redelivery (local time) to Owners. | 104 105 106 |
| Payment of Hire | 9.    ~~Subject to Clause 3 (iii), payment of hire shall be made in immediately available funds to~~ | 107 |

See IOOI Clause 3. and Special Provision 2.

    in     Account     per calendar month in advance, less:
    (i)    any hire paid which Charterers reasonably estimate to relate to off-hire periods, and
    (ii)    any amounts disbursed on Owners' behalf, any advances and commission thereon, and charges which are for Owners' account pursuant to any provision hereof, and
    (iii)    any amounts due or reasonably estimated to become due to Charterers under Clause 3 (ii) or 24 hereof,
any such adjustments to be made at the due date for the next monthly payment after the facts have been ascertained. Charterers shall not be responsible for any delay or error by Owners' bank in crediting Owners' account provided that Charterers have made proper and timely payment.
    In default of such proper and timely payment.
    (a)    Owners shall notify Charterers of such default and Charterers shall within seven days of receipt of such notice pay to Owners the amount due including interest, failing which Owners may withdraw the vessel from the service of Charterers without prejudice to any other rights Owners may have under this charter or otherwise; and
    (b)    Interest on any amount due but not paid on the due date shall accrue from the day after that date up to and including the day when payment is made, at a rate per annum which shall be 1% above the U.S. Prime Interest Rate as published by the Chase Manhattan Bank in New York at 12.00 New York time on the due date, or, if no such interest rate is published on that day, the interest rate published on the next preceding day on which such a rate was so published, computed on the basis of a 360 day year of twelve 30-day months, compounded ~~semi-annually.~~

108
109
110
111
112
113
114
115
116
117
118
119
120
121
122
123
124
125
126
127
128

Charterers nominated delivery 1200 hours on 13th July 1997.

3

| | | |
|---|---|---|
| Space<br>Available to<br>Charterers | 10.  The whole reach, burthen and decks of the vessel and any passenger accommodation (including Owners' suite) shall be at Charterers' disposal, reserving only proper and sufficient space for the vessel's master, officers, crew, tackle, apparel, furniture, provisions and stores, provided that the weight of stores on board shall not, unless specially agreed, exceed                                 tonnes at any time during the charter period. | 129<br>130<br>131<br>132 |

Overtime
11.  ~~Overtime pay of the master, officers and crew in accordance with ship's articles shall be for Charterers'~~ account when incurred, as a result of ~~complying with the request of Charterers~~ or their agents: for loading, ~~discharging, heating of cargo, bunkering or tank cleaning.~~

133
134
135

Instructions and Logs
12.  Charterers shall from time to time give the master all requisite instructions and sailing directions, and he shall keep a full and correct log of the voyage or voyages, which Charterers or their agents may inspect as required. The master shall when required furnish Charterers or their agents with a true copy of such log and with properly completed loading and discharging port sheets and voyage reports for each voyage and other returns as Charterers may require. Charterers shall be entitled to take copies at Owners' expense of any such documents which are not provided by the master.

136
137
138
139
140
141

Bills of Lading
13.  (a)  The master (although appointed by Owners) shall be under the orders and direction of Charterers as regards employment of the vessel, agency and other arrangements, and shall sign bills of lading as Charterers or their agents may direct (subject always to Clauses 35(a) and 40) without prejudice to this charter. Charterers hereby indemnify Owners against all consequences or liabilities that may arise
    (i)  from signing bills of lading in accordance with the directions of Charterers or their agents, to the extent that the terms of such bills of lading fail to conform to the requirements of this charter, or (except as provided in Clause 13(b)) from the master otherwise failing to comply with Charterers' or their agents' orders;
    (ii)  from any irregularities in papers supplied by Charterers or their agents.
  (b)  Notwithstanding the foregoing, Owners shall not be obliged to comply with any orders from Charterers to discharge all or part of the cargo
    (i)  at any place other than that shown on the bill of lading and/or
    (ii)  without presentation of an original bill of lading
    unless they have received from Charterers both written confirmation of such orders and an indemnity in a form acceptable to Owners.

142
143
144
145
146
147
148
149
150
151
152
153
154
155

Conduct of Vessel's Personnel
14.  If Charterers complain of the conduct of the master or any of the officers or crew, Owners shall immediately investigate the complaint. If the complaint proves to be well founded, Owners shall, without delay, make a change in the appointments and Owners shall in any event communicate the result of their investigations to Charterers as soon as possible.

156
157
158
159

Bunkers at Delivery and Redelivery

**See International Overseas Cl. 5.**

15.  ~~Charterers shall accept and pay for all bunkers on board at the time of delivery, and Owners shall, on~~ redelivery (whether it occurs at the end of the charter period or on the earlier termination of this charter) accept and pay for all bunkers remaining on board, at the then-current market prices ~~at the port of delivery or redelivery,~~ as the case may be, or if such prices are not available payment ~~shall be~~ at the then-current market prices at the nearest port at which such prices are available; provided that if delivery or redelivery does not take place in a port payment shall be at ~~the price paid at~~ the vessel's last port of bunkering before delivery or redelivery, as the case may be. ~~Owners shall give Charterers the use and benefit of any fuel contracts they may have in force from time to time, if so required by Charterers, provided suppliers agree.~~

160
161
162
163
164
165
166
167

Stevedores, Pilots, Tugs
16.  Stevedores when required shall be employed and paid by Charterers, but this shall not relieve Owners from responsibility at all times for proper stowage, which must be controlled by the master who shall keep a strict account of all cargo loaded and discharged. Owners hereby indemnify Charterers, their servants and agents against all losses, claims, responsibilities and liabilities arising in any way whatsoever from the employment of pilots, tugboats or stevedores, who although employed by Charterers shall be deemed to be the servants of and in the service of Owners and under their instructions (even if such pilots, tugboat personnel or stevedores are in fact the servants of Charterers their agents or any affiliated company); provided, however, that
    (i)  the foregoing indemnity shall not exceed the amount to which Owners would have been entitled to limit their liability if they had themselves employed such pilots, tugboats or stevedores, and
    (ii)  Charterers shall be liable for any damage to the vessel caused by or arising out of the use of stevedores, fair wear and tear excepted, to the extent that Owners are unable by the exercise of due diligence to obtain redress therefor from stevedores.

168
169
170
171
172
173
174
175
176
177
178
179

Supernumeraries
17.  Charterers may send representatives in the vessel's available accommodation upon any voyage made under this charter, Owners finding provisions and all requisites as supplied to officers, except liquors. Charterers paying at the rate of                     per day for each representative while on board the vessel.

180
181
182

Sub-letting
18.  Charterers may sub-let the vessel, but shall always remain responsible to Owners for due fulfilment of this charter.

183
184

Final Voyage

~~Owners~~

19.  If when a payment of hire is due hereunder Charterers reasonably expect to redeliver the vessel before the next payment of hire would fall due, the hire to be paid shall be assessed on ~~Charterers'~~ reasonable estimate of the time necessary to complete Charterers' programme up to redelivery, ~~and from which estimate Charterers may deduct amounts due or reasonably expected to become due for~~
    (i)  ~~disbursements on Owners' behalf or charges for Owners' account pursuant to any provision hereof, and~~
    (ii)  ~~bunkers on board at redelivery pursuant to Clause 15~~
    Promptly after redelivery any overpayment shall be refunded by Owners ~~or any underpayment made good by Charterers.~~
    If at the time this charter would otherwise terminate in accordance with Clause 4 the vessel is on a ballast voyage to a port of redelivery or is upon a laden voyage, Charterers shall continue to have the use of the vessel at the same rate and conditions as stand herein for as long as necessary to complete such ballast voyage, or to complete such laden voyage and return to a port of redelivery as provided by this charter, as the case may be.

185
186
187
188
189
190
191
192
193
194
195
196
197

4

**Loss of Vessel**

20. Should the vessel be lost, this charter shall terminate and hire shall cease at noon on the day of her loss; should the vessel be a constructive total loss, this charter shall terminate and hire shall cease at noon on the day on which the vessel's underwriters agree that the vessel is a constructive total loss; should the vessel be missing, this charter shall terminate and hire shall cease at noon on the day on which she was last heard of. Any hire paid in advance and not earned shall be returned to Charterers and Owners shall reimburse Charterers for the value of the estimated quantity of bunkers on board at the time of termination, at the price paid by Charterers at the last bunkering port.

**Off-hire**

21. (a) On each and every occasion that there is loss of time (whether by way of interruption in the vessel's service or, from reduction in the vessel's performance, or in any other manner)

(i) due to deficiency of personnel or stores; repairs; gas-freeing for repairs; time in and waiting to enter dry dock for repairs; breakdown (whether partial or total) of machinery, boilers or other parts of the vessel or her equipment (including without limitation tank coatings); overhaul, maintenance or survey; collision, stranding, accident or damage to the vessel; or any other similar cause preventing the efficient working of the vessel; and such loss continues for more than three consecutive hours (if resulting from interruption in the vessel's service) or cumulates to more than three hours (if resulting from partial loss of service); or

(ii) due to industrial action, refusal to sail, breach of orders or neglect of duty on the part of the master, officers or crew; or

(iii) for the purpose of obtaining medical advice or treatment for or landing any sick or injured person (other than a Charterers' representative carried under Clause 17 hereof) or for the purpose of landing the body of any person (other than a Charterers' representative), and such loss continues for more than three consecutive hours; or

(iv) due to any delay in quarantine arising from the master, officers or crew having had communication with the shore at any infected area without the written consent or instructions of Charterers or their agents, or to any detention by customs or other authorities caused by smuggling or other infraction of local law on the part of the master, officers, or crew; or

(v) due to detention of the vessel by authorities at home or abroad attributable to legal action against or breach of regulations by the vessel, the vessel's owners, or Owners (unless brought about by the act or neglect of Charterers); then

without prejudice to Charterers' rights under Clause 3 or to any other rights of Charterers hereunder or otherwise the vessel shall be off-hire from the commencement of such loss of time until she is again ready and in an efficient state to resume her service from a position not less favourable to Charterers than that at which such loss of time commenced; provided, however, that any service given or distance made good by the vessel whilst off-hire shall be taken into account in assessing the amount to be deducted from hire.

(b) If the vessel fails to proceed at any guaranteed speed pursuant to Clause 24, and such failure arises wholly or partly from any of the causes set out in Clause 21(a) above, then the period for which the vessel shall be off-hire under this Clause 21 shall be the difference between

(i) the time the vessel would have required to perform the relevant service at such guaranteed speed, and

(ii) the time actually taken to perform such service (including any loss of time arising from interruption in the performance of such service).

For the avoidance of doubt, all time included under (ii) above shall be excluded from any computation under Clause 24.

(c) Further and without prejudice to the foregoing, in the event of the vessel deviating (which expression includes without limitation putting back, or putting into any port other than that to which she is bound under the instructions of Charterers) for any cause or purpose mentioned in Clause 21(a), the vessel shall be off-hire from the commencement of such deviation until the time when she is again ready and in an efficient state to resume her service from a position not less favourable to Charterers than that at which the deviation commenced, provided, however, that any service given or distance made good by the vessel whilst so off-hire shall be taken into account in assessing the amount to be deducted from hire. If the vessel, for any cause or purpose mentioned in Clause 21 (a), puts into any port other than the port to which she is bound on the instructions of Charterers, the port charges, pilotage and other expenses at such port shall be borne by Owners. Should the vessel be driven into any port or anchorage by stress of weather hire shall continue to be due and payable during any time lost thereby.

(d) If the vessel's flag state becomes engaged in hostilities, and Charterers in consequence of such hostilities find it commercially impracticable to employ the vessel and have given Owners written notice thereof then from the date of receipt by Owners of such notice until the termination of such commercial impracticability the vessel shall be off-hire and Owners shall have the right to employ the vessel on their own account.

(e) Time during which the vessel is off-hire under this charter shall count as part of the charter period.

**Periodical Drydocking**

22. (a) Owners have the right and obligation to drydock the vessel at regular intervals of _____. On each occasion Owners shall propose to Charterers a date on which they wish to drydock the vessel, not less than _____ before such date, and Charterers shall offer a port for such periodical drydocking and shall take all reasonable steps to make the vessel available as near to such date as practicable.

Owners shall put the vessel in drydock at their expense as soon as practicable after Charterers place the vessel at Owners' disposal clear of cargo other than tank washings and residues. Owners shall be responsible for and pay for the disposal into reception facilities of such tank washings and residues and shall have the right to retain any monies received therefor, without prejudice to any claim for loss of cargo under any bill of lading or this charter.

(b) If a periodical drydocking is carried out in the port offered by Charterers (which must have suitable accommodation for the purpose and reception facilities for tank washings and residues), the vessel shall be off-hire from the time she arrives at such port until drydocking is completed and she is in every way ready to resume Charterers' service and is at the position at which she went off-hire or a position no less favourable to Charterers, whichever she first attains. However,

(i) provided that Owners exercise due diligence in gas-freeing, any time lost in gas-freeing to the standard required for entry into drydock for cleaning and painting the hull shall not count as off-hire, whether lost on passage to the drydocking port or after arrival there (notwithstanding Clause 21), and

(ii)  any additional time lost in further gas-freeing to meet the standard required for hot work or entry to cargo tanks shall count as off-hire, whether lost on passage to the drydocking port or after arrival there.

Any time which, but for sub-Clause (i) above, would be off-hire, shall not be included in any calculation under Clause 24.

The expenses of gas-freeing, including without limitation the cost of bunkers, shall be for Owners' account.

(c)  If Owners require the vessel, instead of proceeding to the offered port, to carry out periodical drydocking at a special port selected by them, the vessel shall be off-hire from the time when she is released to proceed to the special port until she next presents for loading in accordance with Charterers' instructions, provided, however, that Charterers shall credit Owners with the time which would have been taken on passage at the service speed had the vessel not proceeded to drydock. All fuel consumed shall be paid for by Owners but Charterers shall credit Owners with the value of the fuel which would have been used on such notional passage calculated at the guaranteed daily consumption for the service speed, and shall further credit Owners with any benefit they may gain in purchasing bunkers at the special port.

(d)  Charterers shall, insofar as cleaning for periodical drydocking may have reduced the amount of tank-cleaning necessary to meet Charterers' requirements, credit Owners with the value of any bunkers which Charterers calculate to have been saved thereby, whether the vessel drydocks at an offered or a special port.

**Ship Inspection**

23.  Charterers shall have the right at any time during the charter period to make such inspection of the vessel as they may consider necessary. This right may be exercised as often and at such intervals as Charterers in their absolute discretion may determine and whether the vessel is in port or on passage. Owners affording all necessary co-operation and accommodation on board provided, however,

(i)  that neither the exercise nor the non-exercise, nor anything done or not done in the exercise or non-exercise, by Charterers of such right shall in any way reduce the master's or Owners' authority over, or responsibility to Charterers or third parties for, the vessel and every aspect of her operation, nor increase Charterers' responsibilities to Owners or third parties for the same; and

(ii)  that Charterers shall not be liable for any act, neglect or default by themselves, their servants or agents in the exercise or non-exercise of the aforesaid right.

**Detailed Description and Performance**

24/  ~~(a)  Owners guarantee that the speed and consumption of the vessel shall be as follows:~~

**See International Oil Overseas Clause 7.**

| Average speed in knots | | Maximum average bunker consumption main propulsion   –   auxiliaries | |
|---|---|---|---|
| Laden | | fuel oil/diesel oil tonnes | fuel oil/diesel oil tonnes |
| | | | |
| Ballast | | | |

The foregoing bunker consumptions are for all purposes except cargo heating and tank cleaning and shall be pro-rated between the speeds shown.

The service speed of the vessel is          knots laden and          knots in ballast and in the absence of Charterers' orders to the contrary the vessel shall proceed at the service speed. However if more than one laden and one ballast speed are shown in the table above Charterers shall have the right to order the vessel to steam at any speed within the range set out in the table (the "ordered speed").

If the vessel is ordered to proceed at any speed other than the highest speed shown in the table, and the average speed actually attained by the vessel during the currency of such order exceeds such ordered speed plus 0.5 knots (the "maximum recognised speed"), then for the purpose of calculating any increase or decrease of hire under this Clause 24 the maximum recognised speed shall be used in place of the average speed actually attained.

For the purposes of this charter the "guaranteed speed" at any time shall be the then–current ordered speed or the service speed, as the case may be.

The average speeds and bunker consumptions shall for the purposes of this Clause 24 be calculated by reference to the observed distance from pilot station to pilot station on all sea passages during each period stipulated in Clause 24 (c), but excluding any time during which the vessel is (or but for Clause 22 (b) (i) would be) off-hire and also excluding "Adverse Weather Periods", being (i) any periods during which reduction of speed is necessary for safety in congested waters or in poor visibility (ii) any days, noon to noon, when winds ~~exceed force 8 on the Beaufort Scale for more than 12 hours.~~

275
276
277
278
279
280
281
282
283
284
285
286
287
288
289
290
291
292
293
294
295
296
297
298
299
300
301
302
303
304
305
306
307
308
309
310
311
312
313
314
315
316
317
318
319
320
321
322
323
324
325
326

6

~~(b)  If during any year from the date on which the vessel enters service (anniversary to anniversary)~~
the vessel falls below or exceeds the performance guaranteed in Clause 24(a) then if such shortfall or excess
results

(i)   from a reduction or an increase in the average speed of the vessel, compared to the speed
guaranteed in Clause 24(a). then an amount equal to the value at the hire rate of the time so lost or gained, as the
case may be. shall be deducted from or added to the hire paid:

(ii)   from an increase or a decrease in the total bunkers consumed, compared to the total bunkers
which would have been consumed had the vessel performed as guaranteed in Clause 24(a). an amount equivalent
to the value of the additional bunkers consumed or the bunkers saved. as the case may be. based on the average
price paid by Charterers for the vessel's bunkers in such period. shall be deducted from or added to the hire paid.

The addition to or deduction from hire so calculated for the yearly periods terminating respectively
shall be adjusted to take into account the mileage steamed in each such condition during Adverse Weather
Periods. by dividing such addition or deduction by the number of miles over which the performance has been
calculated and multiplying by the same number of miles plus the miles steamed during the Adverse Weather
Periods. in order to establish the total addition to or deduction from hire to be made for such period.

Reduction of hire under the foregoing sub-Clause (b) shall be without prejudice to any other
remedy available to Charterers.

(c)  Calculations under this Clause 24 shall be made for the yearly periods terminating on each
successive anniversary of the date on which the vessel enters service. and for the period between the last such
anniversary and the date of termination of this charter if less than a year. Claims in respect of reduction of hire
arising under this Clause during the final year or part year of the charter period shall in the first instance be settled
in accordance with Charterers' estimate made two months before the end of the charter period. Any necessary
adjustment after this charter terminates shall be made by payment by Owners to Charterers or by Charterers to
Owners as the case may require.

Payments in respect of increase of hire arising under this Clause shall be made promptly after
~~receipt by Charterers of all the information necessary to calculate such increase.~~

**Salvage**

25.   Subject to the provisions of Clause 21 hereof. all loss of time and all expenses (excluding any damage to
or loss of the vessel or tortious liabilities to third parties) incurred in saving or attempting to save life or in
successful or unsuccessful attempts at salvage shall be borne equally by Owners and Charterers provided that
Charterers shall not be liable to contribute towards any salvage payable by Owners arising in any way out of
services rendered under this Clause 25.

All salvage and all proceeds from derelicts shall be divided equally between Owners and Charterers
after deducting the master's. officers' and crew's share.

**Lien**

26.   Owners shall have a lien upon all cargoes and all freights. sub-freights and demurrage for any amounts
due under this charter: and Charterers shall have a lien on the vessel for all monies paid in advance and not
earned. and for all claims for damages arising from any breach by Owners of this charter.

**Exceptions**

27.  (a)  The vessel. her master and Owners shall not. unless otherwise in this charter expressly provided.
be liable for any loss or damage or delay or failure arising or resulting from any act. neglect or default of the
master. pilots. mariners or other servants of Owners in the navigation or management of the vessel: fire. unless
caused by the actual fault or privity of Owners: collision or stranding: dangers and accidents of the sea: explosion.
bursting of boilers. breakage of shafts or any latent defect in hull. equipment or machinery; provided. however.
that Clauses 1. 2. 3 and 24 hereof shall be unaffected by the foregoing. Further. neither the vessel. her master or
Owners. nor Charterers shall. unless otherwise in this charter expressly provided. be liable for any loss or damage
or delay or failure in performance hereunder arising or resulting from act of God. act of war. seizure under legal
process. quarantine restrictions. strikes. lock-outs. riots. restraints of labour. civil commotions or arrest or
restraint of princes. rulers or people.

(b)  The vessel shall have liberty to sail with or without pilots. to tow or go to the assistance of vessels
in distress and to deviate for the purpose of saving life or property.

(c)  Clause 27(a) shall not apply to or affect any liability of Owners or the vessel or any other relevant
person in respect of

(i)   loss or damage caused to berth. jetty. dock. dolphin. buoy. mooring line. pipe or crane
or other works or equipment whatsoever at or near any place to which the vessel may proceed under this charter.
whether or not such works or equipment belong to Charterers. or

(ii)   any claim (whether brought by Charterers or any other person) arising out of any loss of or
damage to or in connection with cargo. All such claims shall be subject to the Hague-Visby Rules or the Hague
Rules. as the case may be. which ought pursuant to Clause 38 hereof to have been incorporated in the relevant bill
of lading (whether or not such Rules were so incorporated) or. if no such bill of lading is issued. to the
Hague-Visby Rules.

(d)  In particular and without limitation. the foregoing subsections (a) and (b) of this Clause shall not
apply to or in any way affect any provision in this charter relating to off-hire or to reduction of hire.

**Injurious Cargoes**

28.   No acids. explosives or cargoes injurious to the vessel shall be shipped and without prejudice to the
foregoing any damage to the vessel caused by the shipment of any such cargo. and the time taken to repair such
damage. shall be for Charterers' account. No voyage shall be undertaken. nor any goods or cargoes loaded. that
would expose the vessel to capture or seizure by rulers or governments.

**Grade of Bunkers**

29.   Charterers shall supply marine diesel oil/fuel oil with a maximum viscosity of  180  Centistokes at 50
degrees Centigrade/~~ACGFO~~ for main propulsion and diesel oil/~~ACGFO~~ for the auxiliaries. If Owners require
the vessel to be supplied with more expensive bunkers they shall be liable for the extra cost thereof.

Charterers warrant that all bunkers provided by them in accordance herewith shall be of a quality
complying with the International Marine Bunker Supply Terms and Conditions of Shell International Trading
Company and with its specification for marine fuels as amended from time to time

**Disbursements**

30.   Should the master require advances for ordinary disbursements at any port. Charterers or their agents
shall make such advances to him. in consideration of which Owners shall pay a commission of two and a half per
cent. and all such advances and commission shall be deducted from hire.

327
328
329
330
331
332
333
334
335
336
337
338
339
340
341
342
343
344
345
346
347
348
349
350
351
352
353
354
355
356
357
358
359
360
361
362
363
364
365
366
367
368
369
370
371
372
373
374
375
376
377
378
379
380
381
382
383
384
385
386
387
388
389
390
391
392
393
394
395
396
397
398
399

**Laying-up**

31.   Charterers shall have the option, after consultation with Owners, of requiring Owners to lay up the vessel at a safe place nominated by Charterers, in which case the hire provided for under this charter shall be adjusted to reflect any net increases in expenditure reasonably incurred or any net saving which should reasonably be made by Owners as a result of such lay-up. Charterers may exercise the said option any number of times during the charter period.

**Requisition**

32.   Should the vessel be requisitioned by any government, de facto or de jure, during the period of this charter, the vessel shall be off-hire during the period of such requisition, and any hire paid by such government in respect of such requisition period shall be for Owners' account. Any such requisition period shall count as part of the charter period.

**Outbreak of War**

33.   If war or hostilities break out between any two or more of the following countries: U.S.A., U.S.S.R., P.R.C., U.K., Netherlands–both Owners and Charterers shall have the right to cancel this charter.

**Additional War Expenses**

34.   If the vessel is ordered to trade in areas where there is war (de facto or de jure) or threat of war, Charterers shall reimburse Owners for any additional insurance premia, crew bonuses and other expenses which are reasonably incurred by Owners as a consequence of such orders, provided that Charterers are given notice of such expenses as soon as practicable and in any event before such expenses are incurred, and provided further, that Owners obtain from their insurers a waiver of any subrogated rights against Charterers in respect of any claims by Owners under their war risk insurance arising out of compliance with such orders.

**War Risks**

35.   (a)  The master shall not be required or bound to sign bills of lading for any place which in his or Owners' reasonable opinion is dangerous or impossible for the vessel to enter or reach owing to any blockade, war, hostilities, warlike operations, civil war, civil commotions or revolutions.

(b)  If in the reasonable opinion of the master or Owners it becomes, for any of the reasons set out in Clause 35(a) or by the operation of international law, dangerous, impossible or prohibited for the vessel to reach or enter, or to load or discharge cargo at, any place to which the vessel has been ordered pursuant to this charter (a "place of peril"), then Charterers or their agents shall be immediately notified by telex or radio messages, and Charterers shall thereupon have the right to order the cargo, or such part of it as may be affected, to be loaded or discharged, as the case may be, at any other place within the trading limits of this charter (provided such other place is not itself a place of peril). If any place of discharge is or becomes a place of peril, and no orders have been received from Charterers or their agents within 48 hours after dispatch of such messages, then Owners shall be at liberty to discharge the cargo or such part of it as may be affected at any place which they or the master may in their or his discretion select within the trading limits of this charter and such discharge shall be deemed to be due fulfilment of Owners' obligations under this charter so far as cargo so discharged is concerned.

(c)  The vessel shall have liberty to comply with any directions or recommendations as to departure, arrival, routes, ports of call, stoppages, destinations, zones, waters, delivery or in any other wise whatsoever given by the government of the state under whose flag the vessel sails or any other government or local authority or by any person or body acting or purporting to act as or with the authority of any such government or local authority including any de facto government or local authority or by any person or body acting or purporting to act as or with the authority of any such government or local authority or by any committee or person having under the terms of the war risks insurance on the vessel the right to give any such directions or recommendations. If by reason of or in compliance with any such directions or recommendations anything is done or is not done, such shall not be deemed a deviation.

If by reason of or in compliance with any such direction or recommendation the vessel does not proceed to any place of discharge to which she has been ordered pursuant to this charter, the vessel may proceed to any place which the master or Owners in his or their discretion select and there discharge the cargo or such part of it as may be affected. Such discharge shall be deemed to be due fulfilment of Owners' obligations under this charter so far as cargo so discharged is concerned.

Charterers shall procure that all bills of lading issued under this charter shall contain the Chamber of Shipping War Risks Clause 1952.

**Both to Blame Collision Clause**

36.   If the liability for any collision in which the vessel is involved while performing this charter falls to be determined in accordance with the laws of the United States of America, the following provision shall apply:

"If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the master, mariner, pilot or the servants of the carrier in the navigation or in the management of the ship, the owners of the cargo carried hereunder will indemnify the carrier against all loss, or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of the said cargo, paid or payable by the other or non-carrying ship or her owners to the owners of the said cargo and set off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or carrier."

"The foregoing provisions shall also apply where the owners, operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect of a collision or contact."

Charterers shall procure that all bills of lading issued under this charter shall contain a provision in the foregoing terms to be applicable where the liability for any collision in which the vessel is involved falls to be determined in accordance with the laws of the United States of America.

**New Jason Clause**

37.   General average contributions shall be payable according to the York/Antwerp Rules, 1974, and shall be adjusted in London in accordance with English law and practice but should adjustment be made in accordance with the law and practice of the United States of America, the following provision shall apply:

"In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible by statute, contract or otherwise, the cargo, shippers, consignees or owners of the cargo shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo."

"If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover

400
401
402
403
404
405
406
407
408
409
410
411
412
413
414
415
416
417
418
419
420
421
422
423
424
425
426
427
428
429
430
431
432
433
434
435
436
437
438
439
440
441
442
443
444
445
446
447
448
449
450
451
452
453
454
455
456
457
458
459
460
461
462
463
464
465
466
467
468
469
470
471
472

the estimated contribution of the cargo and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the cargo to the carrier before delivery." 473

Charterers shall procure that all bills of lading issued under this charter shall contain a provision in the foregoing terms, to be applicable where adjustment of general average is made in accordance with the laws and practice of the United States of America. 474 / 475 / 476 / 477

**Clause Paramount**

38. Charterers shall procure that all bills of lading issued pursuant to this charter shall contain the following clause: 478

"(1) Subject to sub-clause (2) hereof, this bill of lading shall be governed by, and have effect subject to, the rules contained in the International Convention for the Unification of Certain Rules relating to Bills of Lading signed at Brussels on 25th August 1924 (hereafter the "Hague Rules") as amended by the Protocol signed at Brussels on 23rd February 1968 (hereafter the "Hague-Visby Rules"). Nothing contained herein shall be deemed to be either a surrender by the carrier of any of his rights or immunities or any increase of any of his responsibilities or liabilities under the Hague-Visby Rules." 479 / 480 / 481 / 482 / 483 / 484

"(2) If there is governing legislation which applies the Hague Rules compulsorily to this bill of lading, to the exclusion of the Hague-Visby Rules, then this bill of lading shall have effect subject to the Hague Rules. Nothing herein contained shall be deemed to be either a surrender by the carrier of any of his rights or immunities or an increase of any of his responsibilities or liabilities under the Hague Rules." 485 / 486 / 487 / 488

"(3) If any term of this bill of lading is repugnant to the Hague-Visby Rules, or Hague Rules if applicable, such term shall be void to that extent but no further." 489 / 490

"(4) Nothing in this bill of lading shall be construed as in any way restricting, excluding or waiving the right of any relevant party or person to limit his liability under any available legislation and/or law." 491 / 492 / 493

**TOVALOP**

39. Owners warrant that the vessel is:
   (i) a tanker in TOVALOP and 494
   (ii) properly entered in                                      P & I Club 495
and will so remain during the currency of this charter. 496

When an escape or discharge of Oil occurs from the vessel and causes or threatens to cause Pollution Damage, or when there is the threat of an escape or discharge of Oil (i.e. a grave and imminent danger of the escape or discharge of Oil which, if it occurred, would create a serious danger of Pollution Damage, whether or not an escape or discharge in fact subsequently occurs), then Charterers may, at their option, upon notice to Owners or master, undertake such measures as are reasonably necessary to prevent or minimise such Pollution Damage or to remove the Threat, unless Owners promptly undertake the same. Charterers shall keep Owners advised of the nature and result of any such measures taken by them and, if time permits, the nature of the measures intended to be taken by them: Any of the aforementioned measures taken by Charterers shall be deemed taken on Owners' authority as Owners' agent, and shall be at Owners' expense except to the extent that: 497 / 498 / 499 / 500 / 501 / 502 / 503 / 504 / 505 / 506

   (1) any such escape or discharge or Threat was caused or contributed to by Charterers, or 507
   (2) by reason of the exceptions set out in Article III, paragraph 2, of the 1969 International Convention on Civil Liability for Oil Pollution Damage, Owners are or, had the said Convention applied to such escape or discharge or to the Threat, would have been exempt from liability for the same, or 508 / 509 / 510
   (3) the cost of such measures together with all other liabilities, costs and expenses of Owners arising out of or in connection with such escape or discharge or Threat exceeds one hundred and sixty United States Dollars (US \$160) per ton of the vessel's Tonnage or sixteen million eight hundred thousand United States Dollars (US \$16,800,000), whichever is the lesser, save and insofar as Owners shall be entitled to recover such excess under either the 1971 International Convention on the Establishment of an International Fund for Compensation for Oil Pollution Damage or under CRISTAL: 511 / 512 / 513 / 514 / 515 / 516

PROVIDED ALWAYS that if Owners in their absolute discretion consider said measures should be discontinued, Owners shall so notify Charterers and thereafter Charterers shall have no right to continue said measures under the provisions of this Clause 39 and all further liability to Charterers under this Clause 39 shall thereupon cease. 517 / 518 / 519 / 520

The above provisions are not in derogation of such other rights as Charterers or Owners may have under this charter or may otherwise have or acquire by law or any International Convention or TOVALOP. 521

The term "TOVALOP" means the Tanker Owners' Voluntary Agreement Concerning Liability for Oil Pollution dated 7th January 1969, as amended from time to time, and the term "CRISTAL" means the Contract Regarding an Interim Supplement to Tanker Liability for Oil Pollution dated 14th January 1971, as amended from time to time. The terms "Oil", "Pollution Damage", and "Tonnage" shall for the purposes of this Clause 39 have the meanings ascribed to them in TOVALOP. 522 / 523 / 524 / 525 / 526 / 527

*Owners to maintain membership of ITOPF for duration of this Charter.*

**Export Restrictions**

40. The master shall not be required or bound to sign bills of lading for the carriage of cargo to any place to which export of such cargo is prohibited under the laws, rules or regulations of the country in which the cargo was produced and/or shipped. 528 / 529 / 530

Charterers shall procure that all bills of lading issued under this charter shall contain the following clause: 531

"If any laws rules or regulations applied by the government of the country in which the cargo was produced and/or shipped, or any relevant agency thereof, impose a prohibition on export of the cargo to the place of discharge designated in or ordered under this bill of lading, carriers shall be entitled to require cargo owners forthwith to nominate an alternative discharge place for the discharge of the cargo, or such part of it as may be affected, which alternative place shall not be subject to the prohibition, and carriers shall be entitled to accept orders from cargo owners to proceed to and discharge at such alternative place. If cargo owners fail to nominate an alternative place within 72 hours after they or their agents have received from carriers notice of such prohibition, carriers shall be at liberty to discharge the cargo or such part of it as may be affected by the prohibition at any safe place on which they or the master may in their or his absolute discretion decide and such discharge shall constitute due performance of the contract contained in this bill of lading so far as the cargo so discharged is concerned" 532 / 533 / 534 / 535 / 536 / 537 / 538 / 539 / 540 / 541 / 542 / 543

The foregoing provision shall apply mutatis mutandis to this charter, the references to a bill of lading being deemed to be references to this charter. 544 / 545 / 546

9

**Law and Litigation**

41  (a)  This charter shall be construed and the relations between the parties determined in accordance with the laws of England. | 547 548

(b)  Any dispute arising under this charter shall be decided by the English Courts to whose jurisdiction the parties hereby agree. | 549

(c)  Notwithstanding the foregoing, but without prejudice to any party's right to arrest or maintain the arrest of any maritime property, either party may, by giving written notice of election to the other party, elect to have any such dispute referred to the arbitration of a single arbitrator in London in accordance with the provisions of the Arbitration Act 1950, or any statutory modification or re-enactment thereof for the time being in force. | 550 551 552 553 554

(i)  A party shall lose its right to make such an election only if: | 555

(a)  it receives from the other party a written notice of dispute which – | 556

(1)  states expressly that a dispute has arisen out of this charter; | 557

(2)  specifies the nature of the dispute; and | 558

(3)  refers expressly to this clause 41(c) | 559 560

and | 561

(b)  it fails to give notice of election to have the dispute referred to arbitration not later than 30 days from the date of receipt of such notice of dispute. | 562 563

(ii)  The parties hereby agree that either party may – | 563 564

(a)  appeal to the High Court on any question of law arising out of an award; | 565

(b)  apply to the High Court for an order that the arbitrator state the reasons for his award; | 566

(c)  give notice to the arbitrator that a reasoned award is required; and | 567

(d)  apply to the High Court to determine any question of law arising in the course of the reference. | 568

(d)  It shall be a condition precedent to the right of any party to a stay of any legal proceedings in which maritime property has been, or may be, arrested in connection with a dispute under this charter, that that party furnishes to the other party security to which that other party would have been entitled in such legal proceedings in the absence of a stay. | 569 570 571 572 573

**Construction**

42.  The side headings have been included in this charter for convenience of reference and shall in no way affect the construction hereof. | 574 575

Special Provisions Nos. 1. to 7. as attached are deemed incorporated in this Charter Party.

FOR AND ON BEHALF OF OWNERS
BY WRITTEN AUTHORITY

*Karajine*

**ATLAS - Time Charter Party dated 11th July 1997**

Special Provisions - Page 1.

1.　　With reference to Clause 4, line 65 insert:
　　　Minimum seven (7) days/maximum thirty (30) days in Charterers' option.  Charterers
　　　to give five (5) days firm redelivery notice.

2.　　With reference to Clause 9, line 107 insert:
　　　In US Dollars by telegraphic transfer to:
　　　Chase Manhattan Bank N.A.,
　　　PO Box 1276.,
　　　Chase House,
　　　Grenville Street,
　　　St Helier,
　　　Jersey, JE4 8QH, Channel Islands.
　　　Credit:　　　Wintersea Maritime Corporation
　　　Account No:　6710018513
　　　Reference:　Atlas / CP 11/07/97

3.　　Bunkers on delivery expected to be about 1,950 metric tons IFO and about 150 tons
　　　MDO/MGO.  Prices to be same on delivery/redelivery, i.e. US$98.00/US$210.00
　　　respectively.

4.　　Owners confirm that Inert Gas System is operative and vessel will arrive load port
　　　inerted, if instructed.

5.　　Master to allow agents at load port to issue/sign Bill of Lading on his behalf,
　　　Charterers providing necessary documents to protect Owners' position in all
　　　respects.

6.　　Address commission of 2.5 percent on hire deductible when paid.

　　　Commission of 1.25 percent payable by Owners to Petrian Shipbrokers Limited,
　　　London on hire as and when paid.

7.　　International Oil Overseas International Additional Clauses Nos. 1 to 40 as amended
　　　and attached are deemed incorporated in this Charter Party.

ATLAS - Time Charter Party dated 11th July 1997
INTERNATIONAL OIL OVERSEAS ADDITIONAL CLAUSES FOR TIME CHARTER
(SHELLTIME 4) (dated 01.08.1993)                                    (Page 1)


1)    TRADING                                                  AMENDED
      ARABIAN GULF (excluding IRAQ), RED SEA-INDIA-EAST AFRICA (not south of
      DAR ES SALAAM), excluding ISRAEL.


2)    VESSEL DESCRIPTION:
      Name                        : m/t Atlas
      Flag                        : Liberian
      Built                       : 1975
      Class                       : NKK
      SDWT                        : 78,893 metric tons
      Draft                       : 12.83 metres
      Cubic capacity:             : 83,442 cubic metres (non CBT Mode for Fuel Oil)
      LOA                         : 246 metres
      Beam                        : 37.6 metres
      Coated                      :
      Coiled                      : Heating coils
      IGS/COW                     : Yes / Yes
      Size and description of
        Reducers on board         : 2 (16 X 12) : 2 (16 X 10) : 1 (12 X 10) : 1 (12 X 6)
      Pumping capacity            : 3500 cubic metres/hour
      Tank cleaning equipment     :

      Owners advise basis 39 feet salt water arrival draft Pakistan vessel's deadweight
      about 71,400 metric tons


3)    HIRE PAYMENT:                                             AMENDED
      **Charterers to pay first hire on delivery for seven (7) days, thereafter hire
      payable every seven (7) days in advance without deduction. If any payment is
      not received by the due date, or it is apparent that it will not be received,
      Owners to have the right to suspend voyage or operations and not resume until
      hire received. Any time so lost to count in full.**


4)    CLEANING OF CARGO TANKS, LINES AND PUMPS:              AMENDED
      Master of vessel to ensure that all cargo tanks completely dry and free of any water
      when presenting vessel for loading. The vessel has fixed or portable equipment
      on board necessary to undertake cleaning operation efficiently and timely without
      delay and such equipment will be maintained properly and kept on board the
      vessel throughout the Charter period in good working condition.


5)    BUNKERS: (Revised 14/01/96)                             AMENDED
      The vessel is to be delivered with bunkers as on board (which if required are to
      be measured by independent cargo surveyor) and redelivered with **at least** the
      same quantity as on delivery, **but maximum ten (10) percent more.** During the

ATLAS - Time Charter Party dated 11th July 1997
INTERNATIONAL OIL OVERSEAS ADDITIONAL CLAUSES FOR TIME CHARTER

Page 2.

period of the Charter the Charterers will replenish bunkers as necessary in their own time and at their own expense. **In any event Charterers to provide bunkers prior to sailing first load port sufficient for return voyage to Pakistan so that vessel will have minimum quantity as on delivery.**

In the event of an excess in quantity on redelivery, Owners shall make reimbursement at the following prices:

| | | |
|---|---|---|
| Fuel Oil 180 Centistokes | US$ | per metric ton |
| Diesel Oil | US$ | per metric ton |

6) **DRYDOCKING:**
Owner warrants vessel will not dry dock during the period this Charter Party except due to Force Majeure.

7) **SPEED/CONSUMPTION:**
Approximate daily Speed/Consumption up to and including B4 and DSS4:

**12 knots on 45 tons Fuel Oil (180) and 3.5 tons MDO (average laden/ballast)**
**Discharge:**                    **65 tons + 3.5 tons**
**Idle (boiler on standby):**     **6 tons + 3.5 tons**

**Maintain cargo temperature:**   **25 tons FO per day**
**Manoeuvring:**                   **2.0 metric tons DO per hour**
**Loading:**                      **15 tons FO**
**Inerting:**                     **20 tons FO**
**Ballasting/deballasting:**      **15 tons FO each operation**
**Cleaning:**                     **25 tons FO**

**All above plus 3.5 metric tons MDO per day**

8) **BUNKERS ON BOARD:**
On delivery vessel will have about 300 metric tons Fuel and about 50 metric tons Gasoil.

9) **FRESHWATER:**
All fresh water required on board including boiler fresh water to be for Owners' account.

10) **CARGO RISK:**
Cargo shall be loaded into the vessel at Charterers' expense and risk only up to vessel's receiving manifold. Cargo shall be discharged from the vessel at Owners' risk only up vessel's discharge manifold.

ATLAS - Time Charter Party dated 11th July 1997
INTERNATIONAL OIL OVERSEAS ADDITIONAL CLAUSES FOR TIME CHARTER

Page 3.

11)  SLOPS:                                                      AMENDED
Thereafter slops on board if any shall not be discharged without prior Charterers' approval and all costs for removal of such slops will be for Owners' account. Owners undertake to report to Charterers whenever slops accumulate and advise stowage, volume and proposed usage/disposal of such slops.

12)  SAFETY AND CONDITION:
Vessel's equipment, operation and manning shall be in conformity with approved and/or accepted international standards such as IMO and ICS/OCIMF with regard to safety and pollution prevention. Any delays arising from vessel's failure to meet the above standards shall entitle to place the Charterers to place the vessel off-hire without prejudice to other remedies available to Charterers.

13)  MANNING:
In order to properly handle bunkering operations the vessel shall have as a minimum requirement the Master, two licensed Deck Officers and four Able Seamen available on deck throughout the operations.

14)  PERFORMANCE:                                               AMENDED
Owners waive any right to make an overperformance claim. This waiver shall not offset any underperformance claim made by Charterers.

15)  ON HIRE/OFF HIRE SURVEY:                                  DELETED

16)  ELIGIBILITY:                                               AMENDED
Owners warrant that the vessel is in all respects eligible for trading within, to and from ranges and areas specified in the Charter Party and at all times she shall have on board all certificates, records and other documents and equipment required for such service.

17)  DRUG AND ALCOHOL CLAUSE:
Owners warrant that they have a policy on Drug and Abuse ("Policy") applicable to the vessel which meets or exceeds the standards in the Oil Companies' Marine Forum Guidelines for the Control of Drugs and Alcohol on Board Ship ("OCIMF Guidelines"). Owners further warrant that this Policy is complied with. For the purposes of the Clause and the OCIMF Guidelines, alcohol impairment shall be defined as a blood alcohol content of 40 mg/100 ml or greater; the appropriate seafarers to be tested shall be all vessel officers and the drug/alcohol testing and screening shall include random testing of the officers with a frequency to ensure that each officer is tested at least once a year.

ATLAS - Time Charter Party dated 11th July 1997
INTERNATIONAL OIL OVERSEAS ADDITIONAL CLAUSES FOR TIME CHARTER

**Page 4.**

**18) ETA CLAUSE:**

Master to give Charterers ETA loading port as soon as ordered and seven (7) days, 72/48/24/12 hours prior arrival at loading and discharge ports where time permits also ETA discharge port on sailing from load port as well as change in ETA exceeding six (6) hours in all cases.

**19) BALLAST, INERT GAS SYSTEM AND CRUDE OIL WASHING:**

A. Vessel shall arrive at load port with clean ballast.

B. Owner warrants vessel has operable Crude Oil Washing and Inert Gas System, and both Systems shall be operational during duration of this Charter Party up to standard required by Loading Terminals by fully capable and qualified personnel.

**20) CERTIFICATES:**

Vessel to comply with latest effective MARPOL and IMO Regulations and to be kept in compliance throughout period.

All other National and International Certificates to be kept clean and valid including but not limited to Compliance on Civil Liabilities, FMC Certificates as per current Rules and Regulations and any changes in such Rules and Regulations. Owners warrant that the vessel will conform in all respects with the applicable parts of the requirements as defined by the "International Convention for the Prevention of Pollution from Ships 1973/1978". Such compliance to include but not to be limited to requirements as regards efficient stripping. The vessel is provided with a dual IOPP Certificate, necessitating inspection and certification by Class Surveyor.

Any delay caused to vessel due to any Certificate being unavailable or expired shall be totally for Owners' account.

**21) CARGO:**                                                **AMENDED**

Charterers have the option of loading Crude Oil, Dirty Petroleum Products, Gasoil and Marine Diesel Oil, maximum........grades, but where vessel loads one grade on top of another for admixing purposes same to be treated as one grade.

Owners warrant vessel is able to segregate minimum two (2) grades with double valve, line and pump segregation. Owner warrants vessel able to load/discharge two (2) grades simultaneously without contamination.

**Charterers fully indemnify Owners for any claims arising as a result of admixing/co-mingling cargo.**

ATLAS - Time Charter Party dated 11th July 1997
INTERNATIONAL OIL OVERSEAS ADDITIONAL CLAUSES FOR TIME CHARTER

Page 5.

22)   PUMPING:                                                                     AMENDED
Owners warrant that the vessel can maintain at vessel's manifolds a pressure of
**average** 100 PSI or that cargo can be  discharged  within twenty four (24) hours,
**except for stripping and crude oil washing,** provided shore facilities permit **and
discharge is not interrupted**.  Owner warrants vessel can discharge two (2) grades
simultaneously.

In ship to ship  transfer  operations,  vessel  warrants  to achieve  a discharge rate
of up to 2,500 metric tons per hour and any rate requested by Charterer below such
maximum down to 400  metric tons per hour, **provided receiving vessel is capable
of receiving same.**   Vessel has on board  a sufficient range of reducers to allow
connection  to  various hose line diameters and terminal cargo manifolds.

23)   SHIP TO SHIP TRANSFER OPERATIONS:
If  required  by  the Charterers the vessel shall' load and/or discharge full or part
cargo  alongside  other  vessel(s)  in port or at a safe anchorage or under any other
circumstances, provided they  are  safe  and  at Master's discretion, which shall not
be unreasonably withheld.

Charterers  are  to provide  suitable fenders/lines and hoses to safely effect such
operations and have the option to store same on board for the duration of Charter
Party.  Handling of such equipment on board the vessel shall be by Owners' crew at
Owners' cost. All such equipment shall be removed from the vessel by Charterers
upon  completion  of  Charter  Party without delay.

Vessel's crew shall connect/disconnect cargo hoses, heave down/heave up fenders,
take/throw connection lines, transfer to/transfer back cargo hoses and any other
activities required for the completion and safe conduct of the ship to ship  transfer
operation  for  their  account  without any exclusion.

Owners warrant that the  vessel  is  equipped  with  minimum ten (10) ton  derricks
port and starboard amidships to handle bunker lines/cargo hoses.

All  extra  insurance  for  above  ship  to  ship  lighterage operations shall be for
Owners' account and  Charterers  have  no liability for hull or other damage, if any,
that may occur during such operations.  Owners warrant that the vessel is equipped
and capable of safely carrying out all procedures as set out in the latest revised
edition of the  ICS/OCIMF  SHIP TO SHIP TRANSFER GUIDE.

Ship to Ship Transfer  may  include  Charterers'  very  large crude  barge (VLCB) of
about 34,500 tons deadweight chartered to perform such operations.

24)   SUPERCARGO:
Charterers shall have the option to place on board  one  supercargo at any  time
during this Charter Party.   Owner is to provide  such  supercargo  with  good
accommodation with private bath and  food at Captain's table at a cost of US$7.00
per day at Charterers' expense.  Supercargo will be allowed access, to investigate,

ATLAS - Time Charter Party dated 11th July 1997
INTERNATIONAL OIL OVERSEAS ADDITIONAL CLAUSES FOR TIME CHARTER

Page 6.

ullage and sample all cargo, slop, bunker, and ballast tanks, also any void spaces, and access to any other parts of vessel that may relate to carriage of cargo as he may require. He shall also have the right to require selected valves on bunker and cargo systems to be sealed to preclude the possibility of cargo/product/bunker migrations.

**25)   PROTECTION & INDEMNITY INSURANCE:**
Owner warrants the vessel is a member of the **Liverpool & London** P&I Club and is complying with the revised P&I TOVALOP Clause 1987 as attached all in good standing. Owner warrants that vessel holds a pollution cover of US$500 million, and additional US$200 million during full time of Charter Party. Owners agree to allow Charterers to have the benefit of Owners' P&I insurance to the extent the Rules of that Association permits. Owners to be responsible for all third party claims which fall under Owners' responsibility.

**26)   SAFETY:**
The vessel is to comply with the latest Safety at Sea and other Safety Regulations.

**27)   INSURED VALUE:**
The vessel insured value is US$...........................

**28)   COMMUNICATIONS:**
The Master is to allow Charterers' supercargo the use of vessel's communication equipment for reasonable operational purposes without charge.

Vessel shall maintain twenty four (24) hour listening watch on VHF Channel 16/14.

**29)   TRADING HISTORY:**
Owners guarantee that the vessel is not boycotted by the Arab League and has never traded to Israel.

**30)   AGENCY:**
Charterers' agents shall attend to all matters relating to Charterers' obligations. Owners shall appoint their agents to attend to all matters relating to Owners' obligations.

**31)   ACCESS:**
The Master shall not allow any vessel or craft, other than those of port authorities or pilots, to secure alongside without the express authority of Charterers.

ATLAS - Time Charter Party dated 11th July 1997
INTERNATIONAL OIL OVERSEAS ADDITIONAL CLAUSES FOR TIME CHARTER

Page 7.

32) **MOORING:**

Owners shall provide vessel with appropriate wires/lines for safe  mooring  at  all terminals  within  the  ranges/areas specified herein.

33) **OVER AGE INSURANCE:**                                            DELETED

34) **QUANTITATIVE RESPONSIBILITY:**

Although Charterers' surveyor may be monitoring any transfer operation, this does not relieve  Master or Owners of responsibility  for  verifying  the quantity involved in each oil movement nor for liability under the terms of this Charter Party for any oil losses.

35) **BERTH OCCUPANCY:**                                            AMENDED

Owners warrant vessel shall vacate the berth after completion of  ballasting  or within  one  and  a  half hours following completion of loading/discharging.  **Any delays not attributable to vessel to be for Charterers' account.**

36) **PRIVACY:**                                            AMENDED

**All negotiations/eventual fixture to be kept strictly private and confidential and not to be discussed with any third party.**

37) **WAR RISKS:**                                            AMENDED

Any  increase  of hull and machinery war risk premia over and above those in effect on the date of this Charter Party  will be for  Charterers'  account. Any  premia  or increases thereto attributable to closure (i.e.  blocking and trapping) insurance shall be for Owners' account.

Surcharges which are in effect on the date of this Charter Party are for Owners' account.

38) **CHARTERERS' UNDERWRITERS' CLAUSE:**                          DELETED

39)                                            DELETED

40) With  reference  to Shell Time 4 Bill of Lading Clause 13 add at the end of the clause the words "Without Bank Guarantee or countersignature."

# EXHIBIT M

T ATLAS/IOOI  C/P 11/7/97

VESSEL DELIVERED TO CHRTRS OFF FUJAIRAH ON 12TH JULY 1997 1200HRS
LOCAL TIME WITH 1742.704 MT FUEL OIL AND 120.49 MT DIESEL OIL AND
REDELIVERED TO OWNERS OFF FUJAIRAH ON 4TH AUGUST 1997 1515HRS LOCAL
TIME WITH 1740.60 MT FUEL OIL AND 119.40 MT DIESEL OIL.

FINAL HIRE STATEMENT

FM 12/7/97 1200HRS LT
TO  4/8/97 1515HRS LT

23D 03H 15M OR 23.135417DAYS X USD 9,500=       USD 219,786.46

LESS COMM 2.5 PCT                              (USD   5,494.66)

BUNKER DIFFERENCE
F.O. 1742.70MT-1740.60MT= 2.10MT X USD  98=    USD    205.80
D.O.  120.50MT- 119.40MT= 1.10MT X USD 210=    USD    231.00

OFF HIRE AT BIN QASIM POLUTION
COMPLETED DISCHARGE          30/7 0848HRS
HOSES OFF                     30/7 0935HRS
DOCUMENTS O/B                 30/7 1100HRS
PILOT ARRANGED FOR SAILING   30/7 1500HRS
VESSEL CLEARED               31/7 2100HRS
OFF HIRE FM 30/7 1500HRS TO 31/7 2100HRS
01D 06H OR 1.25DAYS X USD 9,500=              (USD  11,875.00)

COMM 2.5PCT                                    USD     296.88

LESS RECEIVED ON ACCOUNT 17/7 USD 64,837.50
                         21/7 USD 64,837.50
                         29/7 USD 27,787.50
                         29/7 USD 18,525.00
                         --------------------   (USD 175,987.50)

DUE OWNERS                                      USD  27,162.98
                                               ==============

PLEASE REMIT BY TELEGRAPHIC TRANSFER TO

CHASE MANHATTAN BANK NA
PO BOX 127
CHASE HOUSE
GRENVILLE STREET
ST. HELLIER
JERSEY JE4 8QH
CHANNEL ISLANDS
FOR CREDIT WINTERSEA MARITIME CORPORATION
USD ACCOUNT NR 6710018513


REGARDS
POLEMBROS


9413497

# EXHIBIT N





11, AG. SPYRIDONOS STR.
PIRAEUS 18535
GREECE

PHONE: (301) 422-6670
FAX: (301) 422-6679
TELEX: 212000 MRDN GR
hhpt:// www.meridtank.gr

FROM: Meridian Brokerage Inc. - Tlx 212000 mrdn gr
DATE: 15-Feb-99 09:46
MSG.: TBK-03287

TO:    INT'L OIL OVERSEAS
ATTN:  SAYED AGHA

TO:    POLEMBROS SHIPPING
ATTN:  JOHN PATTAS

WE ARE PLEASED TO SET OUT THE FOLLOWING TRANSPORTATION AGREEMENTS,
BOTH SUBJECT STEM/SHIPPERS/RECEIVERS/MANAGEMENT APPROVAL LATEST BY
1100 HRS LONDON ON 15/2/99.

M.T. LEON
MALTESE FLAG
BUILT 1982
SDWT 108,480 MT
DRAFT 15.65 M
LOA 258.95 M
BEAM 39.8 M
CAPACITY 111,930 M3 AT 98PCT EXC SLOPS
CLASS ABS
IGS/COW/SBT
LAST 3 CARGOES JET/NAP/N/A (D/D)

APPROX DAILY SPEED/CONSUMPTION UPTO AND INCL BEAUFORT SCALE 4 AND
DOUGLAS SEA STATE 4 :

12KN ON 50T FO AVERAGE LADEN/BALLAST
LOADING 15T FO
DISCHARGING 85T FO
IDLE 6T FO
ALL ABOVE PLUS 4.5T MDO

EXPECTED BUNKERS ON DELY - ABT XXX MT IFO + ABT XXX MT MDO
PRICES - PLATTS BUNKER WIRE FUJAIRAH PRICES (MID PRICE) AT TIME OF
REDELY

PERIOD: MIN 20 UPTO MAX 75 DAYS IN CHOPT. CHRS TO GIVE 10 DAYS
        AND THEN 7/5/3/2/1 DAYS FIRM REDEL NOTICE.
TRADING:AG EXCL IRAQ, RSEA-INDIA-EAFR (NOT SOUTH OF D-E-S) EXC ISRAEL
        SPORE/INDO/MALAY RGE INCLUDING STORAGE OFF FUJAIRAH
CARGO:  MAX 2 GRADES WVNS GASOIL UNL/UND THAN 2.5 NPA
DELY:   OFF FUJAIRAH
REDEL:  OFF FUJAIRAH
L/CAN:  15-16 FEB 1999 TO BE NARROWED BY CHRS TO ONE DAY
HIRE    USD 8,500 PD/PR FOR 1-45 DAY
        USD 9,500 PD/PR FOR 46-75 DAY
        HIRE PAYABLE EVERY 7 DAYS IN ADVANCE

LOI IF ANY PER OWNERS P+I CLUB USUAL WORDING WITHOUT BANK GTEE
OR COUNTERSIGNATURE

OWNERS CONFIRM THAT IGS IS OPERATIVE AND VESSEL WILL ARRIVE
LOADPORT INERTED, IF INSTRUCTED.

ALL NEGOTIATIONS/EVENTUAL FIXTURE TO BE KEPT STRICTLY P+C AND NOT TO
BE DISCUSSED WITH ANY THIRD PARTY.

MASTER TO ALLOW AGENTS AT LOADPORT TO ISSUE/SIGN B/L ON HIS BEHALF,
CHRTS PROVIDING NECESSARY DOCS TO PROTECT OWNERS POSITION IN ALL
RESPECTS (PER ADDENDUM TO BE AGREED).

OWNERS CONFIRM THAT VESSEL WILL USE WIRES INSTEAD OF ROPES AT HER
MOORING AT PAKISTAN.

OWNERS CONFIRM VESSEL WILL PRESENT WITH 12 MOORING WIRES AT LOADPORT.

SHELLTIME 4 C/P EXCEPT:

| | | |
|---|---|---|
| 9 | - | DELETE - SEE ADDITIONAL CL3 |
| 11 | - | DELETE |
| 15 | - | DELETE - SEE ADDITIONAL CL5 |
| 19 | - | LINE 186 - DELETE 'CHARTERERS' INSERT 'OWNERS' |
| | | LINE 187 - DELETE AFTER 'REDELIVERY' TILL END LINE 191 |
| | | LINE 192/3 DELETE FROM 'OR' TILL END OF SENTENCE. |
| 24 | - | DELETE (SEE DESCRIPTION ABOVE) |
| 39 | - | DELETE AND INSERT 'OWNERS TO MAINTAIN MEMBERSHIP OF |
| | | ITOPF FOR DURATION OF THIS CHARTER' |

IOOI ADDITIONAL CLAUSES 1-40 DTD 1.8.93 EXCEPT:

| | |
|---|---|
| 3 | DELETE AND REPLACE WITH THE FOLLOWING: |
| | 'CHRTS TO PAY FIRST HIRE ON DELIVERY FOR 7 DAYS THEREAFTER |
| | HIRE PAYABLE EVERY 7 DAYS IN ADVANCE WITHOUT DEDUCTION EXCEPT |
| | IF REDELIVERY NOTICE ALREADY GIVEN WHEN HIRE DUE, IN WHICH |
| | CASE OWNERS ESTIMATED NUMBER OF DAYS TO APPLY. |
| | IF ANY PAYMENT IS NOT RECEIVED BY THE DUE DATE, OR IT IS |
| | APPARENT THAT IT WILL NOT BE RECEIVED DUE TO CHARTERERS FAULT |
| | OWNERS TO HAVE THE RIGHT TO SUSPEND VOYAGE OR OPERATIONS AND |
| | NOT RESUME UNTIL HIRE RECEIVED. ANY TIME SO LOST TO COUNT IN |
| | FULL.' |
| 4 | DELETE FIRST SENTENCE. |
| 5 | LINE 3 TO READ 'AT LEAST THE SAME QUANTITY AS ON DELIVERY BUT |
| | MAX 10 PCT MORE' |
| | ADD AT END OF PARA 1 - 'IN ANY EVENT CHARTERERS TO PROVIDE |
| | BUNKERS PRIOR TO SAILING 1ST LOADPORT SUFFICIENT FOR RETURN |
| | VOYAGE TO PAKISTAN SO THAT VESSEL WILL HAVE MIN QUANTITY |
| | AS ON DELIVERY' |
| | PARA 2 DELETE 'OR SHORTFALL' AND 'OR CHARTERERS RESPECTIVELY' |
| 7 | DELETE - SEE DESCRIPTION AS ADVISED |
| 11 | DELETE FIRST SENTENCE |
| 14 | DELETE PARA 2 |
| 15 | DELETE |
| 16 | DELETE FROM 'AND, HAVING BEEN' IN LINE 3 UNTIL 'AND AREAS' |
| | IN LINE 7 |
| 21 | ADD 'CHRTS FULLY INDEMNIFY OWNERS FOR ANY CLAIMS ARISING |
| | AS A RESULT OF ADMIXING/CO-MINGLING CARGO.' |
| 22 | PARA1 LINE 2 INSERT 'AVERAGE' PRIOR TO '100 PSI' AND DELETE |
| | 'AND/' AND DELETE 'A FULL' |
| | LINE 3 AFTER '24 HRS' INSERT 'EXCEPT FOR STRIPPING AND COW' |
| | LINE 4 AFTER 'PERMIT' ADD 'AND DISCHARGE IS NOT INTERRUPTED' |

PARA 2 LINE 4 AFTER '400 MT/HR' ADD 'PROVIDED RECEIVING
VESSEL IS CAPABLE OF RECEIVING SAME'
33      DELETE
35      ADD AT END 'ANY DELAYS NOT ATTRIBUTABLE TO VESSEL TO BE FOR
CHRTS A/C'
DELETE 'WHICHEVER IS SOONER'
37      LINES 3/4 - DELETE FROM 'EXCEPT' UNTIL 'OWNERS A/C'
38      DELETE
39      DELETE

IOOI ADDITIONAL CL 52 (ASBATANKVOY) DATED 8/7/98 SHALL BE DEEMED TO
BE INCORPORATED TO THIS CHARTER PARTY.

BP ISM CLAUSE TO APPLY

2.5PCT ADDCOMM ON HIRE PLUS 1.25 PCT TO MERIDIAN BROKERAGE INC.

END

THANK YOU VERY MUCH INDEED

REGARDS
THANOS KAIRAKTIDIS
MERIDTANK

# EXHIBIT O

TO..: MERIDIAN BROKERAGE INC.
FROM: POLEMBROS SHIPPING LTD
DATE: 03-JUN-99 12:16
MSG. : 45630

(B1)

TO: MERIDIAN BROKERAGE
FM: POLEMBROS LONDON

M/V LEON/IOOI  C/P 16/02/99

VESSEL DELIVERED TO CHRTRS AT FUJAIRAH ON 17TH FEBRUARY 1999 AT
0001HRS LOCAL TIME WITH 1676.177MT FUEL OIL AND 198.685MT DIESEL OIL
AND REDELIVERED TO OWNERS ON 3RD OF JUNE 1999 0915HRS LOCAL TIME WITH
1676.847MT FUEL OIL AND 196.197MT DIESEL OIL.

FINAL HIRE STATEMENT

FM 17/02/99 0001HRS LT
TO 03/04/99 0001HRS LT

45DAYS X USD 8,500.00=                              USD 382,500.00

FM 03/04/99 0001HRS LT
TO 03/06/99 0915HRS LT

61D 09H 15M OR 61.385417DAYS X USD 9,500=           USD 583,161.46
                                                    ----------------
                                                    USD 965,661.46

LESS COMM 2.50PCT                                   (USD  24,141.54)

BUNKER DIFFERENCE DELY/REDELY
F.O. -1676.177MT-1676.847MT=0.670MT X USD  79=      (USD     52.93)
D.O. -198.685MT--196.197MT=2.488MT X USD 140         USD    348.32

LESS RECEIVED ON ACCOUNT 22/2 USD 57,998.50
                         25/2 USD 57,998.50
                         03/3 USD 57,998.50
                         11/3 USD 57,505.17
                         17/3 USD 57,998.50
                         23/3 USD 57,998.50
                         06/4 USD 61,912.50
                         08/4 USD 64,823.50
                         14/4 USD 64,823.50
                         21/4 USD 64,823.50
                         29/4 USD 64,823.50
                         06/5 USD 64,823.50
                         14/5 USD 64,806.00
                         19/5 USD 64,823.50
                         26/5 USD 64,823.50
                              --------------        (USD 927,980.67)
                                                    ----------------
DUE OWNERS                                          USD  13,834.64
                                                    ================

*Dely  $160,233:33*
*Redely. 159,937:94*

*295.3p*

PLEASE REMIT BY TELEGRAPHIC TRANSFER TO

CHASE MANHATTAN BANK NA
PO BOX 127
CHASE HOUSE
GRENVILLE STREET

CHASE MANHATTAN BANK C.I.
PO BOX 127
CHASE HOUSE
GRENVILLE STREET
ST.HELLIER
JERSEY JE4 8QH
CHANNEL ISLANDS
FOR CREDIT WINTERSEA MARITIME CORPORATION
USD ACCOUNT NR 6710018513
REF: M/V LEON


REGARDS
POLEMBROS


0601 212000 MRDN GR

:
0601212000+
212000 MRDN GR
23132  POLEGB G
23132  POLEGB G
212000 MRDN GR

---------------------------- END OF OUTGOING TLX ----------------------------

EXHIBIT P

Code word for this Charter Party
"SHELLTIME 4"

Issued December 1984

# ORIGINAL

# Time Charter Party

LONDON, 31 Dec  1997

## PETRIAN
## HIPBROKERS
## LIMITED

IT IS THIS DAY AGREED between  HARDFORD FINANCE INCORPORATED     1

of MONROVIA, LIBERIA      (hereinafter referred to as "Owners"), being owners of the    2

good    Greek flag.    vessel called  ILIAD      3

(hereinafter referred to as "the vessel") described as per Clause 1 hereof and  INTERNATIONAL OIL    4

OVERSEAS INC.   of PANAMA      (hereinafter referred to as "Charterers"):      5

**Description and Condition of Vessel**

1.    At the date of delivery of the vessel under this charter    6
   (a)   she shall be classed:    NK / NV     7
   (b)   she shall be in every way fit to carry crude petroleum and/or its products;    8

   (c)   she shall be tight, staunch, strong, in good order and condition, and in every way fit for the    9
service, with her machinery, boilers, hull and other equipment (including but not limited to hull stress calculator    10
and radar) in a good and efficient state;    11
   (d)   her tanks, valves and pipelines shall be oil-tight;    12
   (e)   she shall be in every way fitted for burning    13
     at sea – fueloil with a maximum viscosity of   180   Centistokes at 50 degrees Centigrade/any    14
     commercial grade of fueloil (=ACCFO) for main propulsion, marine diesel oil/ACCFO    15
     for auxiliaries    16
     in port – marine diesel oil/ACCFO for auxiliaries:    17
   (f)   she shall comply with the regulations in force so as to enable her to pass through the Suez and    18
Panama Canals by day and night without delay;    19
   (g)   she shall have on board all certificates, documents and equipment required from time to time by    20
any applicable law to enable her to perform the charter service without delay:    21
   (h)   she shall comply with the description in Form B appended hereto, provided however that if there    22
is any conflict between the provisions of Form B and any other provision, including this Clause 1, of this charter    23
such other provision shall govern.    24

**See International Oil Overseas Clause 2.**

**Shipboard Personnel and their Duties**

2.    (a)   At the date of delivery of the vessel under this charter    25
     (i)   she shall have a full and efficient complement of master, officers and crew for a vessel of her    26
tonnage, who shall in any event be not less than the number required by the laws of the flag state and who shall be    27
trained to operate the vessel and her equipment competently and safely:    28
     (ii)   all shipboard personnel shall hold valid certificates of competence in accordance with the    29
requirements of the law of the flag state;    30
     (iii)   all shipboard personnel shall be trained in accordance with the relevant provisions of the    31
International Convention on Standards of Training, Certification and Watchkeeping for Seafarers, 1978:    32
     (iv)   there shall be on board sufficient personnel with a good working knowledge of the English    33
language to enable cargo operations at loading and discharging places to be carried out efficiently and safely and    34
to enable communications between the vessel and those loading the vessel or accepting discharge therefrom to be    35
carried out quickly and efficiently.    36
   (b)   Owners guarantee that throughout the charter service the master shall with the vessel's officers    37
and crew, unless otherwise ordered by Charterers.    38
     (i)   prosecute all voyages with the utmost despatch:    39
     (ii)   render all customary assistance: and    40
     (iii)   load and discharge cargo as rapidly as possible when required by Charterers or their agents    41
to do so, by night or by day, but always in accordance with the laws of the place of loading or discharging (as the    42
case may be) and in each case in accordance with any applicable laws of the flag state.    43

**Duty to Maintain**

3.    (i)   Throughout the charter service Owners shall, whenever the passage of time, wear and tear or any    44
event (whether or not coming within Clause 27 hereof) requires steps to be taken to maintain or restore the    45
conditions stipulated in Clauses 1 and 2(a), exercise due diligence so to maintain or restore the vessel.    46
     (ii)   If at any time whilst the vessel is on hire under this charter the vessel fails to comply with the    47
requirements of Clauses 1, 2(a) or 10 then hire shall be reduced to the extent necessary to indemnify Charterers    48
for such failure. If and to the extent that such failure affects the time taken by the vessel to perform any services    49
under this charter, hire shall be reduced by an amount equal to the value, calculated at the rate of hire, of the time    50
so lost.    51
     Any reduction of hire under this sub-Clause (ii) shall be without prejudice to any other remedy    52
available to Charterers, but where such reduction of hire is in respect of time lost, such time shall be excluded    53
from any calculation under Clause 24,    54
     (iii)   If Owners are in breach of their obligation under Clause 3(i) Charterers may so notify Owners in    55
writing; and if, after the expiry of 30 days following the receipt by Owners of any such notice, Owners have failed    56
to demonstrate to Charterers' reasonable satisfaction the exercise of due diligence as required in Clause 3(i), the    57
vessel shall be off-hire, and no further hire payments shall be due, until Owners have so demonstrated that they    58
are exercising such due diligence.    59
     Furthermore, at any time while the vessel is off-hire under this Clause 3 Charterers have the    60
option to terminate this charter by giving notice in writing with effect from the date on which such notice of    61
termination is received by Owners or from any later date stated in such notice. This sub-Clause (iii) is without    62
prejudice to any rights of Charterers or obligations of Owners under this charter or otherwise (including without    63
limitation Charterers' rights under Clause 21 hereof).    64

| | | |
|---|---|---|
| Space Available to Charterers | 10. The whole reach, burthen and decks of the vessel and any passenger accommodation (including Owners' suite) shall be at Charterers' disposal, reserving only proper and sufficient space for the vessel's master, officers, crew, tackle, apparel, furniture, provisions and stores, provided that the weight of stores on board shall not, unless specially agreed, exceed _____ tonnes at any time during the charter period. | 129 130 131 132 |

**Overtime** 11. Overtime pay of the master, officers and crew in accordance with ship's articles shall be for Charterers' account when incurred, as a result of complying with the request of Charterers or their agents, for loading, discharging, heating of cargo, bunkering or tank cleaning. 133 134 135

**Instructions and Logs** 12. Charterers shall from time to time give the master all requisite instructions and sailing directions, and he shall keep a full and correct log of the voyage or voyages, which Charterers or their agents may inspect as required. The master shall when required furnish Charterers or their agents with a true copy of such log and with properly completed loading and discharging port sheets and voyage reports for each voyage and other returns as Charterers may require. Charterers shall be entitled to take copies at Owners' expense of any such documents which are not provided by the master. 136 137 138 139 140 141

**Bills of Lading** 13. (a) The master (although appointed by Owners) shall be under the orders and direction of Charterers as regards employment of the vessel, agency and other arrangements, and shall sign bills of lading as Charterers or their agents may direct (subject always to Clauses 35(a) and 40) without prejudice to this charter. Charterers hereby indemnify Owners against all consequences or liabilities that may arise
    (i) from signing bills of lading in accordance with the directions of Charterers or their agents, to the extent that the terms of such bills of lading fail to conform to the requirements of this charter, or (except as provided in Clause 13(b)) from the master otherwise complying with Charterers' or their agents' orders:
    (ii) from any irregularities in papers supplied by Charterers or their agents.
    (b) Notwithstanding the foregoing, Owners shall not be obliged to comply with any orders from Charterers to discharge all or part of the cargo
    (i) at any place other than that shown on the bill of lading and/or
    (ii) without presentation of an original bill of lading
unless they have received from Charterers both written confirmation of such orders and an indemnity in a form acceptable to Owners. 142 143 144 145 146 147 148 149 150 151 152 153 154 155

**Conduct of Vessel's Personnel** 14. If Charterers complain of the conduct of the master or any of the officers or crew, Owners shall immediately investigate the complaint. If the complaint proves to be well founded, Owners shall, without delay, make a change in the appointments and Owners shall in any event communicate the result of their investigations to Charterers as soon as possible. 156 157 158 159

**Bunkers at Delivery and Redelivery** 15. ~~Charterers shall accept and pay for all bunkers on board at the time of delivery, and Owners shall, on redelivery (whether it occurs at the end of the charter period or on the earlier termination of this charter) accept and pay for all bunkers remaining on board, at the then-current market prices at the port of delivery or redelivery, as the case may be, or if such prices are not available payment shall be at the then-current market prices at the nearest port at which such prices are available; provided that if delivery or redelivery does not take place in a port payment shall be at the price paid at the vessel's last port of bunkering before delivery or redelivery, as the case may be. Owners shall give Charterers the use and benefit of any fuel contracts they may have in force from time to time, if so required by Charterers, provided suppliers agree.~~ See International Oil Overseas Clause 5. 160 161 162 163 164 165 166 167

**Stevedores, Pilots, Tugs** 16. Stevedores when required shall be employed and paid by Charterers, but this shall not relieve Owners from responsibility at all times for proper stowage, which must be controlled by the master who shall keep a strict account of all cargo loaded and discharged. Owners hereby indemnify Charterers, their servants and agents against all losses, claims, responsibilities and liabilities arising in any way whatsoever from the employment of pilots, tugboats or stevedores, who although employed by Charterers shall be deemed to be the servants of and in the service of Owners and under their instructions (even if such pilots, tugboat personnel or stevedores are in fact the servants of Charterers their agents or any affiliated company); provided, however, that
    (i) the foregoing indemnity shall not exceed the amount to which Owners would have been entitled to limit their liability if they had themselves employed such pilots, tugboats or stevedores, and
    (ii) Charterers shall be liable for any damage to the vessel caused by or arising out of the use of stevedores, fair wear and tear excepted, to the extent that Owners are unable by the exercise of due diligence to obtain redress therefor from stevedores. 168 169 170 171 172 173 174 175 176 177 178 179

**Supernumeraries** 17. Charterers may send representatives in the vessel's available accommodation upon any voyage made under this charter. Owners finding provisions and all requisites as supplied to officers, except liquors. Charterers paying at the rate of _____ per day for each representative while on board the vessel. 180 181 182

**Sub-letting** 18. Charterers may sub-let the vessel, but shall always remain responsible to Owners for due fulfilment of this charter. 183 184

**Final Voyage** 19. If when a payment of hire is due hereunder Charterers reasonably expect to redeliver the vessel before the next payment of hire would fall due, the hire to be paid shall be assessed on Charterers' reasonable estimate of the time necessary to complete Charterers' programme up to redelivery. ~~and from which estimate Charterers may deduct amounts due or reasonably expected to become due for~~

**Owners'** /
    (i) ~~disbursements on Owners' behalf or charges for Owners' account pursuant to any provision hereof, and~~
    (ii) ~~bunkers on board at redelivery pursuant to Clause 15.~~

Promptly after redelivery any overpayment shall be refunded by Owners or any underpayment made good by Charterers.

If at the time this charter would otherwise terminate in accordance with Clause 4 the vessel is on a ballast voyage to a port of redelivery or is upon a laden voyage, Charterers shall continue to have the use of the vessel at the same rate and conditions as stand herein for as long as necessary to complete such ballast voyage, or to complete such laden voyage and return to a port of redelivery as provided by this charter, as the case may be. 185 186 187 188 189 190 191 192 193 194 195 196 197

5

(ii)   any additional time lost in further gas-freeing to meet the standard required for hot work or entry to cargo tanks shall count as off-hire, whether lost on passage to the drydocking port or after arrival there. 275 276

Any time which, but for sub-Clause (i) above, would be off-hire, shall not be included in any calculation under Clause 24. 277 278

The expenses of gas-freeing, including without limitation the cost of bunkers, shall be for Owners account. 279 280

(c)   If Owners require the vessel, instead of proceeding to the offered port, to carry out periodical drydocking at a special port selected by them, the vessel shall be off-hire from the time when she is released to proceed to the special port until she next presents for loading in accordance with Charterers' instructions, provided, however, that Charterers shall credit Owners with the time which would have been taken on passage at the service speed had the vessel not proceeded to drydock. All fuel consumed shall be paid for by Owners but Charterers shall credit Owners with the value of the fuel which would have been used on such notional passage calculated at the guaranteed daily consumption for the service speed, and shall further credit Owners with any benefit they may gain in purchasing bunkers at the special port. 281 282 283 284 285 286 287 288

(d)   Charterers shall, insofar as cleaning for periodical drydocking may have reduced the amount of tank-cleaning necessary to meet Charterers' requirements, credit Owners with the value of any bunkers which Charterers calculate to have been saved thereby, whether the vessel drydocks at an offered or a special port. 289 290 291

**Ship Inspection**

23.   Charterers shall have the right at any time during the charter period to make such inspection of the vessel as they may consider necessary. This right may be exercised as often and at such intervals as Charterers in their absolute discretion may determine and whether the vessel is in port or on passage. Owners affording all necessary co-operation and accommodation on board provided, however, 292 293 294 295

(i)   that neither the exercise nor the non-exercise, nor anything done or not done in the exercise or non-exercise, by Charterers of such right shall in any way reduce the master's or Owners' authority over, or responsibility to Charterers or third parties for, the vessel and every aspect of her operation, nor increase Charterers' responsibilities to Owners or third parties for the same; and 296 297 298 299

(ii)   that Charterers shall not be liable for any act, neglect or default by themselves, their servants or agents in the exercise or non-exercise of the aforesaid right. 300 301

**Detailed Description and Performance**

24.   ~~(c)   Owners guarantee that the speed and consumption of the vessel shall be as follows:~~ 302

| Average speed in knots | Maximum average bunker consumption | |
|---|---|---|
| | main propulsion fuel oil/diesel oil | auxiliaries fuel oil/diesel oil |
| ~~laden~~ | ~~tonnes~~ | ~~tonnes~~ |

303 304 305 306

See International Oil Overseas Clause 7.

**Ballast** 307

~~The foregoing bunker consumptions are for all purposes except cargo heating and tank cleaning~~ and shall be pro-rated between the speeds shown. 308 309

The service speed of the vessel is _____ knots laden and _____ knots in ballast and in the absence of Charterers' orders to the contrary the vessel shall proceed at the service speed. However if more than one laden and one ballast speed are shown in the table above Charterers shall have the right to order the vessel to steam at any speed within the range set out in the table (the "ordered speed"). 310 311 312 313

If the vessel is ordered to proceed at any speed other than the highest speed shown in the table, and the average speed actually attained by the vessel during the currency of such order exceeds such ordered speed plus 0.5 knots (the "maximum recognised speed"), then for the purpose of calculating any increase or decrease of hire under this Clause 24 the maximum recognised speed shall be used in place of the average speed actually attained. 314 315 316 317 318

For the purposes of this charter the "guaranteed speed" at any time shall be the then-current ordered speed or the service speed, as the case may be 319 320

The average speeds and bunker consumptions shall for the purposes of this Clause 24 be calculated by reference to the observed distance from pilot station to pilot station on all sea passages during each period stipulated in Clause 24 (c), but excluding any time during which the vessel is (or but for Clause 22 (b) (i) would be) offhire and also excluding "Adverse Weather Periods", being (i) any periods during which reduction of speed is necessary for safety in congested waters or in poor visibility (ii) any days, noon to noon, when winds ~~exceed force 8 on the Beaufort Scale for more than 12 hours.~~ 321 322 323 324 325 326

7

**Laying-up**

31.  Charterers shall have the option, after consultation with Owners, of requiring Owners to lay up the vessel at a safe place nominated by Charterers, in which case the hire provided for under this charter shall be adjusted to reflect any net increases in expenditure reasonably incurred or any net saving which should reasonably be made by Owners as a result of such lay-up. Charterers may exercise the said option any number of times during the charter period.

**Requisition**

32.  Should the vessel be requisitioned by any government, de facto or de jure, during the period of this charter, the vessel shall be off-hire during the period of such requisition, and any hire paid by such government in respect of such requisition period shall be for Owners' account. Any such requisition period shall count as part of the charter period.

**Outbreak of War**

33.  If war or hostilities break out between any two or more of the following countries: U.S.A., U.S.S.R., P.R.C., U.K., Netherlands–both Owners and Charterers shall have the right to cancel this charter.

**Additional War Expenses**

34.  If the vessel is ordered to trade in areas where there is war (de facto or de jure) or threat of war, Charterers shall reimburse Owners for any additional insurance premia, crew bonuses and other expenses which are reasonably incurred by Owners as a consequence of such orders, provided that Charterers are given notice of such expenses as soon as practicable and in any event before such expenses are incurred, and provided further that Owners obtain from their insurers a waiver of any subrogated rights against Charterers in respect of any claims by Owners under their war risk insurance arising out of compliance with such orders.

**War Risks**

35.  (a)  The master shall not be required or bound to sign bills of lading for any place which in his or Owners' reasonable opinion is dangerous or impossible for the vessel to enter or reach owing to any blockade, war, hostilities, warlike operations, civil war, civil commotions or revolutions.

(b)  If in the reasonable opinion of the master or Owners it becomes, for any of the reasons set out in Clause 35(a) or by the operation of international law, dangerous, impossible or prohibited for the vessel to reach or enter, or to load or discharge cargo at, any place to which the vessel has been ordered pursuant to this charter (a "place of peril"), then Charterers or their agents shall be immediately notified by telex or radio messages, and Charterers shall thereupon have the right to order the cargo, or such part of it as may be affected, to be loaded or discharged, as the case may be, at any other place within the trading limits of this charter (provided such other place is not itself a place of peril). If any place of discharge is or becomes a place of peril, and no orders have been received from Charterers or their agents within 48 hours after dispatch of such messages, then Owners shall be at liberty to discharge the cargo or such part of it as may be affected at any place which they or the master may in their or his discretion select within the trading limits of this charter and such discharge shall be deemed to be due fulfilment of Owners' obligations under this charter so far as cargo so discharged is concerned.

(c)  The vessel shall have liberty to comply with any directions or recommendations as to departure, arrival, routes, ports of call, stoppages, destinations, zones, waters, delivery or in any other wise whatsoever given by the government of the state under whose flag the vessel sails or any other government or local authority or by any person or body acting or purporting to act as or with the authority of any such government or local authority including any de facto government or local authority or by any person or body acting or purporting to act as or with the authority of any such government or local authority or by any committee or person having under the terms of the war risks insurance on the vessel the right to give any such directions or recommendations. If by reason of or in compliance with any such directions or recommendations anything is done or is not done, such shall not be deemed a deviation.

If by reason of or in compliance with any such direction or recommendation the vessel does not proceed to any place of discharge to which she has been ordered pursuant to this charter, the vessel may proceed to any place which the master or Owners in his or their discretion select and there discharge the cargo or such part of it as may be affected. Such discharge shall be deemed to be due fulfilment of Owners' obligations under this charter so far as cargo so discharged is concerned.

Charterers shall procure that all bills of lading issued under this charter shall contain the Chamber of Shipping War Risks Clause 1952.

**Both to Blame Collision Clause**

36.  If the liability for any collision in which the vessel is involved while performing this charter falls to be determined in accordance with the laws of the United States of America, the following provision shall apply:

"If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the master, mariner, pilot or the servants of the carrier in the navigation or in the management of the ship, the owners of the cargo carried hereunder will indemnify the carrier against all loss, or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of the said cargo, paid or payable by the other or non-carrying ship or her owners to the owners of the said cargo and set off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or carrier."

"The foregoing provisions shall also apply where the owners, operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect of a collision or contact."

Charterers shall procure that all bills of lading issued under this charter shall contain a provision in the foregoing terms to be applicable where the liability for any collision in which the vessel is involved falls to be determined in accordance with the laws of the United States of America.

**New Jason Clause**

37.  General average contributions shall be payable according to the York/Antwerp Rules, 1974, and shall be adjusted in London in accordance with English law and practice but should adjustment be made in accordance with the law and practice of the United States of America, the following provision shall apply:

"In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible by statute, contract or otherwise, the cargo, shippers, consignees or owners of the cargo shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo."

"If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover

401
401
402
403
404

405
406
407
408

409
410

411
412
413
414
415
416

417
418
419
420
421
422
423
424
425
426
427
428
429
430
431
432
433
434
435
436
437
438
439
440
441
442
443
444
445
446

447
448
449
450
451
452
453
454
455
456
457
458
459
460
461

462
463
464
465
466
467
468
469
470
471
472

9

| | |
|---|---|
| Law and<br>Litigation | 41. (a) This charter shall be construed and the relations between the parties determined in accordance with the laws of England.<br>(b) Any dispute arising under this charter shall be decided by the English Courts to whose jurisdiction the parties hereby agree.<br>(c) Notwithstanding the foregoing, but without prejudice to any party's right to arrest or maintain the arrest of any maritime property, either party may, by giving written notice of election to the other party, elect to have any such dispute referred to the arbitration of a single arbitrator in London in accordance with the provisions of the Arbitration Act 1950, or any statutory modification or re-enactment thereof for the time being in force.<br> (i) A party shall lose its right to make such an election only if:<br>  (a) it receives from the other party a written notice of dispute which –<br>   (1) states expressly that a dispute has arisen out of this charter;<br>   (2) specifies the nature of the dispute; and<br>   (3) refers expressly to this clause 41(c)<br>  and<br>  (b) it fails to give notice of election to have the dispute referred to arbitration not later than 30 days from the date of receipt of such notice of dispute.<br> (ii) The parties hereby agree that either party may –<br>  (a) appeal to the High Court on any question of law arising out of an award;<br>  (b) apply to the High Court for an order that the arbitrator state the reasons for his award;<br>  (c) give notice to the arbitrator that a reasoned award is required; and<br>  (d) apply to the High Court to determine any question of law arising in the course of the reference.<br>(d) It shall be a condition precedent to the right of any party to a stay of any legal proceedings in which maritime property has been, or may be, arrested in connection with a dispute under this charter, that that party furnishes to the other party security to which that other party would have been entitled in such legal proceedings in the absence of a stay. |
| Construction | 42. The side headings have been included in this charter for convenience of reference and shall in no way affect the construction hereof. |

547
548
549
550
551
552
553
554
555
556
557
558
559
560
561
562
563
564
565
566
567
568
569
570
571
572
573
574
575

Special Provisions Nos. 1 to 7 as attached are deemed incorporated in this Charter Party.

ILIAD - Time Charter Party dated 31st December 1996

Special Provisions - Page 1.

1. With reference to Clause 9, line 107 insert:
   In US Dollars by telegraphic transfer to:
   Chase Manhattan Bank N.A.,
   PO Box 1276.,
   Chase House,
   Grenville Street,
   St Helier,
   Jersey, JE4 8QH, Channel Islands.
   Credit:        Wintersea Maritime Corporation
   Account No:   6710018513
   Reference:    Iliad / CP 31/12/96

2. Vessel complies with OCIMF Ship to Ship Transfer Guidelines.

3. Owners advise vessel has slops on board.

4. Vessel fully inerted on delivery maximum six percent (6%) oxygen content.

5. Master to allow agents at load port to issue/sign Bill of Lading on his behalf, Charterers providing necessary documents to protect Owners' position in all respects. (If necessary as per Addendum to be agreed).

6. Address commission of 2.5 percent on hire deductible when paid.

   Commission of 1.25 percent payable by Owners to Petrian Shipbrokers Limited, London on hire as and when paid.

7. International Oil Overseas International Additional Clauses Nos. 1 to 40 as amended and attached are deemed incorporated in this Charter Party.

ILIAD - Time Charter Party dated 31st December 1996
INTERNATIONAL OIL OVERSEAS ADDITIONAL CLAUSES FOR TIME CHARTER
(SHELLTIME 4) (dated 01.08.1993)                                        (Page 1)

1) **TRADING**                                                    AMENDED
Arabian Gulf (excluding Iraq), Red Sea/India/East Africa (not south of Dar es Salaam), (excluding Israel.

2) **VESSEL DESCRIPTION:**

| | | |
|---|---|---|
| Name | : | m/t Iliad |
| Flag | : | Greek |
| Built | : | 1975 |
| Class | : | NK/NV |
| SDWT | : | 83,466 metric tons |
| Draft | : | 14.318 metres |
| Cubic capacity: | : | |
| LOA | : | 243.5 metres |
| Beam | : | 35.25 metres |
| Coated | : | |
| Coiled | : | |
| IGS/COW | : | Yes / Yes |
| Size and description of Reducers on board | : | |
| Pumping capacity | : | |
| Tank cleaning equipment | : | |

3) **HIRE PAYMENT:**                                             AMENDED
Charterers to pay first hire on delivery for seven (7) days, thereafter hire payable every seven (7) days in advance without deduction. If any payment is not received by the due date, or it is apparent that it will not be received, Owners to have the right to suspend voyage or operations and not resume until hire received. Any time so lost to count in full.

4) **CLEANING OF CARGO TANKS, LINES AND PUMPS:**                 AMENDED
Master of vessel to ensure that all cargo tanks completely dry and free of any water when presenting vessel for loading. The vessel has fixed or portable equipment on board necessary to undertake cleaning operation efficiently and timely without delay and such equipment will be maintained properly and kept on board the vessel throughout the Charter period in good working condition.

5) **BUNKERS: (Revised 14/01/96)**
The vessel is to be delivered with bunkers as on board (which if required are to be measured by independent cargo surveyor) and redelivered with at least the same quantity as on delivery, but maximum ten (10) percent more. During the period of the Charter the Charterers will replenish bunkers as necessary in their own time and at their own expense. In any event Charterers to provide bunkers prior to sailing first load port sufficient for return voyage to Pakistan so that vessel will have minimum quantity as on delivery.

ILIAD - Time Charter Party dated 31st December 1996
INTERNATIONAL OIL OVERSEAS ADDITIONAL CLAUSES FOR TIME CHARTER    Page 2.

In the event of an excess in quantity on redelivery, Owners shall make reimbursement at the following prices:

Fuel Oil 180 Centistokes          US$          per metric ton
Diesel Oil                        US$          per metric ton

6)   DRYDOCKING:
Owner warrants vessel will not dry dock during the period this Charter Party except due to Force Majeure.

7)   SPEED/CONSUMPTION:
With reference to Clause (24) of the Charter Party:
Approximate daily Speed/Consumption up to and including B4 and DSS4:
12 knots on 45 tons Fuel Oil (180) and 3.5 tons MDO (average laden/ballast)

Discharge:                        65 tons + 3.5 tons
Idle (boiler on standby):         6 tons + 3.5 tons

Maintain cargo temperature:       25 tons FO per day
Manoeuvring:                       2 tons MDO per hour
Loading:                          15 tons FO
Inerting:                         20 tons FO
Ballasting/deballasting:          15 tons FO per operation
Cleaning:                         25 tons FO

All above plus 3.5 metric tons MDO per day.

8)   BUNKERS ON BOARD:
On delivery vessel will have about 300 metric tons Fuel and about 50 metric tons Gasoil.

9)   FRESHWATER:
All fresh water required on board including boiler fresh water to be for Owners' account.

10)  CARGO RISK:
Cargo shall be loaded into the vessel at Charterers' expense and risk only up to vessel's receiving manifold. Cargo shall be discharged from the vessel at Owners' risk only up vessel's discharge manifold.

11)  SLOPS:                                                        AMENDED
Thereafter slops on board if any shall not be discharged without prior Charterers' approval and all costs for removal of such slops will be for Owners' account. Owners undertake to report to Charterers whenever slops accumulate and advise stowage, volume and proposed usage/disposal of such slops.

**ILIAD - Time Charter Party dated 31st December 1996**
**INTERNATIONAL OIL OVERSEAS ADDITIONAL CLAUSES FOR TIME CHARTER    Page 3.**

**12)    SAFETY AND CONDITION:**
Vessel's equipment, operation and manning shall be   in conformity   with approved and/or accepted international standards such as IMO and ICS/OCIMF with regard to safety and pollution prevention.   Any delays arising from vessel's failure to meet the above standards shall entitle to place the Charterers to place the vessel off-hire without prejudice to other remedies available to Charterers.

**13)    MANNING:**
In order to properly handle bunkering operations the vessel shall have as a minimum requirement the Master, two licensed Deck   Officers and   four   Able   Seamen available on deck throughout the operations.

**14)    PERFORMANCE:**                                              **AMENDED**
Owners waive any right to make an overperformance claim. This waiver shall not offset any underperformance claim made by Charterers.

**15)    ON HIRE/OFF HIRE SURVEY:**                                  **DELETED**

**16)    ELIGIBILITY:**                                             **AMENDED**
Owners warrant that the vessel is in all respects eligible for trading within, to and from ranges and areas specified in the Charter Party and at all times she shall have on board all certificates, records and other documents and equipment required for such service.

**17)    DRUG AND ALCOHOL CLAUSE:**
Owners warrant that they have a policy on Drug and Abuse ("Policy") applicable to the vessel which meets or exceeds the standards in the Oil Companies' Marine Forum Guidelines for the Control of Drugs and Alcohol on Board Ship ("OCIMF Guidelines"). Owners further warrant that this Policy is complied with. For the purposes of the Clause and the OCIMF Guidelines, alcohol impairment shall be defined as a blood alcohol content of 40 mg/100 ml or greater; the appropriate seafarers to be tested shall be all vessel officers and the drug/alcohol testing and screening shall include random testing of the officers with a frequency to ensure that each officer is tested at least once a year.

**18)    ETA CLAUSE:**
Master to give Charterers ETA loading port as soon as ordered and seven (7) days, 72/48/24/12 hours prior arrival at loading and discharge ports where time permits also ETA discharge port on sailing from load port as well as change in ETA exceeding six (6) hours in all cases.

**19)    BALLAST, INERT GAS SYSTEM AND CRUDE OIL WASHING:**
A. Vessel shall arrive at load port with clean ballast.

ILIAD - Time Charter Party dated 31st December 1996
INTERNATIONAL OIL OVERSEAS ADDITIONAL CLAUSES FOR TIME CHARTER    Page 4.

B. Owner warrants vessel has operable Crude Oil Washing and Inert Gas System, and both Systems shall be operational during duration of this Charter Party up to standard required by Loading Terminals by fully capable and qualified personnel.

20) **CERTIFICATES:**
Vessel to comply with latest effective MARPOL and IMO Regulations and to be kept in compliance throughout period.

All other National and International Certificates to be kept clean and valid including but not limited to Compliance on Civil Liabilities, FMC Certificates as per current Rules and Regulations and any changes in such Rules and Regulations. Owners warrant that the vessel will conform in all respects with the applicable parts of the requirements as defined by the "International Convention for the Prevention of Pollution from Ships 1973/1978". Such compliance to include but not to be limited to requirements as regards efficient stripping. The vessel is provided with a dual IOPP Certificate, necessitating inspection and certification by Class Surveyor.

Any delay caused to vessel due to any Certificate being unavailable or expired shall be totally for Owners' account.

21) **CARGO:**                                                           **AMENDED**
Charterers have the option of loading Crude Oil, Dirty Petroleum Products, Gasoil and Marine Diesel Oil, maximum........grades, but where vessel loads one grade on top of another for admixing purposes same to be treated as one grade.

Owners warrant vessel is able to segregate minimum two (2) grades with double valve, line and pump segregation. Owner warrants vessel able to load/discharge two (2) grades simultaneously without contamination.

**Charterers fully indemnify Owners for any claims arising as a result of admixing/co-mingling cargo.**

22) **PUMPING:**                                                         **AMENDED**
Owners warrant that the vessel can maintain at vessel's manifolds a pressure of average 100 PSI or that cargo can be discharged within twenty four (24) hours, except for stripping and crude oil washing, provided shore facilities permit and discharge is not interrupted. Owner warrants vessel can discharge two (2) grades simultaneously.

In ship to ship transfer operations, vessel warrants to achieve a discharge rate of up to 2,500 metric tons per hour and any rate requested by Charterer below such maximum down to 400 metric tons per hour, **provided receiving vessel is capable of receiving same.** Vessel has on board a sufficient range of reducers to allow connection to various hose line diameters and terminal cargo manifolds.

ILIAD - Time Charter Party dated 31st December 1996
INTERNATIONAL OIL OVERSEAS ADDITIONAL CLAUSES FOR TIME CHARTER   Page 5.

23)   **SHIP TO SHIP TRANSFER OPERATIONS:**
If required by the Charterers the vessel shall load and/or discharge full or part cargo alongside other vessel(s) in port or at a safe anchorage or under any other circumstances, provided they are safe and at Master's discretion, which shall not be unreasonably withheld.

Charterers are to provide suitable fenders/lines and hoses to safely effect such operations and have the option to store same on board for the duration of Charter Party. Handling of such equipment on board the vessel shall be by Owners' crew at Owners' cost. All such equipment shall be removed from the vessel by Charterers upon completion of Charter Party without delay.

Vessel's crew shall connect/disconnect cargo hoses, heave down/heave up fenders, take/throw connection lines, transfer to/transfer back cargo hoses and any other activities required for the completion and safe conduct of the ship to ship transfer operation for their account without any exclusion.

Owners warrant that the vessel is equipped with minimum ten (10) ton derricks port and starboard amidships to handle bunker lines/cargo hoses.

All extra insurance for above ship to ship lighterage operations shall be for Owners' account and Charterers have no liability for hull or other damage, if any, that may occur during such operations. Owners warrant that the vessel is equipped and capable of safely carrying out all procedures as set out in the latest revised edition of the ICS/OCIMF SHIP TO SHIP TRANSFER GUIDE.

Ship to Ship Transfer may include Charterers' very large crude barge (VLCB) of about 34,500 tons deadweight chartered to perform such operations.

24)   **SUPERCARGO:**
Charterers shall have the option to place on board one supercargo at any time during this Charter Party. Owner is to provide such supercargo with good accommodation with private bath and food at Captain's table at a cost of US$7.00 per day at Charterers' expense. Supercargo will be allowed access, to investigate, ullage and sample all cargo, slop, bunker, and ballast tanks, also any void spaces, and access to any other parts of vessel that may relate to carriage of cargo as he may require. He shall also have the right to require selected valves on bunker and cargo systems to be sealed to preclude the possibility of cargo/product/bunker migrations.

25)   **PROTECTION & INDEMNITY INSURANCE:**
Owner warrants the vessel is a member of the **Liverpool & London P&I Club** and is complying with the revised P&I TOVALOP Clause 1987 as attached all in good standing. Owner warrants that vessel holds a pollution cover of US$500 million, and additional US$200 million during full time of Charter Party. Owners agree to allow Charterers to have the benefit of Owners' P&I insurance to the extent the Rules of that Association permits. Owners to be responsible for all third party claims which fall under Owners' responsibility.

ILIAD - Time Charter Party dated 31st December 1996
INTERNATIONAL OIL OVERSEAS ADDITIONAL CLAUSES FOR TIME CHARTER    Page 6.

**26)    SAFETY:**
The vessel is to comply with the latest Safety at Sea and other Safety Regulations.

**27)    INSURED VALUE:**
The vessel insured value is US$............................

**28)    COMMUNICATIONS:**
The Master is to allow Charterers' supercargo the use of vessel's communication equipment for reasonable operational purposes without charge.

Vessel shall maintain twenty four (24) hour listening watch on VHF Channel 16/14.

**29)    TRADING HISTORY:**
Owners guarantee that the vessel is not boycotted by the Arab League and has never traded to Israel.

**30)    AGENCY:**
Charterers' agents shall attend to all matters relating to Charterers' obligations. Owners shall appoint their agents to attend to all matters relating to Owners' obligations.

**31)    ACCESS:**
The Master shall not allow any vessel or craft, other than those of port authorities or pilots, to secure alongside without the express authority of Charterers.

**32)    MOORING:**
Owners shall provide vessel with appropriate wires/lines for safe   mooring at all terminals within the ranges/areas specified herein.

**33)    OVER AGE INSURANCE:**                                          DELETED

**34)    QUANTITATIVE RESPONSIBILITY:**
Although Charterers' surveyor may be monitoring any transfer operation, this does not relieve Master or Owners of responsibility for verifying the quantity involved in each oil movement nor for liability under the terms of this Charter Party for any oil losses.

**35)    BERTH OCCUPANCY:**                                            AMENDED
Owners warrant vessel shall vacate the berth after completion of ballasting or within one and a half hours following completion of loading/discharging. Any delays not attributable to vessel to be for **Charterers' account.**

ILIAD - Time Charter Party dated 31st December 1996
INTERNATIONAL OIL OVERSEAS ADDITIONAL CLAUSES FOR TIME CHARTER   Page 7.

36)   PRIVACY:                                                                AMENDED
      All negotiations/eventual fixture to be kept strictly private and confidential and not
      to be discussed with any third party.

37)   WAR RISKS:                                                             AMENDED
      Any increase of hull and machinery war risk premia over and above those in effect on
      the date of this Charter Party will be for Charterers' account. Any premia or
      increases thereto attributable to closure (i.e. blocking and trapping) insurance shall be
      for Owners' account.

      Surcharges which are in effect on the date of this Charter Party are for Owners'
      account.

38)   CHARTERERS' UNDERWRITERS' CLAUSE:                                      DELETED

39)                                                                         DELETED

40)   With reference to Shell Time 4 Bill of Lading Clause 13 add at the end of the clause
      the words "Without Bank Guarantee or countersignature."

**P&I REVISED TOVALOP CLAUSE 1987**

Owners warrant that the vessel is a Participating Tanker in TOVALOP and will so remain during this Charter, provided however that nothing herein shall prevent Owners, upon prior notice to Charterers, from withdrawing from TOVALOP under Clauses III(D) or X thereof, and provided further that upon any withdrawal under Clause III(B) or under Clause X, following an amendment to TOVALOP which does not materially increase the obligation of the Parties thereunder, Charterers shall have the option to terminate this Charter.

When an escape or discharge of Oil occurs from the vessel and causes or threatens to cause Pollution Damage, or when there is the Threat of an escape or discharge of Oil (i.e. a grave and imminent danger of the escape or discharge of Oil which, if it occurred, would create a serious danger of Pollution Damage), then Charterers may, at the option, upon notice to Owners or Master, undertake such measures as are reasonably necessary to prevent or minimise such Damage or to remove the Threat, unless Owners promptly undertake the same. Charterers shall keep owners advised of the nature and result of any such measure taken by them, and if time permits, the nature of the measures intended to be taken by them. Any of the aforementioned measured taken by Charterers shall be deemed taken on Owners' authority and as Owners' agents, and shall be at Owners' expense except to the extent that:

(1)     Any such escape or discharge or Threat was caused or contributed to by Charterers, or

(2)     By reason of the exception set out in Article III, Paragraph 2, of the 1969 International Convention on Civil Liability for Oil Pollution Damage, Owners are or, had the said Convention applied to such escape or discharge or to the Threat, would have been exempt from liability for the same, or

(3)     The costs of such measures together with all other liability, costs and expenses of Owners arising out of or in connection with such escape or discharge or Threat removal exceeds One Hundred and Sixty United States Dollars per ton or Sixteen Million Eight Hundred Thousand United States Dollars, whichever is the lesser, save insofar as Owners shall be entitled to remover such excess under either the 1971 International Convention on the establishment of an International Fund for Compensation for Oil Pollution Damage or under CRISTAL, provided that in any incident to which the TOVALOP Supplement applies the Owners' limit of liability hereunder shall be that provided for in the said Supplement;

PROVIDED ALWAYS that if Owners in their absolute discretion consider said measures should be discontinued, Owners shall so notify Charterers and thereafter Charterers shall have no right to continue said measures under the provisions of this Clause and all further liability to Charterers under this Clause shall thereupon cease.

The above provisions are not in derogation of such other rights as Charterers or Owners may have under the Charter or may otherwise have or acquire by Law or any International Convention or TOVALOP.

For the purpose of this Clause, the meaning of the term "Oil" and "Pollution Damage" shall be defined in TOVALOP and "ton" shall be understood in relation to "tonnage" as defined therein.

# EXHIBIT Q

9413497

: 
94.5497+
9413497PETIAN G
-23132  POLEGB G
DATE: 25/04/97
TIME: 14:57:10
REF:  28457


M/T ILIAD/IOOI  C/P 31/12/96

VESSEL DELIVERED TO CHRTRS ON ARRIVAL PILOT STATION YANBU ON 2ND
JANUARY 1997 AT 0845HRS WITH 458MT FUEL OIL AND 122MT DIESEL OIL AND
REDELIVERED TO OWNERS OFF FUJAIRAH 24TH APRIL 1997 2100HRS WITH
410.707MT FUEL OIL AND 113.495MT DIESEL OIL.

FINAL HIRE STATEMENT

FM  2/1/97 0845HRS
TO 24/4/97 2100HRS

112D 15H 15M OR 112.635417DAYS X USD 13,000=    USD 1,464,260.42

LESS COMM 2.5PCT                                (USD    36,606.51)

DIFFERENCE BETWEEN DELY-REDELY
F.O.  47.290MT (458MT-410.707MT) X USD 126=    USD     5,958.54
D.O.   8.505MT (120MT-113.495MT) X USD 232=    USD     1,973.16
                 122
LESS FW COST AT RABIGH                          (USD     2,267.00)

LESS FW COST AT RABIGH                          (USD     3,600.00)

LESS OWNERS EXPENSES                            (USD       315.00)

LESS OWNERS EXPENSES                            (USD       560.00)

LESS RCVD ON A/C                                (USD 1,412,588.00)
                                                -------------------
DUE OWNERS                                       USD    16,055.61
                                                ===================

PLEASE REMIT BY TELEGRAPHIC TRANSFER TO

CHASE MANHATTAN BANK NA
PO BOX 127
CHASE HOUSE
GRENVILLE STREET
ST.HELLIER
JERSEY JE4 8QH
CHANNEL ISLANDS
FOR CREDIT WINTERSEA MARITIME CORPORATION
USD ACCOUNT NR 6710018513


REGARDS
POLEMBROS

23132  POLEGB G